# Exhibit B

(First Amended Class Action Complaint [Dkt. No. 16]
*John Nashel and Tim Robinson v. The New York Times Company*
USDC, Eastern District of Michigan
Case No. 2:22-CV-10633)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JOHN NASHEL and TIM ROBINSON, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>THE NEW YORK TIMES COMPANY,<br><br>        Defendant. | Case No. 22-cv-10633-SJM-DRG<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs John Nashel and Tim Robinson, individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## INTRODUCTION

1.     Defendant The New York Times Company ("NYT") rented, exchanged, and/or otherwise disclosed detailed information about Plaintiffs' *The New York Times* newspaper subscriptions to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed Plaintiffs' information to aggressive advertisers, political organizations, and non-profit

companies. As a result, Plaintiffs have received a barrage of unwanted junk mail. By renting, exchanging, and/or otherwise disclosing Plaintiffs' Private Reading Information (defined below) during the relevant pre-July 31, 2016 time period,[1] NYT violated Michigan's Video Rental Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "VRPA").[2]

    2.    During the relevant pre-July 31, 2016 time period, *i.e.*, between March 24, 2016 and July 30, 2016, numerous list brokers, data aggregators, data cooperatives, data brokers, and others, including but not limited to NextMark, Experian, Direct Magazine, and, on information and belief, Infogroup (now known as Data Axle), acting as third-party intermediaries on behalf of NYT, obtained from NYT and then disclosed to numerous other third parties the Private Reading

---

[1]    The statutory period for this action is six years. *See* M.C.L. § 600.5813.

[2]    In May 2016, the Michigan legislature amended the VRPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the VRPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the VRPA, the pre-amendment version of the VRPA applies in this case. *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. Sept. 28, 2018).

Information of all of the subscribers and recently expired subscribers to *The New York Times* and NYT's other publications. In addition to disclosing to numerous list brokers, data aggregators, data cooperatives, data brokers, and other such entities during the relevant pre-July 31, 2016 time period, NYT also disclosed all of its customers' Private Reading Information to other publishers (and their agents and affiliates) in exchange for the private reading information of individuals who had purchased publications from those publishers.

3. Documented evidence confirms these facts. For example, in 2007, a list broker, NextMark, Inc. ("NextMark"), offered to provide renters access to the mailing list titled "The New York Times Mailing List", which contained the Private Reading Information of 1,144,786 of NYT's active U.S. subscribers at a base price of "$135.00/M [per thousand]," (*i.e.*, 13.5 cents apiece), as shown in the screenshot below:



*See* **Exhibit A** hereto.

4.      And in 2008, another list broker, Direct Magazine, offered to provide renters access to the mailing list titled "The New York Times Enhanced Database", which contained the Private Reading Information of 1,148,550 of NYT's active U.S. subscribers at a base price of "$135.00/M [per thousand]," (*i.e.*, 13.5 cents apiece), as shown in the screenshot below:

4



*See* **Exhibit B** hereto.[3]

5.      Notably, the Direct Magazine offering confirms that *The New York Times* subscriber information has been shared and supplemented, or enhanced, with third-party Experian's demographic data prior to being rented out to third-party mailers including "[f]undraiser[s]." For example, the "DESCRIPTION" portion of the offering reads, "While subscribers to The New York Times share many interests from the arts to sports, Experian INSOURCE data lets you target over 35 different

---

[3]      *See also* **Exhibit C,** Chris Jay Hoofnagle & Jennifer King, *Consumer Information Sharing: Where the Sun Still Don't Shine*, at 12, Univ. of California School of Law, 2008, http://www.law.berkeley.edu/files/sb27report.pdf.

5

lifestyle and demographic selects.  The INSOURCE Database is updated continually in a transactional environment from thousands of public and proprietary sources to identify the prime New York Times subscribers who are most likely to respond to specific types of offers. . . .  Mailers serving the needs of an upscale, educated audience will reach their target with these readers as identified by INSOURCE lifestyle and demographics enhanced."

6.    Although at some point NYT ceased making its "data cards" available on list brokers' publicly accessible websites (the data cards shown above are no longer publicly advertised online), NYT nonetheless continued to sell, rent, exchange, and/or otherwise disclose all of its subscribers' Private Reading Information to data aggregators, data appenders, data cooperatives, and list brokers, among others, throughout the relevant pre-July 31, 2016 time period.  Indeed, Plaintiffs' counsel's investigation into this matter has revealed that, throughout the relevant pre-July 31, 2016 time period, NYT stated in its "Privacy Policy" on its website that it was actively selling, renting, exchanging, or otherwise disclosing its subscribers' Private Reading Information:

> If you are a print subscriber, we may exchange or rent your name and mailing address (but not your email address) and certain other information, such as when you first subscribed to The New York Times with other reputable companies that offer marketing information or products

through direct mail.[4]

7.    Moreover, in 2020, a publication titled "Direct Digital Data Drive Marketing 5th Edition" was released that featured a "case study" on the marketing strategies employed by Virginia Beach, Virginia to boost the city's tourism.[5]  The publication described how Virginia Beach had rented *The New York Times* subscriber list as part of this effort, stating in pertinent part:

> Virginia Beach employs a multi-media marketing strategy, including magazines, interactive/online, broadcast television and radio, as well as select newspapers. Its marketing strategy is designed to achieve two objectives: (1) to generate awareness of Virginia Beach as a quality, year- round destination; and (2) to drive traffic to its tourism websites, VisitVirginiaBeach.com and LiveTheLife.com. Virginia Beach marketers have used list-rental strategies to identify e-mail lists that might prove to be useful in connecting with prospective tourists. They have recently run a dedicated Virginia Beach e-mail campaign with lists from WeatherBug, eTarget Media, iExplore, Orbitz, Sherman's Travel, Daily Candy, *The New York Times*, *The Washington Post*, *The News & Observer* (Raleigh, NC), eBrains, and *The Baltimore Sun*.[6]

---

[4]    **Exhibit D**, The New York Times, *Privacy Policy*, June 10, 2015, https://web.archive.org/web/20160731042525/http://www.nytimes.com/content/help/rights/privacy/policy/privacy-policy.html (last visited June 20, 2022).

[5]    Lisa Spiller, *Direct, Digital & Data-Driven Marketing 5th Ed.*, SAGE Publications Ltd. (2020), http://books.google.com/books?id=fSPLDwAAQBAJ.

[6]    *Id.* at 272.

7

8.     These are but a handful of examples to illustrate NYT's practices of selling, renting, exchanging, and/or otherwise disclosing the Private Reading Information of its entire subscriber-base during the relevant pre-July 31, 2016 time period.  The reality is that NYT disclosed its subscribers' Private Reading Information, including that of the Plaintiffs and the members of the Class, to numerous third parties (the identities of which are not fully known at this time) without consent during this time frame. A reasonable opportunity for discovery will reveal the depth of NYT's wrongdoing.

9.     The VRPA clearly prohibits what NYT has done.  Subsection 2 of the VRPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

VRPA § 2. Thus, by renting, exchanging, or otherwise disclosing the Private Reading Information of its Michigan-based subscribers during the relevant pre-July 31, 2016 time period, NYT violated the VRPA.

10.     Accordingly, Plaintiffs bring this First Amended Class Action Complaint against NYT for its intentional and unlawful disclosure of its customers' Private Reading Information in violation of the VRPA.

8

## NATURE OF THE CASE

11.     To supplement its revenues, NYT rents, exchanges, or otherwise discloses its customers' information—including their full names, titles of publications subscribed to, and home addresses (collectively "Private Reading Information"), as well as myriad other categories of individualized data and demographic information such as gender and age—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers.

12.     By renting, exchanging, or otherwise disclosing—rather than selling—its customers' Private Reading Information, NYT is able to disclose the information time and time again to countless third parties.

13.     NYT's disclosures of Private Reading Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.  For example, anyone could buy a customer list provided by NYT that contains the names and addresses of all women over the age of 80 who subscribe to *The New York Times* and live in Detroit.

14.     While NYT profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Reading Information and other individualized information, it does so at the expense of its customers' statutory

privacy rights (afforded by the VRPA) because NYT does not obtain its customers' written consent prior to disclosing their Private Reading Information.

## **PARTIES**

15.     Plaintiff John Nashel is a natural person and citizen of the State of Michigan and resides in Allen Park, Michigan.

16.     Plaintiff Tim Robinson is a natural person and citizen of the State of Michigan and resides in Howell, Michigan.

17.     Plaintiffs were subscribers to *The New York Times*, including during the relevant pre-July 31, 2016 time period.  *The New York Times* is published by NYT.  While residing in, citizens of, and present in Michigan, Plaintiffs purchased their subscriptions to *The New York Times* newspaper directly from NYT.  Prior to and at the time Plaintiffs subscribed to *The New York Times*, NYT did not notify Plaintiffs that it discloses the Private Reading Information of its customers, and Plaintiffs have never authorized NYT to do so.  Furthermore, Plaintiffs were never provided any written notice that NYT rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out.   After subscribing to *The New York Times*, and during the relevant pre-July 31, 2016 time period, NYT disclosed, without the requisite consent or prior notice, Plaintiffs' Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files.

Moreover, during that same period, NYT rented or exchanged mailing lists containing Plaintiffs' Private Reading Information to third parties seeking to contact NYT subscribers, without first obtaining the requisite written consent from Plaintiffs or even giving them prior notice of the rentals, exchanges, and/or other disclosures. As a result of NYT's practices of disclosing their Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiffs saw a dramatic uptick of junk mail in their mailboxes over the same time period.

18.     Defendant The New York Times Company is a New York corporation with its headquarters and principal place of business in New York, New York. NYT does business throughout Michigan and the entire United States. NYT is the publisher of the newspapers *The New York Times* and *The New York Times International Edition* and the magazine *The New York Times Magazine*.

## **JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

20.     The Court has personal jurisdiction over NYT because Plaintiffs' claims arose in substantial part from actions and omissions in Michigan, including

11

from Plaintiffs' purchase of *The New York Times* subscriptions in Michigan, NYT's direction of such *The New York Times* subscriptions into Michigan, and NYT's failure to obtain Plaintiffs' written consent in Michigan prior to disclosing their Private Reading Information, including their residential addresses in Michigan, to another person, the effects of which were felt from within Michigan by a citizen and resident of Michigan. Personal jurisdiction also exists over NYT in Michigan because NYT conducts substantial business within Michigan, such that NYT has significant, continuous, and pervasive contacts with the State of Michigan.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because NYT is subject to personal jurisdiction in this judicial District, Plaintiffs reside in this judicial District, NYT does substantial business in this judicial District, and a substantial part of the events giving rise to Plaintiffs' claims took place within this judicial District.

## **FACTUAL BACKGROUND**

### ***Michigan's Video Rental Privacy Act***

22. In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."

12

S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

23.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the VRPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

24.     Subsection 2 of the VRPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

VRPA § 2 (emphasis added).

25.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.  This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

13

26.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

27.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities . . . reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id.*

28.     Michigan's passage of the VRPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter."  *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit E**).

29.     Despite the fact that thousands of Michigan residents subscribe to *The New York Times* and NYT's other publications, NYT disregarded its legal responsibility to these individuals by systematically violating the VRPA.

14

### *The Private Information Market:*
### *Consumers' Private Information Has Real Value*

30.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson

Swindle remarked that "the digital revolution . . . has given an enormous capacity

to the acts of collecting and transmitting and flowing of information, unlike anything

we've ever seen in our lifetimes . . . [and] individuals are concerned about being

defined by the existing data on themselves."[7]

31.     More than a decade later, Commissioner Swindle's comments ring

truer than ever, as consumer data feeds an information marketplace that supports a

$26 billion dollar per year online advertising industry in the United States.[8]

32.     The FTC has also recognized that consumer data possesses inherent

monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types
> and amount of information collected by businesses, or why
> their information may be commercially valuable. Data is
> currency. The larger the data set, the greater potential for

---

[7]     **Exhibit F**, The Information Marketplace: Merging and Exchanging
Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at*
https://www.ftc.gov/sites/default/files/documents/public_events/information-
marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited
July 30, 2021).

[8]     *See* **Exhibit G**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011),
http://online.wsj.com/article/SB10001424052748703529004576160764037920274
.html (last visited July 30, 2021).

analysis—and profit.[9]

33.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[10]

34.    The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[11]

35.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of

---

[9]    **Exhibit H**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at*: https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021) (emphasis added).

[10]    *See* **Exhibit I**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

[11]    **Exhibit J**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N120616S.pdf (last visited July 30, 2021).

16

information about consumers that are now available."[12]

36.      Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[13]

37.      In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[14]

38.      Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure

---

[12]      **Exhibit K**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

[13]      *See* **Exhibit L**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[14]      *Id.*

17

unsuspecting consumers into various scams,[15] including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like NYT share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[16]

39.      Information disclosures like those made by NYT are particularly dangerous to the elderly. As NYT has itself recognized in its own newspaper, "[o]lder Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[17] Indeed, the FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly

---

[15] *See* **Exhibit M**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

[16] **Exhibit N**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

[17] *Id.*

18

attractive offers."[18] Consequently, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

40.     Thus, information disclosures like NYT's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[19]

41.     NYT is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

42.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

---

[18]     **Exhibit O**, *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at*  https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf  (last visited June 20, 2022).

[19]     *See id.*

## *Consumers Place Monetary Value on their Privacy and*
## *Consider Privacy Practices When Making Purchases*

43.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

44.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[20]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[21]

45.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

46.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell

---

[20]     *See* **Exhibit P**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

[21]     *Id.*

their information themselves.[22]

47.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[23]

48.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[24]

### NYT *Unlawfully Rents, Exchanges, And Discloses Its Customers' Private Reading Information*

49.     NYT maintains a vast digital database comprised of its customers'

---

[22]     *See* **Exhibit Q**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

[23]     *See* **Exhibit R**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[24]     *See* **Exhibit S**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

Private Reading Information. NYT discloses its customers' Private Reading Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each NYT customer, including his or her gender and age.

50. NYT then rents and/or exchanges its mailing lists—which include subscribers' Private Reading Information identifying which individuals purchased subscriptions to particular newspapers, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts.

51. NYT also discloses its customers' Private Reading Information to data cooperatives, who in turn give NYT access to their own mailing list databases.

52. As a result of NYT's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from NYT that identify NYT's customers by their most intimate details such as their gender and age. NYT's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

53. NYT does not seek its customers' prior consent, written or otherwise, before making these disclosures and its customers remain unaware that their Private

22

Reading Information and other sensitive information is being rented and exchanged on the open market.

54.     NYT was engaged in these practices throughout the relevant pre-July 31, 2016 time period.  During that time period, NYT rented, sold, exchanged, or otherwise disclosed all of its subscribers' Private Reading Information to various data aggregators and appenders, data brokers, list managers, and other third parties, including, on information and belief, and without limitation, Infogroup (now known as Data Axle).

55.     Consumers can sign up for subscriptions to NYT's publications through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribes, NYT never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period. Consequently, during the relevant pre-July 31, 2016 time period, NYT uniformly failed to obtain any form of consent from—or even provide effective notice to—its customers before disclosing their Private Reading Information.

56.     As a result, during the relevant pre-July 31, 2016 time period, NYT disclosed its customers' Private Reading Information—including their reading habits and preferences that can "reveal intimate facts about our lives, from our

political and religious beliefs to our health concerns"[25]—to anybody willing to pay for it.

57.    By and through these actions, NYT intentionally disclosed to third parties its Michigan customers' Private Reading Information without consent during the relevant pre-July 31, 2016 time period, in direct violation of the VRPA.

## CLASS ACTION ALLEGATIONS

58.    Plaintiffs seek to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Reading Information disclosed to third parties by NYT without consent (the "Class"). Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

59.    Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the tens or hundreds of thousands. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

---

[25]    **Exhibit T**, *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

60.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to: (a) whether NYT is a "retailer or distributor" of publications (*i.e.*, newspapers); (b) whether NYT obtained consent before disclosing to third parties Plaintiffs' and the Class's Private Reading Information; and (c) whether NYT's disclosure of Plaintiffs' and the Class's Private Reading Information violated the VRPA.

61.    The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the VRPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiffs' and the Class's Private Reading Information.

62.    Plaintiffs are an adequate representative of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

63.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual

prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION
### Violation of Michigan's Video Rental Privacy Act
### (VRPA § 2)

64.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

65.     Plaintiffs bring this claim individually and on behalf of members of the Class against Defendant NYT.

66.     As a newspaper publisher that sells subscriptions to consumers, NYT is engaged in the business of selling written materials at retail. *See* VRPA § 2.

67.     By purchasing a subscription to *The New York Times*, each of the Plaintiffs purchased written materials directly from NYT. *See* VRPA § 2.

26

68.    Because Plaintiffs purchased written materials directly from NYT, each is a "customer" within the meaning of the VRPA. *See* VRPA § 1.

69.    At various times during the pre-July 31, 2016 time period, NYT disclosed Plaintiffs' Private Reading Information, which identified each as a *The New York Times* customer, in at least three ways.

70.    First, NYT disclosed mailing lists containing Plaintiffs' Private Reading Information (along with all of its other subscribers' Private Reading Information) to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to NYT.

71.    Second, NYT disclosed mailing lists containing Plaintiffs' Private Reading Information (along with all of its other subscribers' Private Reading Information) to data cooperatives, who in turn gave NYT access to their own mailing list databases.

72.    Third, NYT rented and/or exchanged its mailing lists containing Plaintiffs' Private Reading Information (along with all of its other subscribers' Private Reading Information)—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

27

73.    Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and NYT was able to increase its profits gained from the mailing list rentals and/or exchanges.

74.    By renting, exchanging, or otherwise disclosing its customer lists during the relevant pre-July 31, 2016 time period, NYT disclosed to persons other than Plaintiffs records or information concerning their purchases of written materials from NYT.  *See* VRPA § 2.

75.    The information NYT disclosed indicates Plaintiffs' names and addresses, as well as the fact that they subscribed to *The New York Times*. Accordingly, the records or information disclosed by NYT indicated Plaintiffs' identities.  *See* VRPA § 2.

76.    Plaintiffs and the members of the Class never consented to NYT disclosing their Private Reading Information to anyone.

77.    Worse yet, Plaintiffs and the members of the Class did not receive notice before NYT disclosed their Private Reading Information to third parties.

78.    NYT's disclosures of Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

79.    NYT's disclosures of Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made to

collect payment for their subscriptions.

80.     NYT's disclosures of Plaintiffs' Private Reading Information during the relevant pre-July 31, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase NYT's revenue.  Accordingly, NYT's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiffs and the members of the Class.

81.     By disclosing Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period, NYT violated Plaintiffs' and the Class's statutorily protected right to privacy in their reading habits.  *See* VRPA § 2.

82.     As a result of NYT's unlawful disclosure of their Private Reading Information, Plaintiffs and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the VRPA).  On behalf of themselves and the Class, Plaintiffs seek: (1) $5,000.00 to each of the Plaintiffs and each Class member pursuant to VRPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to VRPA § 5(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the

Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

B.      For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

C.      For an award of $5,000 to each of the Plaintiffs and each Class member, as provided by the Video Rental Privacy Act, VRPA § 5(a);

D.      For prejudgment interest on all amounts awarded; and

E.      For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: June 28, 2022                    Respectfully submitted,

**JOHN NASHEL & TIM ROBINSON**

By: */s/ E. Powell Miller*
One of Plaintiffs' Attorneys

E. Powell Miller
epm@millerlawpc.com
THE MILLER LAW FIRM
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248.841.2200

Philip L. Fraietta
pfraietta@bursor.com
Joseph I. Marchese
jmarchese@bursor.com
BURSOR & FISHER, P.A.

30

888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163

Frank S. Hedin
fhedin@hedinhall.com
Arun G. Ravindran
aravindran@hedinhall.com
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801

*Counsel for Plaintiffs and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I, E. Powell Miller, an attorney, hereby certify that on June 28, 2022, I served the above and foregoing ***Plaintiffs' First Amended Class Action Complaint*** on all counsel of record by filing it electronically with the Clerk of the Court using the CM/ECF filing system.


<u>        */s E. Powell Miller*</u>
E. Powell Miller