## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MARY LOU PETT; KATHLEEN FICK-GEE; DIANE BRYCE; PATTI DELVALLE; MICHELLE HOLCOMB; KIM READUS; ALICE REESE; ERIKA VAN ALLER, and LINDA WHITE, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>PUBLISHERS CLEARING HOUSE, INC.,<br><br>    Defendant. | Case No. 2:22-cv-11389-DPH-EAS<br><br>Hon. Denise Page Hood<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT[1]**<br><br>**JURY TRIAL DEMANDED** |

---

[1]   Plaintiffs file this Second Amended Class Action Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B), within 21 days of the filing of Defendant's Motion to Dismiss the First Amended Class Action Complaint. Plaintiffs note that the First Amended Complaint was filed with Defendant's written consent pursuant to Fed. R. Civ. P. 15(a)(2). *See Ramirez v. Cty. of San Bernardino*, 806 F.3d 1002, 1007 (9th Cir. 2015) (holding that Rule 15 "does not prescribe any particular sequence for the exercise of its provisions"); *see also Duncan v. Liberty Mut. Ins. Co.*, 2016 WL 9223846, at *1 (E.D. Mich. Sept. 28, 2016) ("plaintiff used her one free shot to file her second amended complaint. She was within her rights to do so because her first amended complaint was filed with the state court's permission, that is, under Fed. R. Civ. P. 15(a)(2)" (citing *Ramirez*, 806 F.3d at 1007)); *Nuclear Watch New Mexico v. United States Dep't of Energy*, 2018 WL 3405256, at *7 (D.N.M. July 12, 2018) ("[A] plaintiff preserves its as of right amendment under 15(a)(1) even if the plaintiff obtained previous amendments through a different provision of Rule 15."); *Thompson v. Jiffy Lube Int'l, Inc.*, 505 F. Supp. 2d 907, 913 (D. Kan. 2007) ("The plain language of [Rule 15] persuades the Court that Plaintiffs are still entitled to amend their pleading under Rule 15 [as a matter of course]" even though the plaintiffs had previously amended with the court's leave); *Doe #1 v. Syracuse Univ.*, 335 F.R.D. 356, 360 (N.D.N.Y. 2020) (finding plaintiffs were permitted to file third amended complaint where the first two amendments were granted pursuant to Rule 15(a)(2)).

Plaintiffs Mary Lou Pett ("Plaintiff Pett"), Kathleen Fick-Gee ("Plaintiff Fick-Gee"), Diane Bryce ("Plaintiff Bryce"), Patti DelValle ("Plaintiff DelValle"), Michelle Holcomb ("Plaintiff Holcomb"), Kim Readus ("Plaintiff Readus"), Alice Reese ("Plaintiff Reese"), Erika Van Aller ("Plaintiff Van Aller"), and Linda White ("Plaintiff White") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## **INTRODUCTION**

1.      Defendant Publishers Clearing House, Inc. ("PCH") rented, exchanged, and/or otherwise disclosed detailed information about Plaintiffs' purchases of written materials, sound recordings, and/or video recordings, including magazine subscriptions, to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed their information to aggressive advertisers, political organizations, and non-profit companies.  As a result, Plaintiffs have received a barrage of unwanted junk mail.  By renting, exchanging, and/or otherwise disclosing Plaintiffs' Private Purchase Information (defined below) during

the relevant pre-July 31, 2016 time period[2], PCH violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[3]

---

[2]     The statutory period for this action is six years. *See* M.C.L. § 600.5813. The applicable six-year limitation period was tolled for 101 days pursuant to Executive Orders issued by the Governor of Michigan during the COVID-19 pandemic. *See* Mich. Executive Order No. 2020-58 ("[A]ll deadlines applicable to the commencement of all civil and probate actions and proceedings, including but not limited to any deadline for filing an initial pleading . . . are suspended as of March 10, 2020 and shall be tolled until the end of the declared states of disaster and emergency.") (emphasis added); Mich. Supreme Court Administrative Order No. 2020-3 ("For all deadlines applicable to the commencement of all civil and probate case types, including but not limited to the deadline for the initial filing of a pleading . . . any day that falls during the state of emergency declared by the Governor related to COVID-19 is not included.") (emphasis added); Mich. Executive Order No. 2020-122 (ending tolling period on June 20, 2020); Mich. Supreme Court Administrative Order No. 2020-18 (same); *see also Straus v. Governor*, 592 N.W.2d 53, 57 (Mich. 1999) (under Michigan law "the Governor's action [in issuing an Executive Order] has the status of enacted legislation"); *Blaha v. A.H. Robins & Co.*, 708 F.2d 238, 239 (6th Cir. 1983) ("Pursuant to the *Erie* doctrine, state statutes of limitations must be applied by federal courts sitting in diversity.").

[3]     In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 682-83 (W.D. Mich. 2018).

2.      Documented evidence confirms these facts.  For example, on the website of list broker NextMark, Inc. ("NextMark"), PCH offers to provide renters access to the mailing list titled "Publishers Clearing House Magazine Buyers Mailing List", which contains the Private Purchase Information of all 647,541 of PCH's U.S.-based magazine subscription purchasers at a base price of "$100.00/M [per thousand]," (i.e., 10 cents apiece), as shown in the screenshot below:



*See* **Exhibit A** hereto.

3.      PCH also offers to provide renters access to the mailing list titled "Publishers Clearing House Book, Music & Video Buyers Mailing List", which

contains the Private Purchase Information of 1,429,511 of PCH's U.S.-based book,

music, and video purchasers at a base price of "$100.00/M [per thousand]," (i.e., 10

cents apiece), as shown in the screenshot below:



*See* **Exhibit B** hereto.

4.      The lists advertised for sale in the "data cards" shown above in

paragraphs 2 and 3 (and all of the "data cards" attached as exhibits to this pleading)

include, *inter alia*, the full names and addresses, of each person who purchased a

product from PCH and the types, titles, and genres of the products (including of the

written materials, video records, and sound recordings) that each of them purchased, as did the same lists advertised by and in fact disclosed by PCH throughout the relevant pre-July 31, 2016 time period, as discussed further below.

5. PCH has been continuously disclosing its customers' Private Purchase Information since as far back as 2002. Indeed, in March 2002, PCH announced that it had named List Services Corp. ("LSC") to serve as its list manager, effective April 1, 2002[4], in order "to generate revenue and to open the door to list exchanges by making the files available." *See* **Exhibit C** hereto ("List Services Corp. to Manage PCH Files," Chief Marketer, Mar. 20, 2002, available at https://www.chiefmarketer.com/list-services-corp-to-manage-pch-files/). "The files include magazine buyers, merchandise buyers, sweeps nos entries and pch.com buyers and entrants, Linda Gewirtz, senior director-prospect marketing for PCH, told DIRECT Newsline in February." *Id.*

6. From April 2002 through present day, and for the entire duration of the pre-July 31, 2016 time period, PCH continually and systematically disclosed – at least as frequently as once a month – all of its customers' Private Purchase

---

[4] *See also* "LSC to Manage Publishers Clearing House Files," Direct Marketing News, Apr. 1, 2022, available at https://www.dmnews.com/lsc-to-manage-publishers-clearing-house-files/ (last visited Nov. 8, 2022) (making announcement that LSC was selected to manage list on April 1, 2002, and explaining that lists available for rental and exchange contain names and addresses, among other details, about each person).

Information via list rentals, exchanges, and transfers to LSC and other third-party entities.  For example, in 2014, LSC's website advertised for rental the PCH customer list (and all of the related "selects" available for purchase for each customer, in addition to every customer's Private Purchase Information).  *See* **Exhibit D** hereto (webpage printout of The Wayback Machine's archived version of "About Publishers Clearing House Data" webpage on LSC's website in effect on Aug. 11, 2014, available at https://web.archive.org/web/20140811125849/http://www.listservices.com/pch/about.html).  The offering stated that the "PCH Buyers Masterfile" was "update[d]" on a "Monthly" basis, thus indicating that the arrangement between PCH and LSC has called for PCH to transmit its entire customer database to LSC on a monthly basis, which LSC has then systematically rented, exchanged, and otherwise disclosed to various third parties on PCH's behalf. *See id.*

7.     Copies of the data cards on LSC's website advertising the availability of the PCH "Masterfile" – i.e., PCH's entire customer database, which PCH transmitted to LSC (and innumerable other renters and exchangers of this data) – which were cached by The Wayback Machine in 2014, were available on LSC's website (and other websites, including Nextmark's) throughout the relevant pre-July 31, 2016 time period, and are still publicly accessible today on both LSC's and Nextmark's websites, thus demonstrating that, during the relevant pre-July 31, 2016

time period, PCH was disclosing its entire customer database to LSC, to various third party renters of the database, and to other companies who exchanged their own customer database with PCH in return for PCH's customer database. *See, e.g.*, **Exhibit E** hereto (webpage printout of The Wayback Machine's archived version of LSC webpage advertising availability of "PCH Modeling Masterfile" in effect on Sept. 11, 2014, available at https://web.archive.org/web/20140911091320/http://datacards.listservices.com/market;jsessionid=982BEB64CB3106F77E07B314E6596072?page=research/datacard &id=279809); **Exhibit F** hereto (webpage printout of LSC webpage advertising availability of the PCH "Masterfile" in effect on Nov. 8, 2022, available at http://datacards.listservices.com/market?page=research/datacard&id=96245); **Exhibit G** hereto (webpage printout of Nextmark webpage advertising availability of the "Publishers Clearing House Buyers Masterfile Mailing List" in effect on Nov. 8, 2022, available at https://lists.nextmark.com/market?page=order/online/datacard&id=96245).

Moreover, PCH also admitted on its own website, during the relevant pre-July 31, 2016 time period, that "[f]rom time to time we may share or exchange marketing information about the consumers who respond to our offers with other companies so they may contact you about products and services that may interest you." **Exhibit H** hereto (webpage printout of The Wayback Machine's archived version of "Other

Information" page of pch.com website in effect on July 29, 2016, accessible at https://web.archive.org/web/20160729153347/http://privacy.pch.com:80/). And on July 30, 2016, PCH stated as follows on the "mailing lists" page of its website: "Companies want to reach people who are most likely to be interested in what they have to offer. That's why Publishers Clearing House, like all major direct mail marketers, rents and buys relevant mailing lists to help us find prospective customers -- instead of just sending mail at random." **Exhibit I** hereto (webpage printout of The Wayback Machine's archived version of "Mailing Lists" page of pch.com website in effect on July 30, 2016, accessible at https://web.archive.org/web/20160730094459/http://info.pch.com:80/consumer-information/mailing-lists).

8.     Additionally, from 2002 through the present, including throughout the entire pre-July 31, 2016 time period, LSC has also acted as PCH's data appender by continuously using PCH's customer database (transmitted to it by PCH on at least as frequently as a monthly basis) to "enhance" PCH's consumer data files and LSC's other data files, including both its own consumer data files and other clients' consumer data files that it managed, by appending to the files other "demographic, ethnic, lifestyle, . . . and e-mail" information about each consumer listed in these files – which made PCH's list and LSC's other proprietary and client lists more valuable and allowed LSC (on PCH's and on each of its other customers' behalf) to

rent PCH's lists to third parties for more money and to exchange PCH's lists to third parties on more favorable terms.  *See* **Exhibit J** hereto (webpage printout of The Wayback Machine's archived version of "Directbase Enhanced Data" webpage on LSC's website in effect on June 30, 2016, available at https://web.archive.org/web/20160630080645/http://www.listservices.com/data/directbase-enhanced-data/).  As LSC stated on its website on June 30, 2016, squarely during the relevant pre-July 31, 2016 time period: "The same data that drives the success of LSC's DirectBase lists are also the building blocks for LSC's enhanced lists; files from USA TODAY to Publishers Clearing House. Take advantage of the added bonus an enhanced lists brings to the market." *Id.*

9.      Further confirming that PCH was continuously and systematically disclosing its entire customer database to LSC (and to innumerable other downstream entities who exchanged or rented PCH's customer database and "enhanced" customer database), in the manner alleged herein, is the following "testimonial" that Linda Gewirtz, Senior Marketing Director for Publisher's Clearing House, provides on the current version of LSC's website: "LSC Marketing Group has been a great partner, managing our file since it was put on the market in 2002. They have built a strong list rental program for PCH and we would not trust the management of our file to anyone else." **Exhibit K** hereto (webpage printout of "Testimonials" page of LSC's website in effect on Nov. 8, 2022, available at

https://lscmarketinggroup.com/testimonials/).

10.     Thus, for the entire duration of the pre-July 31, 2016 time period, PCH was actively renting, selling, exchanging, and otherwise disclosing all of its customers' Private Purchase Information (including Plaintiffs' and all Class members' Private Purchase Information) to LSC for management and appending, as well as to numerous other third party renters and exchangers of this data, on a systematic and continuous basis for the duration (at least as frequently as once a month).

11.     As a result of PCH's practices of disclosing Plaintiffs' Private Purchase Information during the relevant pre-July 31, 2016 time period, as alleged herein, Plaintiffs saw a dramatic uptick of junk mail in their mailboxes over the same time period.

12.     By renting, exchanging, or otherwise disclosing the Private Purchase Information of all of its Michigan-based customers during the relevant pre-July 31, 2016 time period, PCH violated the PPPA.  Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not disclose to any person, other than the customer, a record or information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer.

PPPA § 2.

11

13.     Accordingly, Plaintiffs bring this Second Amended Class Action Complaint against PCH for its intentional and unlawful disclosure of its customers' Private Purchase Information in violation of the PPPA.

## NATURE OF THE CASE

14.     To supplement its revenues, PCH rents, exchanges, or otherwise discloses its customers' information—including their full names, titles of the written materials (i.e., magazines, books, journals, newsletters, or newspapers) and/or audiovisual materials (i.e., sound recordings, including music or audiobooks, and video recordings, including television shows or movies) they purchased, and home addresses (collectively "Private Purchase Information"), as well as myriad other categories of individualized data and demographic information such as gender—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers.  PCH continuously and systematically engaged in these same practices (disclosing its entire database of its subscribers' Private Purchase Information to LSC and other third parties, at least as frequently as once a month) throughout the entire relevant pre-July 31, 2016 time period.

15.     By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Private Purchase Information, PCH is able to disclose the information time and time again to countless third parties.

16.     PCH's disclosure of Private Purchase Information and other

individualized information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.

17.    While PCH profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Purchase Information and other individualized information, it does so at the expense of its customers' statutory privacy rights (afforded by the PPPA) because PCH does not obtain its customers' written consent prior to disclosing their Private Purchase Information.

## **PARTIES**

18.    Plaintiff Pett is a natural person and citizen of the State of Michigan and resides in Auburn Hills, Michigan.  Plaintiff Pett purchased written materials, sound recordings, and/or video recordings sold by PCH, including but not limited to subscriptions to magazines, prior to July 31, 2016 (including during the relevant pre-July 31, 2016 time period).  While residing in, a citizen of, and present in Michigan, Plaintiff Pett purchased such products, including such magazine subscriptions, directly from PCH.  Prior to and at the time Plaintiff Pett purchased such products (including magazine subscriptions) from PCH, PCH did not notify Plaintiff Pett that it discloses the Private Purchase Information of its customers, and Plaintiff Pett has never authorized PCH to do so.  Furthermore, Plaintiff Pett was never provided any written notice that PCH rents, exchanges, or otherwise discloses its customers' Private Purchase Information, or any means of opting out.  Since purchasing

13

products (including magazine subscriptions) from PCH, and during the relevant pre-July 31, 2016 time period, PCH disclosed, without the requisite consent or prior notice, Plaintiff Pett's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files.  Moreover, during that same period, PCH rented or exchanged mailing lists containing Plaintiff Pett's Private Purchase Information to third parties seeking to contact PCH customers, without first obtaining the requisite written consent from Plaintiff Pett or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

19.    Plaintiff Fick-Gee is a natural person and citizen of the State of Michigan and resides in Freeland, Michigan.  Plaintiff Fick-Gee purchased written materials, sound recordings, and/or video recordings sold by PCH, including but not limited to subscriptions to magazines, prior to July 31, 2016 (including during the relevant pre-July 31, 2016 time period).  While residing in, a citizen of, and present in Michigan, Plaintiff Fick-Gee purchased such products, including such magazine subscriptions, directly from PCH.  Prior to and at the time Plaintiff Fick-Gee purchased such products (including magazine subscriptions) from PCH, PCH did not notify Plaintiff Fick-Gee that it discloses the Private Purchase Information of its customers, and Plaintiff Fick-Gee has never authorized PCH to do so.  Furthermore, Plaintiff Fick-Gee was never provided any written notice that PCH rents, exchanges,

14

or otherwise discloses its customers' Private Purchase Information, or any means of opting out.  Since purchasing products (including magazine subscriptions) from PCH, and during the relevant pre-July 31, 2016 time period, PCH disclosed, without the requisite consent or prior notice, Plaintiff Fick-Gee's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files. Moreover, during that same period, PCH rented or exchanged mailing lists containing Plaintiff Fick-Gee's Private Purchase Information to third parties seeking to contact PCH customers, without first obtaining the requisite written consent from Plaintiff Fick-Gee or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

20.     Plaintiff Bryce is a natural person and citizen of the State of Michigan and resides in Lapeer, Michigan.  Plaintiff Bryce purchased written materials, sound recordings, and/or video recordings sold by PCH, including but not limited to subscriptions to magazines, prior to July 31, 2016 (including during the relevant pre-July 31, 2016 time period).  While residing in, a citizen of, and present in Michigan, Plaintiff Bryce purchased such products, including such magazine subscriptions, directly from PCH.  Prior to and at the time Plaintiff Bryce purchased such products (including magazine subscriptions) from PCH, PCH did not notify Plaintiff Bryce that it discloses the Private Purchase Information of its customers, and Plaintiff Bryce has never authorized PCH to do so.  Furthermore, Plaintiff Bryce was never

provided any written notice that PCH rents, exchanges, or otherwise discloses its customers' Private Purchase Information, or any means of opting out. Since purchasing products (including magazine subscriptions) from PCH, and during the relevant pre-July 31, 2016 time period, PCH disclosed, without the requisite consent or prior notice, Plaintiff Bryce's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files. Moreover, during that same period, PCH rented or exchanged mailing lists containing Plaintiff Bryce's Private Purchase Information to third parties seeking to contact PCH customers, without first obtaining the requisite written consent from Plaintiff Bryce or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

21. Plaintiff DelValle is a natural person and citizen of the State of Michigan and resides in Ironwood, Michigan. Plaintiff DelValle purchased written materials, sound recordings, and/or video recordings sold by PCH, including but not limited to subscriptions to magazines, prior to July 31, 2016 (including during the relevant pre-July 31, 2016 time period). While residing in, a citizen of, and present in Michigan, Plaintiff DelValle purchased such products, including such magazine subscriptions, directly from PCH. Prior to and at the time Plaintiff DelValle purchased such products (including magazine subscriptions) from PCH, PCH did not notify Plaintiff DelValle that it discloses the Private Purchase Information of its

customers, and Plaintiff DelValle has never authorized PCH to do so. Furthermore, Plaintiff DelValle was never provided any written notice that PCH rents, exchanges, or otherwise discloses its customers' Private Purchase Information, or any means of opting out. Since purchasing products (including magazine subscriptions) from PCH, and during the relevant pre-July 31, 2016 time period, PCH disclosed, without the requisite consent or prior notice, Plaintiff DelValle's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files. Moreover, during that same period, PCH rented or exchanged mailing lists containing Plaintiff DelValle's Private Purchase Information to third parties seeking to contact PCH customers, without first obtaining the requisite written consent from Plaintiff DelValle or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

22. Plaintiff Holcomb is a natural person and citizen of the State of Michigan and resides in Dorr, Michigan. Plaintiff Holcomb purchased written materials, sound recordings, and/or video recordings sold by PCH, including but not limited to subscriptions to magazines, prior to July 31, 2016 (including during the relevant pre-July 31, 2016 time period). While residing in, a citizen of, and present in Michigan, Plaintiff Holcomb purchased such products, including such magazine subscriptions, directly from PCH. Prior to and at the time Plaintiff Holcomb purchased such products (including magazine subscriptions) from PCH, PCH did

not notify Plaintiff Holcomb that it discloses the Private Purchase Information of its customers, and Plaintiff Holcomb has never authorized PCH to do so.  Furthermore, Plaintiff Holcomb was never provided any written notice that PCH rents, exchanges, or otherwise discloses its customers' Private Purchase Information, or any means of opting out.  Since purchasing products (including magazine subscriptions) from PCH, and during the relevant pre-July 31, 2016 time period, PCH disclosed, without the requisite consent or prior notice, Plaintiff Holcomb's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files.  Moreover, during that same period, PCH rented or exchanged mailing lists containing Plaintiff Holcomb's Private Purchase Information to third parties seeking to contact PCH customers, without first obtaining the requisite written consent from Plaintiff Holcomb or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

23.     Plaintiff Readus is a natural person and citizen of the State of Michigan and resides in Detroit, Michigan.  Plaintiff Readus purchased written materials, sound recordings, and/or video recordings sold by PCH, including but not limited to subscriptions to magazines, prior to July 31, 2016 (including during the relevant pre-July 31, 2016 time period).  While residing in, a citizen of, and present in Michigan, Plaintiff Readus purchased such products, including such magazine subscriptions, directly from PCH.  Prior to and at the time Plaintiff Readus purchased such products

(including magazine subscriptions) from PCH, PCH did not notify Plaintiff Readus that it discloses the Private Purchase Information of its customers, and Plaintiff Readus has never authorized PCH to do so. Furthermore, Plaintiff Readus was never provided any written notice that PCH rents, exchanges, or otherwise discloses its customers' Private Purchase Information, or any means of opting out. Since purchasing products (including magazine subscriptions) from PCH, and during the relevant pre-July 31, 2016 time period, PCH disclosed, without the requisite consent or prior notice, Plaintiff Readus's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files. Moreover, during that same period, PCH rented or exchanged mailing lists containing Plaintiff Readus's Private Purchase Information to third parties seeking to contact PCH customers, without first obtaining the requisite written consent from Plaintiff Readus or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

24.     Plaintiff Reese is a natural person and citizen of the State of Michigan and resides in Monroe, Michigan. Plaintiff Reese purchased written materials, sound recordings, and/or video recordings sold by PCH, including but not limited to subscriptions to magazines, prior to July 31, 2016 (including during the relevant pre-July 31, 2016 time period). While residing in, a citizen of, and present in Michigan, Plaintiff Reese purchased such products, including such magazine subscriptions,

directly from PCH.  Prior to and at the time Plaintiff Reese purchased such products (including magazine subscriptions) from PCH, PCH did not notify Plaintiff Reese that it discloses the Private Purchase Information of its customers, and Plaintiff Reese has never authorized PCH to do so.  Furthermore, Plaintiff Reese was never provided any written notice that PCH rents, exchanges, or otherwise discloses its customers' Private Purchase Information, or any means of opting out.   Since purchasing products (including magazine subscriptions) from PCH, and during the relevant pre-July 31, 2016 time period, PCH disclosed, without the requisite consent or prior notice, Plaintiff Reese's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files.  Moreover, during that same period, PCH rented or exchanged mailing lists containing Plaintiff Reese's Private Purchase Information to third parties seeking to contact PCH customers, without first obtaining the requisite written consent from Plaintiff Reese or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

25.    Plaintiff Van Aller is a natural person and citizen of the State of Michigan and resides in Zeeland, Michigan.  Plaintiff Van Aller purchased written materials, sound recordings, and/or video recordings sold by PCH, including but not limited to subscriptions to magazines, prior to July 31, 2016 (including during the relevant pre-July 31, 2016 time period).  While residing in, a citizen of, and present

in Michigan, Plaintiff Van Aller purchased such products, including such magazine subscriptions, directly from PCH. Prior to and at the time Plaintiff Van Aller purchased such products (including magazine subscriptions) from PCH, PCH did not notify Plaintiff Van Aller that it discloses the Private Purchase Information of its customers, and Plaintiff Van Aller has never authorized PCH to do so. Furthermore, Plaintiff Van Aller was never provided any written notice that PCH rents, exchanges, or otherwise discloses its customers' Private Purchase Information, or any means of opting out. Since purchasing products (including magazine subscriptions) from PCH, and during the relevant pre-July 31, 2016 time period, PCH disclosed, without the requisite consent or prior notice, Plaintiff Van Aller's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files. Moreover, during that same period, PCH rented or exchanged mailing lists containing Plaintiff Van Aller's Private Purchase Information to third parties seeking to contact PCH customers, without first obtaining the requisite written consent from Plaintiff Van Aller or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

26.     Plaintiff White is a natural person and citizen of the State of Michigan and resides in Lapeer, Michigan. Plaintiff White purchased written materials, sound recordings, and/or video recordings sold by PCH, including but not limited to subscriptions to magazines, prior to July 31, 2016 (including during the relevant pre-

21

July 31, 2016 time period).  While residing in, a citizen of, and present in Michigan, Plaintiff White purchased such products, including such magazine subscriptions, directly from PCH.  Prior to and at the time Plaintiff White purchased such products (including magazine subscriptions) from PCH, PCH did not notify Plaintiff White that it discloses the Private Purchase Information of its customers, and Plaintiff White has never authorized PCH to do so.  Furthermore, Plaintiff White was never provided any written notice that PCH rents, exchanges, or otherwise discloses its customers' Private Purchase Information, or any means of opting out.   Since purchasing products (including magazine subscriptions) from PCH, and during the relevant pre-July 31, 2016 time period, PCH disclosed, without the requisite consent or prior notice, Plaintiff White's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files.  Moreover, during that same period, PCH rented or exchanged mailing lists containing Plaintiff White's Private Purchase Information to third parties seeking to contact PCH customers, without first obtaining the requisite written consent from Plaintiff White or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

27.    Defendant Publishers Clearing House, Inc. is a New York corporation with its headquarters and principal place of business in Jericho, New York.  PCH does business throughout Michigan and the entire United States. PCH sells

numerous written materials (i.e., magazines, books, journals, newsletters, and newspapers) and audiovisual materials (i.e., sound recordings, including music and audiobooks, and video recordings, including television shows and movies) directly to consumers, including *Interior Design* and *Remodeling* magazines.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

29.     The Court has personal jurisdiction over PCH because Plaintiffs' claims arose in substantial part from actions and omissions in Michigan, including from Plaintiffs' purchases of written and audio-visual materials from PCH in Michigan, PCH's direction of such products into Michigan, and PCH's failure to obtain Plaintiffs' written consent in Michigan prior to disclosing their Private Purchase Information, including their residential addresses in Michigan, to another person, the effects of which were felt from within Michigan by citizens and residents of Michigan.  Personal jurisdiction also exists over PCH in Michigan because PCH conducts substantial business within Michigan, such that PCH has significant, continuous, and pervasive contacts with the State of Michigan.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because at least one of the Plaintiffs resides in this judicial District, PCH does substantial business in this judicial District, PCH is subject to personal jurisdiction in this judicial District, and a substantial part of the events giving rise to Plaintiffs' claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

31.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

32.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

33.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

34.     Michigan's protection of reading, listening, and viewing information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.  This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

35.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

36.     Senator Leahy also explained why choices in movies, music, and reading materials are so private: "These activities . . . reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions,

our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id.*

37.    Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit L**).

38.    Despite the fact that thousands of Michigan residents have purchased written materials and other audiovisual materials from PCH, PCH disregarded its legal responsibilities to these individuals by systematically violating the PPPA.

### The Private Information Market:
### Consumers' Private Information Has Real Value

39.    In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[5]

---

[5]    **Exhibit M**, The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-

40.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[6]

41.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[7]

42.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive"

---

marketplace-merging-and-exchanging-consumer-data/transcript.pdf  (last  visited July 30, 2021).

[6]     *See* **Exhibit N**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited July 30, 2021).

[7]     **Exhibit O**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009),           at           2,           *available           at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf  (last  visited  July  30, 2021).

information in an open and largely unregulated market.[8]

43.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[9]

44.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[10]

45.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive

---

[8]     *See* **Exhibit P**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

[9]     **Exhibit Q**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N12061 6S.pdf (last visited July 30, 2021).

[10]    **Exhibit R**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

collections of consumer data.[11]

46.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[12]

47.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[13] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like PCH share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of

---

[11]    *See* **Exhibit S**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[12]    *Id.*

[13]    *See* **Exhibit   T**, *Prize   Scams*, Federal   Trade   Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

fraudulent telemarketers" and other criminals.[14]

48.     Information disclosures like those made by PCH are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[15]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[16] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

49.     Thus, information disclosures like PCH's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of

---

[14]    **Exhibit U**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

[15]    *Id.*

[16]    **Exhibit V**, *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (Aug. 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 30, 2021).

scam artists."[17]

50.     PCH is not alone in jeopardizing its customers' privacy and well-being in exchange for increased revenue: disclosing customer information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing, music, and movie industries.

51.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

52.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

53.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[18]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps

---

[17]     *See id.*

[18]     *See* **Exhibit W**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

that they don't believe protect their privacy online.[19]

54.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

55.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[20]

56.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace:  consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[21]

---

[19]     *Id.*

[20]     *See* **Exhibit X**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

[21]     *See* **Exhibit Y**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011), discussed in European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at*

57.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[22]

### PCH Unlawfully Rents, Exchanges, and Discloses
### Its Customers' Private Purchase Information

58.     PCH maintains a vast digital database comprised of its customers' Private Purchase Information.   PCH discloses its customers' Private Purchase Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each PCH customer, including his or her gender.  (*See, e.g.*, **Exhibits A & B**).

59.     PCH then rents and/or exchanges its mailing lists—which include its customers' Private Purchase Information identifying which individuals purchased particular written materials (i.e., magazines, books, journals, newsletters, and newspapers) and audiovisual materials (i.e., sound recordings, including music and audiobooks, and video recordings, including television shows and movies), and can include the sensitive information obtained from data aggregators and appenders— to other data aggregators and appenders, other consumer-facing businesses, non-

---

https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[22]     *See* **Exhibit Z**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits A & B**).

60.     PCH also discloses its customers' Private Purchase Information to data cooperatives, who in turn give PCH access to their own mailing list databases.

61.     As a result of PCH's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from PCH that identify PCH's customers by their most intimate details such as their reading, viewing, and listening habits and their gender.  PCH's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

62.     PCH does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their Private Purchase Information and other sensitive information is being rented and exchanged on the open market.

63.     PCH was engaged in these practices throughout the relevant pre-July 31, 2016 time period.  During that time period, PCH systematically rented, sold, exchanged, or otherwise disclosed all of its subscribers' Private Purchase Information to various data aggregators and appenders, data brokers, list managers, and other third parties, including but not limited to LSC.

34

64.     Consumers can purchase written materials (i.e., magazines, books, journals, newsletters, and newspapers) and audiovisual materials (i.e., sound recordings, including music and audiobooks, and video recordings, including television shows and movies) from PCH through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer makes a purchase, PCH has never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period.  Consequently, during the relevant pre-July 31, 2016 time period, PCH uniformly failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Private Purchase Information.

65.     As a result, PCH disclosed its customers' Private Purchase Information – including their reading, viewing, and listening habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[23] – to anybody willing to pay for it.

66.     By and through these actions, PCH has intentionally disclosed to third parties its Michigan customers' Private Purchase Information without consent, in direct violation of the PPPA.

---

[23]     **Exhibit AA**, *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

## CLASS ACTION ALLEGATIONS

67.     Plaintiffs seek to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Purchase Information disclosed to third parties by PCH without consent (the "Class").  Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

68.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

69.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to: (a) whether PCH is a "retailer or distributor" of written materials (i.e., magazines, books, journals, newsletters, and newspapers) and audiovisual materials (i.e., sound recordings, including music and audiobooks, and video recordings, including television shows and movies); (b) whether PCH obtained consent before disclosing to third parties Plaintiffs' and the Class's Private Purchase Information; and (c) whether PCH's

36

disclosure of Plaintiffs' and the Class's Private Purchase Information violated the PPPA.

70.     The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the PPPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosures of Plaintiffs' and the Class's Private Purchase Information.

71.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

72.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device

presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION
### Violation of Michigan's Preservation of Personal Privacy Act
### (PPPA § 2)

73.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

74.     Plaintiffs bring this claim individually and on behalf of members of the Class against Defendant PCH.

75.     As a company that sells magazine subscriptions, journals, newsletters, newspapers, books, music, audiobooks, and videos (including movies and television shows) directly to consumers, PCH is engaged in the business of selling written materials, sound recordings, and video recordings at retail. *See* PPPA § 2.

76.     By purchasing subscriptions to magazines and/or books from PCH, Plaintiffs and Class members purchased written materials directly from PCH. *See* PPPA § 2.

77.     By purchasing videos and music from PCH, Plaintiffs and Class members purchased video recordings and sound recordings directly from PCH. *See*

*id.*

78.    Because Plaintiffs and Class members purchased written materials, video recordings, and/or sound recordings directly from PCH, they are each a "customer" within the meaning of the PPPA.  *See* PPPA § 1.

79.    At various times during the pre-July 31, 2016 time period, PCH disclosed Plaintiffs' and Class members' Private Purchase Information, which identified each of them as a customer who purchased particular written materials, sound recordings, and/or video recordings, in at least three ways.

80.    First, PCH disclosed mailing lists containing Plaintiffs' and the Class's Private Purchase Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to PCH.

81.    Second, PCH disclosed mailing lists containing Plaintiffs' and the Class's Private Purchase Information to data cooperatives, who in turn gave PCH access to their own mailing list databases.

82.    Third, PCH rented and/or exchanged its mailing lists containing Plaintiffs' and the Class's Private Purchase Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

83.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and PCH was able to increase its profits gained from the mailing list rentals and/or exchanges.

84.     By renting, exchanging, or otherwise disclosing its customer lists during the relevant pre-July 31, 2016 time period, PCH disclosed to persons other than Plaintiffs and the Class members records or information concerning their purchases of written materials, sound recordings, and/or video recordings from PCH. *See* PPPA § 2.

85.     The information PCH disclosed indicates Plaintiffs' and Class members' names and addresses, as well as the fact that they purchased particular written materials (including but not limited to subscriptions to particular magazines), sound records, and/or video recordings.   Accordingly, the records or information disclosed by PCH indicated Plaintiffs' and the Class members' identities.  *See* PPPA § 2.

86.     Plaintiffs and the members of the Class never consented to PCH disclosing their Private Purchase Information to anyone.

87.     Worse yet, Plaintiffs and the members of the Class did not receive notice before PCH disclosed their Private Purchase Information to third parties.

88.     PCH's disclosures of Plaintiffs' and the Class's Private Purchase Information during the relevant pre-July 31, 2016 time period were not made

pursuant to a court order, search warrant, or grand jury subpoena.

89.  PCH's disclosures of Plaintiffs' and the Class's Private Purchase Information during the relevant pre-July 31, 2016 time period were not made to collect payment for the written materials, sound recordings, and/or video recordings they purchased.

90.  PCH's disclosures of Plaintiffs' and the Class's Private Purchase Information during the relevant pre-July 31, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase PCH's revenue.  Accordingly, PCH's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiffs and the members of the Class.

91.  By disclosing Plaintiffs' and the Class's Private Purchase Information during the relevant pre-July 31, 2016 time period, PCH violated Plaintiffs' and the Class's statutorily protected right to privacy in their reading, listening, and viewing habits.  *See* PPPA § 2.

92.  As a result of PCH's unlawful disclosures of their Private Purchase Information, Plaintiffs and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA).  On behalf of themselves and the Class, Plaintiffs seek: (1) $5,000.00 to each of the Plaintiffs and

each Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys'

fees pursuant to PPPA § 5(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly

situated, seek a judgment against Defendant as follows:

A.  For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

B.  For an order declaring that Defendant's conduct as described herein violated the PPPA;

C.  For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

D.  For an award of $5,000 to each of the Plaintiffs and each Class member, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a);

E.  For prejudgment interest on all amounts awarded; and

F.  For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: November 8, 2022                Respectfully submitted,

/s/ *E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM, P.C.

42

950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

Joseph I. Marchese
Philip L. Fraietta
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163
jmarchese@bursor.com
pfraietta@bursor.com

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801
fhedin@hedinhall.com
aravindran@hedinhall.com

*Counsel for Plaintiffs and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 8, 2022, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com