## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MARY LOU PETT; KATHLEEN FICK-GEE; DIANE BRYCE; PATTI DELVALLE; MICHELLE HOLCOMB; KIM READUS; ALICE REESE; ERIKA VAN ALLER; and LINDA WHITE, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>v.<br><br>PUBLISHERS CLEARING HOUSE, INC.,<br><br>          Defendant. | Civil Action No. 2:22-CV-11389-DPH-EAS<br><br>**DEFENDANT PUBLISHERS CLEARING HOUSE, LLC'S[1] MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**[Oral Argument Requested]**<br><br>Complaint Filed:     June 22, 2022<br>Complaint Served:   June 30, 2022<br>FAC Filed:             September 19, 2022<br>SAC Filed:             November 8, 2022 |

## DEFENDANT PUBLISHERS CLEARING HOUSE, LLC'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT

Defendant PUBLISHERS CLEARING HOUSE, LLC ("PCH") respectfully

requests that this Court dismiss Plaintiffs MARY LOU PETT's ("Pett"),

KATHLEEN FICK-GEE's ("Fick-Gee"), DIANE BRYCE's ("Bryce"), PATTI

DELVALLE's ("DelValle"), MICHELLE HOLCOMB's ("Holcomb"), KIM

READUS's ("Readus"), ALICE REESE's ("Reese"), ERIKA VAN ALLER's

("Van Aller"); and LINDA WHITE's ("White") (collectively, "Plaintiffs") First

---

[1] Erroneously sued as Publishers Clearing House, Inc.

Amended Class Action Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6) because Plaintiffs have failed to state a claim upon which the Court can grant relief ("Motion"). The brief submitted with this Motion explains the legal basis for the motion.

Pursuant to L.R. 7-1, counsel for PCH and counsel for Plaintiffs have met and conferred on several occasions, both over the phone and via email, since Plaintiffs filed the original Complaint, including as recently as December 5, 2022.  During those meet-and-confers, counsel discussed the subject matter of this Motion and the relief requested herein.  No concurrence could be obtained.

DATED: December 6, 2022

**BAKER & HOSTETLER LLP**

By: *s/ Matthew D. Pearson*
     Casie D. Collignon
     Matthew D. Pearson

BAKER HOSTETLER LLP
600 Anton Blvd., Suite 900
Costa Mesa, CA  92626
Tel.: (714) 754-6600
Fax: (714) 754-6611
Email:mpearson@bakerlaw.com
SBN 294302

Attorneys for Defendant
PUBLISHERS CLEARING
HOUSE, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2022, I caused to be electronically filed the foregoing **DEFENDANT PUBLISHERS CLEARING HOUSE, LLC'S MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT** using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Matthew D. Pearson*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MARY LOU PETT; KATHLEEN FICK-GEE; DIANE BRYCE; PATTI DELVALLE; MICHELLE HOLCOMB; KIM READUS; ALICE REESE; ERIKA VAN ALLER; and LINDA WHITE, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>PUBLISHERS CLEARING HOUSE, INC.,<br><br>        Defendant. | Civil Action No. 2:22-CV-11389-DPH-EAS<br><br>**BRIEF IN SUPPORT OF DEFENDANT PUBLISHERS CLEARING HOUSE, LLC'S[1] MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**[Oral Argument Requested]**<br><br>Complaint Filed: June 22, 2022<br>Complaint Served: June 30, 2022<br>FAC Filed: September 19, 2022<br>SAC Filed: November 8, 2022 |

## BRIEF IN SUPPORT OF DEFENDANT PUBLISHERS CLEARING HOUSE, LLC'S MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT

Defendant PUBLISHERS CLEARING HOUSE, LLC ("PCH") submits this Brief in Support of its Motion to Dismiss Plaintiffs MARY LOU PETT's ("Pett"), KATHLEEN FICK-GEE's ("Fick-Gee"), DIANE BRYCE's ("Bryce"), PATTI DELVALLE's ("DelValle"), MICHELLE HOLCOMB's ("Holcomb"), KIM READUS's ("Readus"), ALICE REESE's ("Reese"), ERIKA VAN ALLER's ("Van Aller"); and LINDA WHITE's ("White") (collectively, "Plaintiffs") Second Amended Class Action Complaint, [Dkt. No. 22] ("Motion").

---

[1] Erroneously sued as Publishers Clearing House, Inc.

# **TABLE OF CONTENTS**

**Page**

CONCISE STATEMENT OF ISSUES PRESENTED .............................................1

CONTROLLING OR MOST APPROPRIATE AUTHORITY ................................1

I.     INTRODUCTION..............................................................................................2

II.    PLAINTIFFS' ALLEGATIONS ......................................................................6

   A.     NextMark Allegations ...............................................................................8

   B.     LSC Allegations ........................................................................................8

III.   MOTION TO DISMISS STANDARD ............................................................9

IV.    ARGUMENT...................................................................................................10

   A.     Plaintiffs' Exact Allegations Have Already Been Twice Rejected By
          Courts, Including By This One..................................................................10

   B.     Plaintiffs' Deliberate Omissions Kill Their Claim...................................14

   C.     Plaintiffs' NextMark-Related and LSC-Related Allegations Do Not Save
          Their Claims. ............................................................................................16

      1.     NextMark-Related Allegations. ............................................................16

      2.     LSC-Related Allegations. .....................................................................20

V.    CONCLUSION ................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................9, 10

*Balistreri v. Pacifica Police Dep't.*,
    901 F. 2d 696 (9th Cir. 1990) .................................................................9

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................................9, 10

*Bishop v. Lucent Techs., Inc.*,
    520 F.3d 516 (6th Cir. 2008) ...............................................................10

*Greenberg v. Life Ins. Co. of Virginia*,
    177 F.3d 507 (6th Cir. 1999) ...............................................................17

*John Nashel & Tim Robinson, Plaintiffs, v. The New York Times
    Company, Defendant*,
    No. 2:22-CV-10633, 2022 WL 6775657 (E.D. Mich. Oct. 11,
    2022)
    ............................................................ 5, 6, 11, 12, 13, 15, 23

*King v. William Beaumont Hosp.*,
    No. 10-CV-13623-DT, 2011 WL 860656 (E.D. Mich. Mar. 9,
    2011) ....................................................................................16

*Mitchell v. City of Detroit*,
    114 F.3d 1188 (6th Cir. 1997) .............................................................13

*Pratt v. KSE Sportsman Media, Inc.*,
    No. 1:21-CV-11404, 2022 WL 469075 (E.D. Mich. Feb. 15, 2022) ...........14, 15

*Saddle Rock Partners, Ltd. v. Hiatt*,
    No. 95-2326 GA, 1996 WL 859986 (W.D. Tenn. Mar. 26, 1996)....................17

*Schutter v. Harold Zeigler Auto Grp., Inc.*,
    No. 1:18-CV-47, 2018 WL 1536538 (W.D. Mich. Mar. 29, 2018) ...................15

*Wheaton v. Apple Inc.*,
    No. C 19-02883 WHA, 2019 WL 5536214 (N.D. Cal. Oct. 25,
    2019)
    ................................................................................ 5, 6, 10, 11, 13, 15, 23

**State Statutes**

Michigan Comp. Laws Ann. § 445.1712, Sec. 2(a) ................................................14

## CONCISE STATEMENT OF ISSUES PRESENTED

1.  Whether Plaintiffs' Second Amended Class Action Complaint ("SAC")
    should be dismissed pursuant to Federal Rule of Civil Procedure
    12(b)(6) because Plaintiffs have not sufficiently alleged a plausible
    cause of action for a violation of the Michigan's Preservation of
    Personal Privacy Act, Mich. Comp. Law 445.1711, *et seq*. ("PPPA").

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

Authority:   *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v.
Twombly,* 550 U.S. 544, 556 (2007); *Wheaton v. Apple Inc.,* No. C 19-
02883 WHA, 2019 WL 5536214 (N.D. Cal. Oct. 25, 2019); *John
Nashel & Tim Robinson, Plaintiffs, v. The New York Times Company,
Defendant,* No. 2:22-CV-10633, 2022 WL 6775657 (E.D. Mich. Oct.
11, 2022).

## I.   <u>INTRODUCTION</u>

The PPPA was designed to protect an individual's right to privacy in his or her purchases, leases, or rentals of "books or other written materials, sound recordings, or video recordings." To achieve this result, the PPPA prohibits an entity "engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings…[from] knowingly disclos[ing] to any person, other than the customer, *a record or information that personally identifies the customer as having purchased, leased, rented, or borrowed those materials from the person engaged in the business*." In the SAC, Plaintiffs define this "record" as "Private Purchase Information." They claim that, prior to July 31, 2016, PCH "continuously" disclosed their Private Purchase Information to a myriad of largely unidentified third parties. Their claim, however, is nothing more than a legal conclusion unadorned and unsupported by any facts.

Since August 2021, at least 85 cases asserting violations of the PPPA have been filed in either this Court or the United States District Court for the Western District of Michigan. Of those 85 cases, the plaintiffs in 71 of them have based their claims on the representations made by a largely unknown, third-party "list broker" by the name of NextMark, Inc. ("NextMark"). More specifically, the plaintiffs in those 71 cases alleged that because NextMark claims on its website to be able to provide access to certain "mailing lists," the defendant ***must have*** disclosed that

2

"mailing list" in violation of the PPPA. In each of those 71 cases, the plaintiffs included within and/or attached to the complaint a screenshot of these third-party marketing websites. Not surprisingly, the plaintiffs' counsel in each of those cases were the same.

This case is plaintiffs' counsel's 85th PPPA class action, and their 71st based almost entirely on NextMark's website. Here, nine Plaintiffs filed suit against PCH, each asserting the exact same generic allegations. They claim that PCH violated the PPPA by disclosing to a third party, without Plaintiffs' consent and prior to July 31, 2016, Plaintiffs' names, addresses, and the fact that they purchased directly from PCH "written materials, sound recordings, and/or video recordings." They assert this claim on behalf of themselves and on behalf of a putative class of Michigan residents. For each alleged disclosure, they seek $5,000 in statutory damages based on a provision in the PPPA that has since been removed by the legislature and that has been held to apply only to disclosures that occurred prior to July 31, 2016.

The flaw in Plaintiffs' SAC, just like the flaw in nearly every PPPA claim filed by plaintiffs' counsel, is that Plaintiffs have not credibly alleged what (if anything) they purchased, when, and how—all of which are required to plead a viable PPPA claim. Plaintiffs claim to have made purchases prior to July 31, 2016— the last date on which statutory damages were available under the PPPA—yet they fail to provide any actual date of purchase or specify what they purchased. Moreover,

they claim that PCH disclosed, prior to July 31, 2016, their Private Purchase Information to a laundry list of third-party entities; yet, with the exception of their implausible allegations related to third-party marketing websites, they fail to specifically identify even one of those entities.

In fact, Plaintiffs' SAC, like most of the complaints filed in plaintiffs' counsel's PPPA class actions, depends almost entirely on third-party screenshots, none of which supports their allegation that PCH disclosed anything to anyone prior to July 31, 2016. First, nowhere in the screenshots does it state that NextMark or List Services Corp. ("LSC") is in possession of anyone's Private Purchase Information, let alone Plaintiffs'. In fact, NextMark's website states the opposite, referring any person interested in buying mailing lists to a third-party "list supplier." Second, even if either NextMark or LSC was in possession of information relating to Plaintiffs, none of the screenshots suggest that that information is Private Purchase Information. At best, NextMark and LSC claim to have access to the "Product/Subscription *Category*" of what was purchased, leased, or rented, not the name of the actual product or subscription itself. Finally, nowhere in the screenshots does it state that NextMark or LSC received the "mailing lists" (if they have them at all) prior to July 31, 2016.

This is not the first time that allegations related to third-party marketing websites in PPPA class actions have been challenged. Nor would it be the first time

that they have been held to be insufficient to state a viable claim under the PPPA. Indeed, they have been flatly rejected on at least two prior occasions, with the most recent occurring on October 11, 2022. First, in *Wheaton v. Apple Inc.* ("*Wheaton*")*, No. C 19-02883 WHA, 2019 WL 5536214, at *4 (N.D. Cal. Oct. 25, 2019), the United States District Court for the Northern District of California dismissed a PPPA claim, filed by these same Plaintiffs' attorneys, because questionable marketing screenshots did not "provide sufficient facts to support" the plaintiffs' claims, and plaintiffs had "failed to explain anything about" what, in fact, the third party operating the website actually possessed. Then, earlier this year, this Court in *John Nashel, et al. v. The New York Times Company* ("*Nashel*"), No. 2:22-CV-10633, 2022 WL 6775657 (E.D. Mich. Oct. 11, 2022), dismissed another PPPA putative class action that was filed by Plaintiffs' counsel here and that relied on screenshots from NextMark's website, stating that "Plaintiffs relied on evidence that creates only suspicion as to whether Defendant violated the PPPA during the pre-July 31, 2016 period" and that "a complaint containing a statement of facts that merely creates a suspicion of a legally cognizable right of action is insufficient." The same is true here; at best, the SAC raises only the suspicion of a PPPA claim against PCH.

Ultimately, Plaintiffs have failed entirely to assert a viable claim against PCH for violation of the PPPA. None of the Plaintiffs alleged sufficient facts to state a PPPA claim against PCH under which relief can be granted. If Plaintiffs truly

believed that PCH disclosed their Private Purchase Information, they could have (1) alleged exactly what they purchased; (2) alleged when they made that purchase; and/or (3) provided some proof that NextMark and/or LSC is or was actually in possession of a mailing list that included any of the Plaintiff's Private Purchase Information. They did not. Thus, just as the Northern District of California did in *Wheaton* and just as this Court did in *Nashel*, this Court should dismiss this case in its entirety and with prejudice.

## II.   PLAINTIFFS' ALLEGATIONS

Each of the nine named Plaintiffs makes the exact same allegations. **First**, they each allege that they are "natural person[s] and citizens of the State of Michigan," and reside in various Michigan cities. [SAC, ¶¶ 18-26.] **Second,** they each allege that they "purchased written materials, sound recordings, and/or video recordings sold by PCH, including but not limited to subscriptions to magazines, prior to July 31, 2016." [*Id.* at ¶¶ 18-26.] **Third**, they each allege that they purchased "such products, including such magazine subscriptions, directly from PCH." [*Id.* at ¶¶ 18-26.] **And fourth**, they each allege that "[s]ince purchasing products (including magazine subscriptions) from PCH, and during the relevant pre-July 31, 2016 time period, PCH disclosed, without the requisite consent or prior notice,…[their] Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files" and "rented

or exchanged mailing lists containing…[their] Private Purchase Information to third parties seeking to contact PCH customers, without first obtaining the requisite written consent from…[Plaintiffs] or even giving…[them] prior notice of the rentals, exchanges, and/or other disclosures." [*Id.* at ¶¶ 18-26.]

Throughout the SAC, Plaintiffs identify a myriad of types of third parties to which they claim PCH disclosed their Private Purchase Information. These third parties include "data aggregators," [SAC, ¶¶ 1, 14, 18-26, 58-59, 63, 80, 90]; "data appenders," [*id.* at ¶¶ 1, 14, 18-26, 58-59, 63, 80, 90]; "data cooperatives," [*id.* at ¶¶ 1, 14, 18-26, 60, 81, 90]; "list brokers," [*id.* at ¶¶ 1, 63]; "other consumer-facing businesses," [*id.* at ¶¶ 59, 82]; "non-profit companies," [*id.* at ¶ 1]; "non-profit organizations seeking to raise awareness and solicit donations," [*id.* at ¶ 59]; "political organizations soliciting donations, votes, and volunteer efforts," [*id.* at ¶¶ 1, 59]; "organizations soliciting monetary contributions, volunteer work, and votes," [*id.* at ¶¶ 82, 90]; "direct-mail advertisers," [*id.* at ¶¶ 82, 90]; "other third parties," [*id.* at ¶¶ 6, 14, 63]; and "anybody willing to pay for it," [*id.* at ¶ 65].

Plaintiffs  provide no specific facts to support of any of these allegations and, despite including a laundry list of types of entities to which Plaintiffs claim PCH disclosed their Private Purchase Information, only specifically identify two third parties that they claim possess their information—NextMark and LSC. Even so, Plaintiffs' allegations regarding these two entities are so vague and sparse that

Plaintiffs' bare assertions relating to them should have no impact on this Court's analysis at all.

### A.   <u>NextMark Allegations</u>

According to Plaintiffs, NextMark is a "list broker" on whose website "PCH offers to provide renters access to the mailing list titled 'Publishers Clearing House Magazine Buyers Mailing List', which contains the Private Purchase Information of all 647,541 of PCH's U.S.-based magazine subscription purchasers at a base price of '$100.00/M [per thousand][.]" [SAC, ¶ 2 (alterations in original).] Additionally, Plaintiffs allege that, on NextMark's website, "PCH also offers to provide renters access to the mailing list titled 'Publishers Clearing House Book, Music & Video Buyers Mailing List', which contains the Private Purchase Information of 1,429,511 of PCH's U.S.-based book, music, and video purchasers at a base price of '$100.00/M [per thousand][.]' [*Id.* at ¶ 3 (alterations in original).] In support of these two allegations, Plaintiffs include within and attach to their SAC two screenshots from NextMark's website. [*Id.* at ¶¶ 2-3, Exhibits A-B.]

### B.   <u>LSC Allegations</u>

LSC, according to Plaintiffs, "serves as [PCH's] list manager" and has served PCH in that role since "April 1, 2002." [SAC, ¶ 5.] The PCH "mailing lists" that LSC manages, Plaintiffs allege, "include magazine buyers, merchandise buyers, sweeps nos entries and pch.com buyers and entrants…." [*Id.*] Plaintiffs

further allege that, "for the entire duration of the pre-July 31, 2016 time period, PCH continuously and systematically disclosed—at least as frequently as once a month—all of its customer's Private Purchase Information via list rentals, exchanges, and transfer to LSC and other third-party entities." [*Id.* at ¶ 6.]

In support of their claims, Plaintiffs attach to the SAC Exhibits D through G, which they claim demonstrate that PCH violated the PPPA. [*Id.* at Exhibits D - G.]

## III.   <u>MOTION TO DISMISS STANDARD</u>

A complaint is subject to dismissal under Federal Rule of Civil Procedure 12(b)(6) if there are insufficient facts alleged under a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't.*, 901 F. 2d 696, 699 (9th Cir. 1990). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal* ("*Iqbal*"), 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly* ("*Twombly*"), 550 U.S. 544, 556 (2007)). "Facial plausibility" requires factual allegations "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556 (2007)). Although a complaint "does not need detailed factual allegations," the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *see also Bishop v. Lucent Techs., Inc.,* 520 F.3d 516, 519 (6th Cir. 2008) ("Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.").

## IV.   ARGUMENT

### A.   Plaintiffs' Exact Allegations Have Already Been Twice Rejected By Courts, Including By This One.

As noted above, this is neither the first, second, nor even the 70th complaint filed by Plaintiffs' counsel that (1) alleges violations of the PPPA and (2) is based almost exclusively on the online marketing claims of third parties. Similarly, this is not the first case in which this Court should (and has) rejected such specious and conjectural claims. On at least two prior occasions, two different courts have rejected the very claims presented here for the same reasons this Court should reject them—namely, that the *mere possibility* of a PPPA violation is insufficient to state a claim for a violation of the PPPA.

In *Wheaton*, the United States District Court for the Northern District of California dismissed a similar PPPA claim that (1) was brought by the same plaintiffs' attorneys who filed this lawsuit and (2) was based on similar screenshots as those included in the SAC here. *Wheaton*, 2019 WL 5536214, at *5. The plaintiffs in *Wheaton*, like Plaintiffs here, attached to their complaint a screenshot from the website of what the plaintiffs claimed was "one of the many traffickers of …

Personal Listening Information," which they asserted, like Plaintiffs assert here, was evidence that the defendant had violated the PPPA. *Id.* at *4; [*see also Wheaton, et al. v. Apple, Inc.*, Case No. 5:19-cv-02883, Dkt. No. 1 ("*Wheaton* Complaint"), attached hereto as **Exhibit A**, ¶ 48.]

The court analyzed the screenshot, characterized by the plaintiffs as "a listing by a third-party data broker selling customers' names, addresses, and personal listening information," and found that it did not "plausibly show[] that Apple disclosed plaintiffs' personal listening information." *Wheaton*, 2019 WL 5536214, at *4. Specifically, the court found that nothing in the screenshot suggested, let alone demonstrated, that the third-party entity was in possession of "any names, addresses, or personally identifying information of customers[.]" *Id.* At most, the screenshot had a "mail icon," which, according to the court, was "merely a picture of an envelope." *Id.* Furthermore, the Court noted that "[w]ithout more information, *which was surely available to counsel*, this order will not speculate that the mail icon explicitly would lead to Apple customers' names and addresses[.]" *Id.* (emphasis added).

Three years later, in *Nashel*, this Court reached the same conclusion. *Nashel*, 2022 WL 6775657, at *6. There, the plaintiffs' complaint largely mirrored the Plaintiffs' SAC here, in that it relied on screenshots from two third-party entities to which the plaintiffs claimed the defendant disclosed their Personal Reading

11

Information (i.e., NextMark and "Direct Magazine"). *Id.* at *4. [*See also Nashel,* Case No. 2:22-CV-10633, Dkt. No. 16, attached hereto as **Exhibit B**, ¶¶ 3-4.] The Complaint in *Nashel*, however, contained more factual specificity than the SAC here. Unlike here, the complaint in *Nashel* actually identified what the plaintiffs purchased from the defendant (i.e., subscriptions to The New York Times newspaper). [*See* **Exhibit B**, ¶ 17 (alleging that "Plaintiffs purchased their subscriptions to The New York Times newspaper directly from NYT").]

Despite that level of factual specificity, not present in the SAC here, this Court still dismissed the *Nashel* complaint for failure to state a claim. *Nashel*, 2022 WL 6775657, at *6. In reviewing the two screenshots included within and attached to the *Nashel* complaint, the Court stated that they "create[d] only suspicion as to whether Defendant violated the PPPA during the pre-July 31, 2016," which is insufficient to establish "a legally cognizable right of action[.]" *Id.* at *4.

Specifically, this Court found that "the content of the [screenshots] d[id] not create a reasonable inference that Defendant violated the PPPA" because while "the two third-party list broker[s]…appeared to claim access to the private reading information of over a million active United States The New York Times subscribers],]… nothing on the [screenshots] explains how the list brokers received Defendant's subscription list[,]" and, therefore, the screenshots "fail[ed] to support a crucial element of Plaintiffs' alleged action: that Defendant 'engaged in the

business of selling written material to disclose information personally identifying the customer.'" *Id.* at *5.

The same is true here. In fact, for this Court to find that the Plaintiffs here have stated a viable claim against PCH under the PPPA, the Court would have to engage in an even greater level of speculation than that rejected by the court in *Wheaton* and this court in *Nashel*. In *Wheaton*, the plaintiffs alleged that Apple disclosed the "specific titles of the digitally-recorded music that its customers have purchased via the iTunes Store." [*See* **Exhibit A**, ¶ 3.] In *Nashel*, the plaintiffs alleged that The New York Times disclosed that the plaintiffs had purchased the newspaper. [*See* **Exhibit B**, ¶ 1.] Here, Plaintiffs do not even identify *what* they purchased from PCH. [*See generally* SAC.]

In truth, Plaintiffs' SAC is riddled with bald assertions, unadorned and unsupported by facts, that PCH violated, prior to July 30, 2016, Plaintiffs' and the putative class members' rights under the PPPA. And, just as the courts in both *Wheaton* and *Nashel* held, such conclusory assertions are insufficient to state a viable claim. *See also Mitchell v. City of Detroit*, 114 F.3d 1188 (6th Cir. 1997) (affirming dismissal because the complaint's "conclusory allegations that [plaintiff's] rights were violated…are not sufficient to state a claim"). Plaintiffs' SAC must be dismissed.

### B.   __Plaintiffs' Deliberate Omissions Kill Their Claim.__

The PPPA makes clear that it only prohibits the unconsented-to disclosure to third parties of "a record or information that personally identifies the customer as having purchased, leased, rented, or borrowed" "books or other written materials, sound recordings, or video recordings[.]" Mich. Comp. Laws Ann. § 445.1712, Sec. 2(a). Yet, nowhere in the SAC do any of the nine Plaintiffs identify what it is they claim to have purchased from PCH. In fact, they go out of their way to keep their alleged purchases deliberately vague. For example, they each allege that they "purchased written materials, sound recordings, and/or video recordings sold by PCH, including but not limited to subscriptions to magazines, prior to July 31, 2016." [*Id.* at ¶¶ 18-26.] Certainly, Plaintiffs should know (and should have alleged) which "written materials," "sound recordings," or "video recordings" they purchased from PCH.

Additionally, Plaintiffs fail to allege *when* they purchased whatever it is they purchased. They merely state that they purchased *something* at *some time* prior to July 31, 2016. This, too, is not surprising, given that (1) Plaintiffs only seek statutory damages under the PPPA and (2) after July 30, 2016, statutory damages were no longer available. *See Pratt v. KSE Sportsman Media, Inc*., No. 1:21-CV-11404, 2022 WL 469075, at *7 (E.D. Mich. Feb. 15, 2022).

Finally, and most egregiously, Plaintiffs fail to specifically identify any third-

party entity that actually (1) claims to have PCH customer Private Purchase Information; (2) claims to have Plaintiffs' Private Purchase Information; or (3) claims to have received from PCH Private Purchase Information prior to July 31, 2016. [*See generally id.*] That is not to say that Plaintiffs do not include in their SAC a veritable laundry list of types of third-party entities to which they claim PCH disclosed their Private Purchase Information.  Indeed, they identify twelve different types of third-party entities. [*See* SAC, ¶¶ 1, 6, 14, 18-26, 58-60, 63, 65, 80-82, 90.] One would assume, with categories as broad as "other third parties," [*id.* at ¶¶ 6, 14, 63], and "anybody willing to pay," [*id.* at ¶ 65], Plaintiffs would be able to identify at last one entity allegedly in possession of *their* Private Purchase Information. They do not. They merely generically identify categories of third parties to whom PCH *could have* disclosed their Private Purchase Information in the hopes that this Court does not require them to plead more.

These factually devoid allegations, just like those in *Wheaton* and *Nashel*, do not state a viable claim under the PPPA; they are nothing more than bare recitals of the elements of their PPPA claims. Their claims should be dismissed. *See, e.g., Schutter v. Harold Zeigler Auto Grp., Inc.*, No. 1:18-CV-47, 2018 WL 1536538, at *1 (W.D. Mich. Mar. 29, 2018) (dismissing claims because the "[c]omplaint contains bare recitations of the elements of [plaintiff's] claims, presents legal conclusions without supporting facts, and fails to address all material elements

necessary to state a plausible claim for relief"); *King v. William Beaumont Hosp.*, No. 10-CV-13623-DT, 2011 WL 860656, at *2 (E.D. Mich. Mar. 9, 2011).

### C.   Plaintiffs' NextMark-Related and LSC-Related Allegations Do Not Save Their Claims.

#### 1.   NextMark-Related Allegations.

NextMark is one of the two third-party entities that each Plaintiff alleges is in possession of his or her Private Purchase Information. [*See* SAC, ¶ 2, Ex. A; *id.* at ¶ 3, Ex. B.] According to Plaintiffs, PCH offers to provide on the website of NextMark, "a list broker," "access to the mailing list titled 'Publishers Clearing House Magazine Buyers Mailing List', which contains the Private Purchase Information of 647,541 of PCH's U.S.-based magazine subscription purchasers at a base price of '$100.00/M [per thousand],' (i.e., 10 cents apiece)" and "access to the mailing list titled 'Publishers Clearing House Book, Music & Video Buyers Mailing List', which contains the Private Purchase Information of 1,429,511 of PCH's U.S.-based book, music, and video purchasers at a base price of "$100.00/M [per thousand],' (i.e., 10 cents apiece)." [*Id.* at ¶¶ 2-3.] Plaintiffs claim that the screenshots of NextMark's website attached to the SAC provide "documented evidence" that PCH violated their rights under the PPPA. [*Id.* at ¶ 2.]

That is far from the truth. **First**, Plaintiffs' own allegations make clear that NextMark was never actually in possession of any Private Purchase Information;

they were just purporting to act as the middleman between PCH and any interested renters/buyers. [*Id.* at ¶¶ 2-3 (alleging that *PCH* offered to provide access to Private Purchase Information *through NextMark's website*).] This is consistent with the claims of NextMark itself. On its website, NextMark admits that it does not "sell mailing lists or other media," [*see* NextMark.com, Frequently Asked Questions, located at: https://www.nextmark.com/company/faq/ (last visited: October 7, 2022)][2], and if a potential buyer/renter were to select the "Get More Information" button on NextMark's page (as seen in Exhibits A and B to the SAC), he or she would be rerouted to another page, which states:

> Your request will be instantly routed to the *list supplier*. *More than 1,400 suppliers are represented here on this website*. It's important to fill out the form as completely as possible to ensure your request is handled properly. After submission, you will get a confirmation via email that

---

[2] Although the entirety of NextMark's website is not included in the SAC, the Court can still consider it in connection with this Motion to Dismiss because NextMark's website is "referred to in the [SAC]" (i.e., Plaintiffs attach to the SAC three screenshots from NextMark's website) and is "central to [Plaintiffs'] claims." *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (considering, at motion to dismiss phase, insurance policies not attached to the complaint because "the insurance policies are referred to throughout the complaint" and because "the policies are central to the [plaintiffs'] claims"). Furthermore, "[o]n a motion to dismiss, the court may consider the entire text of documents from which selected passages are referred to in the complaint without converting the motion into one for summary judgment." *Saddle Rock Partners, Ltd. v. Hiatt*, No. 95-2326 GA, 1996 WL 859986, at *5 (W.D. Tenn. Mar. 26, 1996). Here, Plaintiffs rely on and attach portions of NextMark's website. Therefore, the Court can consider the entire NextMark website.

provides you with your tracking code and list supplier contact information,

[*see* NextMark.com, "Request for Information" Page, located at: https://lists.nextmark.com/market?page=research/request_info&id=552860 (last visited: October 7, 2022) (emphasis added)].

**Second**, neither screenshot suggests, let alone establishes, that either list contains Private Purchase Information, let alone the Private Purchase Information of any of the Plaintiffs. Exhibit A states that the individuals included on the "Magazine Buyers Mailing List" "have purchased from over 100 popular titles in a wide variety of interest categories" but not what titles they actually purchased. [*Id.* at ¶ 2, Ex. A.] Furthermore, Exhibit A describes the individuals as "[i]deal *prospects* for magazine subscriptions, general merchandise, publishing, fundraising, credit card, home, garden, ethnic, children, family, education, must and book clubs, health and fitness, mature, travel, hobbies, collectibles, and sports offers." [*Id.* at ¶ 2, Ex. A.] A list of *prospects* that could be interested in a wide variety of topics is not a list of Private Purchase Information.

Likewise, Exhibit B describes the individuals included on the "Music & Video Buyers Mailing List" as "promotionally responsive and credit-worthy buyers of merchandise at affordable prices" who are "music, book & video enthusiast[s]" who "spend their discretionary income on a variety of merchandise for their entertainment and enjoyment." [*Id.* at ¶ 3, Ex. B.] Identifying people as "music, book

& video enthusiasts" does not equate to identifying the specific music, books, and videos those people purchased. [*Id.* at ¶ 3, Ex. B.] At best, Exhibit B suggests that these individuals might be interested in purchasing such materials.

Plaintiffs' claims are even more tenuous when they are applied to Plaintiffs specifically. Both screenshots claim to have "counts through 06/30/2022," [*see id* at ¶ 2, Ex. A; ¶ 3, Ex. B], but every Plaintiff here alleges to have purchased something from PCH roughly six years before that date. [*Id.* at ¶¶ 18-26.] Moreover, neither screenshot suggests that the two lists include individuals who purchased from PCH "written materials, sound recordings, and/or video recordings," as Plaintiffs claim they did. Instead, according to the screenshots, the lists were "generated from PCH's sweepstakes mailings," which none of the Plaintiffs claim to have received. [*Id.* at ¶ 2, Ex. A; ¶ 3, Ex. B.]

**Finally**, even if NextMark could facilitate the sale/rental of the mailing lists; even if it could do so prior to July 31, 2016; even if the mailing lists included Private Purchase Information; and even if the entity selling/renting the mailing lists was PCH, nothing in the SAC or either screenshot suggests that PCH ever sold or rented the mailing lists to anyone. Plaintiffs do not even identity a third-party entity who attempted to purchase/rent the lists.

In other words, Plaintiffs' allegations, at best, suggest that if another third party was interested in buying or renting either the PCH "Magazine Buyers Mailing

19

List" or the PCH "Book, Music, & Video Buyers Mailing List", NextMark *might* be able to put that third party in contact with the entity selling or renting those lists. But whether the third party could ever successfully purchase or rent the lists, whether the lists included Private Purchase Information, and whether the entity selling or renting the lists was PCH is left entirely to impermissible speculation. Plaintiffs' NextMark-related allegations do not save their claims. Their claims must be dismissed.

### 2.   LSC-Related Allegations.

The main, and only, difference between Plaintiffs' First Amended Complaint and their SAC is that the SAC includes allegations related to LSC. Plaintiffs claim that PCH "continuously disclos[ed] its customers' Private Purchase Information" to LSC "since as far back as 2002." [SAC, ¶ 5.] According to Plaintiffs, "in March 2002, PCH announced that it had named…[LSC] to serve as its list manager, effective April 1, 2022, in order to 'generate revenue and to open the door to list exchanges by making files available.'" [*Id.*] The "files," Plaintiffs allege, "include magazine buyers, merchandise buyers, sweeps nos entries and pch.com buyers and entrants…." [*Id.*]

What Plaintiffs do not allege, and what their attachments do not support, is that the "files" and "lists" PCH allegedly provided to LSC actually identified the products purchased by the individuals included within those "files" and on those "lists." For purposes of the PPPA, it makes no difference *how* PCH collects

customer information, whether through magazine subscription purchases, product

purchases, sweepstake entries, etc. What matters is whether PCH discloses to a

third party, without the customer's consent and outside the scope of the exceptions

to the PPPA, that a specific customer located at a specific address purchased,

leased, or rented a *specific "book[] or other written material[], sound recording[],*

*or video recording[].*" Without that information, there is no violation of the PPPA.

Plaintiffs other LSC-related allegations and exhibits make clear that

Plaintiffs cannot allege any facts that would show that PCH violated the PPPA. For

example, Plaintiffs attach to the SAC as Exhibit D a historical screenshot from

LSC's website. [SAC, Exhibit D.]  Exhibit D does not state, or even suggest, that

the information in its possession, if it even possesses any information, includes the

exact products purchased by PCH customers. In fact, it says the opposite. It says

that the information available includes "product/subscription category" and

provides the type of categories available, such as "Book/Video/Music," "Cooking;

Food Gifts," or "Home Décor." [*See id.* at Exhibit D.] Disclosing that an individual

purchased a "Book/Music/Video" does not disclose what book, music, or video the

individual purchased. Therefore, on the face of Plaintiffs' own exhibit, it is clear

that PCH did not violate the PPPA by disclosing information to LSC.

Plaintiffs also attach as Exhibits E and F two historical screenshots from

LSC's website that Plaintiffs claim demonstrate that PCH violated the PPPA by

disclosing their Private Purchase Information to LSC prior to July 31, 2016. These exhibits, however, do not even come close to establishing what Plaintiffs claim they establish. First, both exhibits cite back to NextMark, suggesting that LSC relies on NextMark for the mailing lists [*See* SAC, Exhibit E (describing mailing list as "NextMark 279809"), Exhibit F (describing mailing list as "NextMark 926245")], and NextMark has indicated that it does not actually possess or sell mailing lists.

Second, in neither screenshot does LSC claim to possess information that would specifically identify the product purchased by each individual. Like Exhibit D, Exhibit F claims to provide interested individuals or companies with the ability to "select[] by *Product Category*." [*Id.* at Exhibit F (emphasis added).] Again, disclosing the "product category" purchased by an individual does not equate to disclosing what book, written material, music, or video the individual purchased.

Finally, Plaintiffs attach as Exhibit G to their SAC yet another screenshot from NextMark's website. [*See* SAC, Exhibit G.] Exhibit G contains the same fatal flaws as all of Plaintiffs' exhibits. It does not state (1) that the "available list" actually includes the exact product purchased; (2) that the "available list" was provided to NextMark by PCH; (3) that the "available list" was provided to NextMark before July 31, 2016; or (4) that the "available list" included Plaintiffs. [*See* SAC, Exhibit G.]

At bottom, regardless of the number of exhibits Plaintiffs attach to their SAC, they have not established and cannot establish that PCH did anything, prior to July 31, 2016, that violated their rights under the PPPA. They have not established that PCH disclosed to any third party the Private Purchase Information of any PCH customer, let alone their Private Purchase Information. Nor have they established that PCH disclosed to any third party their Private Purchase Information prior to July 31, 2016. Their SAC, like the complaints in *Wheaton* and *Nashel*, is entirely predicated on speculation and conjecture, requiring the Court to make several leaps in logic just to find that Plaintiffs *might* be able to state a viable PPPA claim against PCH. The Court, like the court in *Wheaton* and this Court in *Nashel*, should refuse to do so. The SAC should be dismissed, in its entirety and with prejudice.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant Publishers Clearing House, LLC

respectfully requests that the Court dismiss with prejudice, pursuant to Federal

Rule of Civil Procedure 12(b)(6), Plaintiffs' SAC for failure to state a claim upon

which relief can be granted.

DATED: December 6, 2022                    **BAKER & HOSTETLER LLP**

By: *s/ Matthew D. Pearson*
Matthew D. Pearson

BAKER HOSTETLER LLP
600 Anton Blvd., Suite 900
Costa Mesa, CA  92626
Tel.: (714) 754-6600
Fax: (714) 754-6611
Email:mpearson@bakerlaw.com
SBN 294302

Casie D. Collignon

BAKER HOSTETLER LLP
1801 California Street, Suite 4400
Denver, CO 80202
Telephone: (303) 764-4037
Facsimile: (303) 861-7805Tel.:
Email:
ccollignon@bakerlaw.com

Attorneys for Defendant
PUBLISHERS CLEARING HOUSE, LLC

24

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2022, I caused to be electronically filed the foregoing **BRIEF IN SUPPORT OF DEFENDANT PUBLISHERS CLEARING HOUSE, LLC'S MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT** using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Matthew D. Pearson*

# Exhibit A

(Class Action Complaint [Dkt. No. 1]
*Leigh Wheaton; Jill Paul and Trevor Paul v. Apple Inc.*
USDC, Northern District of California
Case No. 5:19-CV-02883)

1  HEDIN HALL LLP
   Frank S. Hedin (SBN 291289)
2  fhedin@hedinhall.com
   Four Embarcadero Center, Suite 1400
3  San Francisco, California 94104
   Telephone:  (415) 766-3534
4  Facsimile:  (415) 402-0058

5  AHDOOT & WOLFSON, PC
   Robert Ahdoot (SBN 172098)
6  rahdoot@ahdootwolfson.com
   10728 Lindbrook Drive
7  Los Angeles, California 90024
   Telephone:  (310) 474-9111
8  Facsimile:  (310) 474-8585

9  BURSOR & FISHER, P.A.
   L. Timothy Fisher (SBN 191626)
10 ltfisher@bursor.com
   1990 North California Blvd., 940
11 Walnut Creek, California 94596
   Telephone:  (925) 300-4455
12 Facsimile:  (925) 407-2700

13 [Additional counsel on signature page]

14 *Counsel for Plaintiffs and the Putative Classes*

15             **UNITED STATES DISTRICT COURT**

16           **NORTHERN DISTRICT OF CALIFORNIA**

17

18 LEIGH WHEATON; JILL PAUL; and        Case No. _____
   TREVOR PAUL, individually and on behalf
19 of all others similarly situated,

20        Plaintiffs,                     CLASS ACTION

21 v.                                     **CLASS ACTION COMPLAINT**

22 APPLE INC.,

23        Defendant.

24

─────────────────────────────────────────────────
                  CLASS ACTION COMPLAINT

1   On behalf of themselves and all others similarly situated, Plaintiffs Leigh

2   Wheaton, Jill Paul, and Trevor Paul complain and allege as follows based on personal

3   knowledge as to themselves, the investigation of their counsel, and information and

4   belief as to all other matters, and demand trial by jury. Plaintiffs believe that substantial

5   evidentiary support will exist for the allegations in this complaint, after a reasonable

6   opportunity for discovery.

7                          **NATURE OF THE CASE**

8        1.      In early 2019, in an effort to capitalize on recent revelations concerning

9   the data-sharing practices of its competitors Facebook, Inc. and Google LLC, Apple

10  Inc. ("Apple") placed a massive billboard in Las Vegas, Nevada touting its supposedly

11  pro-consumer positions on issues of data privacy:



21       2.      The statement on the billboard is plainly untrue, however, because – as

22  will be explained in detail below – none of the information pertaining to the music you

23  purchase on your iPhone stays on your iPhone.

24

CLASS ACTION COMPLAINT

3.     To supplement its revenues and enhance the formidability of its brand in the eyes of mobile application developers, Apple sells, rents, transmits, and/or otherwise discloses, to various third parties, information reflecting the music that its customers purchase from the iTunes Store application that comes pre-installed on their iPhones.  The data Apple discloses includes the full names and home addresses of its customers, together with the genres and, in some cases, the specific titles of the digitally-recorded music that its customers have purchased via the iTunes Store and then stored in their devices' Apple Music libraries (collectively "Personal Listening Information").  After Apple discloses its customers' Personal Listening Information, the various third-party recipients of this data then append to it a myriad of other categories of personal information pertaining to Apple's customers – such as gender, age, household income, educational background, and marital status – only to then re-sell that Personal Listening Information (enhanced with various categories of demographic data) to other third parties on the open market.

4.     Rhode Island resident Leigh Wheaton brings this action for legal and equitable remedies to redress and put a stop to the illegal actions of Apple in disclosing to third parties her Personal Listening Information and that of all other similarly-situated Rhode Island residents who purchased music from Apple on its iTunes Store platform, in violation of Rhode Island's Video, Audio and Publication Rentals Privacy Act, R.I. Gen. Laws § 11-18-32 (the "RIVRPA").

5.     Additionally, Michigan residents Jill Paul and Trevor Paul, individually and on behalf of all others similarly situated, bring this action for legal remedies to redress the illegal actions of Apple in disclosing to third parties, between May 24, 2016

CLASS ACTION COMPLAINT

and July 30, 2016, their Personal Listening Information and that of all other similarly-situated Michigan residents who purchased music from Apple on its iTunes Store platform, in violation of Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg., Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg., Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "MIPPPA").[1]

6.     As set forth below, Apple has sold, rented, transmitted, and/or otherwise disclosed the Personal Listening Information of the Plaintiffs and millions of its other customers to developers of various mobile applications available for download in its App Store, as well as to data aggregators, data appenders, data cooperatives, list brokers, and other third parties, many of whom have in turn re-disclosed Plaintiffs' and the other unnamed class members' Personal Listening Information to other third parties for further exploitation and monetization – all without providing prior notice to or obtaining the requisite consent from anyone.  Such disclosures invaded Plaintiffs' and the unnamed Class members' privacy and have resulted in a barrage of unwanted junk mail to their home addresses and e-mail inboxes.

7.     The Rhode Island RIVRPA and the Michigan MIPPPA clearly prohibit what Apple has done. Subsection (a) of Rhode Island's RIVRPA provides:

---

[1]     In May 2016, the Michigan legislature amended the MIPPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq*.). The May 2016 amendment to the MIPPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [MIPP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods*., 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the MIPPPA, the unamended version of the MIPPPA applies in this case.  *See Horton v. GameStop, Corp.*, No. 18-cv-00596-GJQ-PJG, Dkt. 18 at 3-5 (W.D. Mich. 2018).

CLASS ACTION COMPLAINT

It shall be unlawful for any person to reveal, transmit, publish, or disseminate in any manner, any records <u>which would identify the names and addresses of individuals, with the titles or nature of</u> video films, <u>records, cassettes, or the like, which they purchased,</u> leased, rented, or borrowed, from libraries, book stores, video stores, or record and cassette shops <u>or any retailer or distributor of those products,</u> whether or not the identities and listings are kept in a remote computing service or electronic storage or the disclosure is made through or by a remote computing service.

RIVRPA § (a) (emphasis added). Similarly, section 2 of the MIPPPA provides:

[A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, <u>sound recordings,</u> or video recordings shall not disclose to any person, other than the customer, <u>a record or information concerning the purchase,</u> lease, rental, or borrowing <u>of those materials by a customer that indicates the identity of the customer.</u>

MIPPPA § 2 (emphasis added).

8. Thus, while Apple profits handsomely from its unauthorized sale, rental, transmission, and/or disclosure of its customers' Personal Listening Information, it does so at the expense of its customers' privacy and statutory rights because Apple does not notify let alone obtain the requisite written consent from its customers prior to disclosing their Personal Listening Information.

9. Apple's disclosures of the Personal Listening Information of Plaintiffs and the other unnamed Class members were not only unlawful, they were also dangerous because such disclosures allow for the targeting of particularly vulnerable members of society. For example, any person or entity could rent a list with the names and addresses of all unmarried, college-educated women over the age of 70 with a household income of over $80,000 who purchased country music from Apple via its iTunes Store mobile application. Such a list is available for sale for approximately $136 per thousand customers listed.

4
CLASS ACTION COMPLAINT

10. On behalf of themselves and the putative Classes defined below, Plaintiffs bring this Complaint against Apple for intentionally and unlawfully disclosing their Personal Listening Information, *en masse*, in violation of the RIVRPA and the MIPPPA, as well as for unjust enrichment.

## JURISDICTION AND VENUE

11. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one member of each of the classes is a citizen of a state different from Apple.

12. Personal jurisdiction and venue are proper because Apple maintains its corporate headquarters in Cupertino, California and within this district.

## PARTIES

13. Plaintiff Wheaton is, and at all times alleged herein was, a natural person and citizen of the State of Rhode Island. Plaintiff Wheaton is an avid music listener who has regularly purchased digital music, including rock music, from Apple via Apple's iTunes Store, using her iPhone.

14. Plaintiff Jill Paul is, and at all times alleged herein was, a natural person and citizen of the State of Michigan. Plaintiff Paul is an avid music listener who has regularly purchased digital music, including rock music, from Apple via Apple's iTunes Store, using her iPhone.

15. Plaintiff Trevor Paul is, and at all times alleged herein was, a natural person and citizen of the State of Michigan. Plaintiff Paul is an avid music listener who

1    has regularly purchased digital music, including rock music, from Apple via Apple's

2    iTunes Store, using his iPhone.

3        16.    Defendant Apple Inc. is a Delaware corporation with its principal place of

4    business in Cupertino, California. Apple does business throughout California and

5    across the United States. Apple is a retailer and distributor of digital music, which it

6    sells to consumers online via its iTunes Store mobile application.

7                        **APPLICABLE STATUTORY SCHEMES**

8        17.    In 1988, leading up to the enactment of the federal Video Privacy

9    Protection Act ("VPPA"), 18 U.S.C. § 2710, members of the United States Senate

10   warned that records of consumers' purchases and rentals of audiovisual and publication

11   materials offer "a window into our loves, likes, and dislikes," and that "the trail of

12   information generated by every transaction that is now recorded and stored in

13   sophisticated record-keeping systems is a new, more subtle and pervasive form of

14   surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and

15   Leahy, respectively).

16       18.    As Senator Patrick Leahy recognized in proposing the Video and Library

17   Privacy Protection Act (later codified as the VPPA), "[i]n practical terms our right to

18   privacy protects the choice of movies that we watch with our family in our own homes.

19   And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399

20   (May 10, 1988).   The personal nature of such information, and the need to protect it

21   from disclosure, is the raison d'être of the statute: "These activities are at the core of

22   any definition of personhood. They reveal our likes and dislikes, our interests and our

23

24

                        **CLASS ACTION COMPLAINT**

whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

19.     Following the VPPA's enactment, several states, including Rhode Island and Michigan, quickly followed suit.

## I.     Rhode Island's Video, Audio, And Publication Rentals Privacy Act

20.     Recognizing the need to further protect its citizens' privacy rights, Rhode Island's legislature enacted the RIVRPA to "prohibit[] the revealing of records relating to the rental of video or audio tapes or publications." Explanation By The Legislate Council, attached as **Exhibit A**.

21.     Subsection (a) of the RIVRPA states:

> It shall be unlawful for any person to reveal, transmit, publish, or disseminate in any manner, any records <u>which would identify the names and addresses of individuals, with the titles or nature of</u> video films, <u>records, cassettes, or the like</u>, <u>which they purchased</u>, leased, rented, or borrowed, from libraries, book stores, video stores, or record and cassette shops <u>or any retailer or distributor of those products</u>, whether or not the identities and listings are kept in a remote computing service or electronic storage or the disclosure is made through or by a remote computing service.

RIVRPA § (a) (emphasis added).

22.     Despite the fact that tens of thousands of Rhode Island residents have purchased music from Apple via its iTunes Store platform, Apple has disregarded its legal responsibilities to these individuals by systematically disclosing their Personal Listening Information in violation of the RIVRPA.

## II.     Michigan's Personal Privacy Preservation Act

23.      Also recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the MIPPPA "to preserve personal privacy with respect

CLASS ACTION COMPLAINT

1  to the purchase, rental, or borrowing of certain [audiovisual and reading] materials," by

2  prohibiting companies from disclosing certain types of sensitive consumer information

3  pertaining thereto.  H.B.  No. 5331, 1988 Mich. Legis. Serv. 378 (West).

4        24.    Subsection 2 of the MIPPPA states:

5              [A] person, or an employee or agent of the person, engaged
               in the business of selling at retail, renting, or lending books

6              or other written materials, <u>sound recordings</u>, or video
               recordings shall not disclose to any person, other than the

7              customer, <u>a record or information concerning the purchase</u>,
               lease, rental, or borrowing <u>of those materials by a customer</u>

8              <u>that indicates the identity of the customer</u>.

9  MIPPPA § 2 (emphasis added).

10       25.    Michigan's passage of the MIPPPA also established as a matter of law

11  "that a person's choice in reading, music, and video entertainment is a private matter,

12  and not a fit subject for consideration by gossipy publications, employers, clubs, or

13  anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative

14  Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit B**).

15       26.    Despite the fact that hundreds of thousands of Michigan residents have

16  purchased music from Apple via its iTunes Store platform, Apple has disregarded its

17  legal responsibilities to these individuals by systematically disclosing their Personal

18  Listening Information in violation of the MIPPPA.

19                          **BACKGROUND FACTS**

20  **I.    Consumers' Personal Information Has Real Market Value**

21       27.    In 2001, Federal Trade Commission ("FTC") Commissioner Orson

22  Swindle remarked that "the digital revolution . . . has given an enormous capacity to

23  the acts of collecting and transmitting and flowing of information, unlike anything

24

CLASS ACTION COMPLAINT

1 we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined

2 by the existing data on themselves."[2]

3     28.    More than a decade later, Commissioner Swindle's comments ring truer

4 than ever, as consumer data feeds an information marketplace that supports a $26

5 billion dollar per year online advertising industry in the United States.[3]

6     29.    The FTC has also recognized that consumer data possesses inherent

7 monetary value within the new information marketplace and publicly stated that:

8         Most consumers cannot begin to comprehend the types and
        amount of information collected by businesses, or why their

9         information may be commercially valuable. Data is currency.
        The larger the data set, the greater potential for analysis – and

10         profit.[4]

11     30.    In fact, an entire industry exists while companies known as data

12 aggregators purchase, trade, and collect massive databases of information about

13 consumers. Data aggregators then profit by selling this "extraordinarily intrusive"

14 information in an open and largely unregulated market.[5]

15

16

---

[2]    FCC, *The Information Marketplace* (Mar. 13, 2001), at 8-11, *available at*
17 https://www.ftc.gov/sites/default/files/documents/public_events/information-
marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

18
[3]    *See Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011),
19 http://online.wsj.com/article/SB10001424052748703529004576160764037920274.ht
ml (last visited May 13, 2019).

20
[4]    Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, *available at*
21 https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-
exploring-privacy-roundtable/091207privacyroundtable.pdf.

22
[5]    *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July
23 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-
right-now/ (last visited May 13, 2019).

24

CLASS ACTION COMPLAINT

31. The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[6]

32. Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[7]

33. Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[8]

---

[6] N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited May 13, 2019).

[7] Letter from Sen. J. Rockefeller IV, Sen. Cmtee. on Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c.

[8] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

10

CLASS ACTION COMPLAINT

34.    Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[9] including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like Apple share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

35.    Disclosures like Apple's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12]

---

[9]    *See    Prize    Scams*,    Federal    Trade    Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited May 13, 2019).

[10]    C. Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times (May 20, 2007), *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited May 13, 2019).

[11]    *Id.*

[12]    *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf.

CLASS ACTION COMPLAINT

36.     Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like Apple's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

37.     Apple is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

38.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

## II.     Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

39.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their personal information.

40.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[14] As a result, 81 percent of

---

[13]     *Id.*

[14]     *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited May 13, 2019).

CLASS ACTION COMPLAINT

1  smartphone users polled said that they avoid using smartphone apps that they don't

2  believe protect their privacy online.[15]

3      41.    Thus, as consumer privacy concerns grow, consumers are increasingly

4  incorporating privacy concerns and values into their purchasing decisions and

5  companies viewed as having weaker privacy protections are forced to offer greater

6  value elsewhere (through better quality and/or lower prices) than their privacy-

7  protective competitors.

8      42.    In fact, consumers' personal information has become such a valuable

9  commodity that companies are beginning to offer individuals the opportunity to sell

10  their personal information themselves.[16]

11      43.    These companies' business models capitalize on a fundamental tenet

12  underlying the personal information marketplace: consumers recognize the economic

13  value of their private data.  Research shows that consumers are willing to pay a

14  premium to purchase services from companies that adhere to more stringent policies of

15  protecting their personal data.[17]

16

17  _____

   [15]    *Id.*

18

19  [16]    *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-

20  price-on-their-personal-data.html (last visited May 13, 2019).

21  [17]    *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254

22  (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at*

23  https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited May 13, 2019).

24

13

CLASS ACTION COMPLAINT

44.     Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[18] As such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### III.   Apple Unlawfully Sells, Rents, Transmits, And Otherwise Discloses Its Customers' Personal Listening Information

45.     Apple maintains a vast digital database comprised of all of its customers' Personal Listening Information, including information reflecting the genres and titles of all digital music sold to its customers via its iTunes Store platform.[19]

46.     During the time period relevant to this action, Apple has monetized this data in at least two primary ways: (1) by selling, renting, transmitting and/or otherwise disclosing lists comprised of its customers' Personal Listening Information and other highly-personalized demographic information to various third parties; and (2) transmitting and disclosing its customers' full iTunes libraries, comprised of such detailed Personal Listening Information as the specific titles of the songs and albums

---

[18]     *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited May 13, 2019) ("It is obvious that people value online privacy.").

[19]     *See also* Titlow, John Paul, *iTunes Radio: Smart for Apple, "Meh" for Users, And Harmless for Pandora*, Sept. 18, 2013, *available at* https://www.fastcompany.com/3017612/itunes-radio-smart-for-apple-meh-for-users-and-harmless-for-pandora (last visited May 13, 2019) (reporting that Apple was using various music-purchasing and listening applications to "collect[] new data points in the form of users tapping those thumb buttons, not to mention skipping, or most tellingly of all, purchasing songs and albums. Over time, these insights will strengthen Apple's music recommendation engine, which is presumably already privy to the day-to-day listening habits of hundreds of millions of users.") (emphasis added).

14

CLASS ACTION COMPLAINT

that its customers have purchased, to various iOS mobile application developers, who in turn have further disclosed this detailed Personal Listening Information to data brokers, data miners, mobile application developers, marketers, and other third parties.

### A. Apple Sells Mailing Lists Comprised of its Customers' Personal Listening Information to Anyone Willing to Pay

47.     First, Apple discloses its customers' Personal Listening Information, identifying the names and addresses of its customers and the particular genres of music they have purchased from its iTunes Store, to data aggregators, data miners, data brokers, data appenders, and other third parties, who then supplement that information with additional sensitive personal information about each of Apple customers, including their age, gender, purchasing habits, education, household income, and (when applicable) the number, age, and gender of the subscriber's children.

48.     These factual allegations are corroborated by publicly-available evidence. For instance, as shown in the screenshot below, the Personal Listening Information of 18,188,721 "iTunes and Pandora Music Purchasers," residing across the United States (including in Michigan and Rhode Island), is offered for sale on the website of Carney Direct Marketing ("CDM") – one of many traffickers of this type of Personal Listening Information – at a base price of "$80/M [per thousand records]" (8 cents each):

**CLASS ACTION COMPLAINT**

| SEGMENTS | PRICE | ID NUMBER | |
|---|---|---|---|
| | | NextMark | 385690 |
| 18,188,721 TOTAL UNIVERSE / BASE RATE | $80.00/M | Manager | |
| 1 Month Hotline | + $12.00/M | **UNIVERSE** | |
| 3 Month Hotline | + $8.00/M | 18,188,721 | |
| | | LIST TYPE | |
| **DESCRIPTION** | | Consumer | |
| iTunes and Pandora music Purchasers are consumers using major | | | |
| internet providers for their music listening pleasure. iTunes and | | SOURCE | |
| Pandora Music Purchasers enjoy playing their favorite radio | | LIST MAINTENANCE | |
| stations from home, work, or mobile devises. Individual song, | | Counts through | 04/01/2019 |
| video and record purchases and/or commercial free listening allow | | Last update | 04/01/2019 |
| for a highly custom playlist along with a much wider geographical | | Next update | 05/01/2019 |
| reach then local radio stations for a higher quality transmitted | | SELECTS | |
| sound. These purchasers get access to more stations and a wider | | AGE | 10.00/M |
| variety of programming options all hand selected by the | | Buying Behavior | |
| individual. | | Demographic | |
| | | Education | 8.00/M |
| | | Full Lifestyle | |
| iTunes and Pandora Music Purchasers are constantly looking for | | GENDER | 10.00/M |
| the most up to date cutting edge technology. They are highly | | Geography | 8.00/M |
| response to new technology, cell phones and apps, computers, | | House Hold Income | 10.00/M |
| vacation packages, coupons, deal saving offers, trial run offers, | | Interest | |
| entertainment, satellite TV and sports offers. | | Mail Order Buyer | 10.00/M |
| | | MARITAL STATUS | 10.00/M |
| | | PRESENCE OF CHILDREN | 10.00/M |
| | | GEOGRAPHY | |
| | | USA | |

*See* **Exhibit C** hereto.

49.     The "iTunes and Pandora Music Purchasers" list offered for sale by CDM contains the Personal Listening Information of tens of thousands of Rhode Island residents and hundreds of thousands of Michigan residents who have purchased music from Apple's iTunes Store.  The "iTunes and Pandora Music Purchasers" list includes, for each Rhode Island and Michigan purchaser of music appearing on the list, the person's name and address, "age," "house hold income," "education," "gender," "geography," "presence of children" and, significantly, "buying behavior," which identifies the particular genre(s) of music that the person purchased from Apple.

16

CLASS ACTION COMPLAINT

50.     SRDS, another list brokerage company, offers for sale the same or a similar list as the one sold by CDM, at the same price, and additionally offers a finder's fee to brokers who are able to find purchasers of this Personal Listening Information (offering "20% commission to brokers" and "15% commission to agencies"), as shown in the screenshot below of a publicly-accessible webpage on SRDS's website:



*See* **Exhibit D** hereto.

**B. Apple Discloses its Customers' Personal Listening Information to Various Third-Party Mobile Application Developers, Who in Turn Redisclose Such Information to Other Third Parties**

51.     Additionally, Apple has disclosed and continues to disclose its customers' Personal Listening Information to developers of iOS mobile applications, who in turn have disclosed and continue to disclose such data to other third parties for profit.

CLASS ACTION COMPLAINT

52. During the relevant time period, Apple has intentionally transmitted, either directly or through an intermediary or intermediaries, its customers' Personal Listening Information to the developers of mobile applications programmed with Apple's iOS SDK, without first obtaining the requisite consent of its customers.

53. Specifically, many mobile applications developed using Apple's iOS SDK have been programmed to provide their developers with complete and total access, via Apple's "MediaPlayer Framework API," to highly-detailed metadata reflecting the full content of the iTunes music libraries of users of devices on which such applications are installed (applications which, on information and belief, include but are not limited to those developed by Pandora).

54. Thus, Apple's MediaPlayer Framework API, used in conjunction with the iOS SDK, has enabled application developers to collect, via transmissions made by Apple, metadata reflecting the specific titles of the music purchased by particular users of the iOS-equipped devices on which applications utilizing this functionality are installed.  During the relevant time period, developers have accomplished this with as little as a single line of code written into their mobile applications. For example, using the MPMediaQuery.songsQuery() function of the MediaPlayer Framework API, developers are able to grant themselves access to metadata that identifies the titles of all of the songs that a particular user of their application has purchased on iTunes.[20]

---

[20] *See* Dodson, Ben, *Your Music Library is a Security and Privacy Risk on iOS*, Jan. 13, 2016, *available at* https://bendodson.com/weblog/2016/02/23/details-on-ios-9-3-media-library-additions/ (last accessed May 13, 2019) (a copy of which is attached hereto as **Exhibit E**); Open Radar: Community Bug Reports, *No permission required to access full music library metadata*, Jan. 13, 2016, *available at* https://openradar.appspot.com/radar?id=6078139771912192 (last accessed May 9, 2019) (a copy of which is attached hereto as **Exhibit F**).

CLASS ACTION COMPLAINT

55.     Further, during the relevant time period the MediaPlayer Framework API has enabled developers to "create arbitrarily complex queries" with "database access classes from from [the] API," in order to collect users' metadata filtered by specific categories of purchased music. For example, Apple's MediaPlayer Framework API permits developers to retrieve the titles of specific "collections" (i.e., album names) of music that users of their applications have purchased, as well as the "tracks" (i.e., songs) comprising such albums, as illustrated in the graphic below:



See Apple Inc., iPod Library Access Programming Guide, available at https://developer.apple.com/library/archive/documentation/Audio/Conceptual/iPodLibraryAccess_Guide/AboutiPodLibraryAccess/AboutiPodLibraryAccess.html#//apple_ref/doc/uid/TP40008765-CH103-SW16 (last accessed May 14, 2019) (section titled "About Collections and Playlists"), a copy of which is attached hereto as **Exhibit G**.

56.     As another example, Apple's MediaPlayer Framework API has enabled application developers to collect from their users' iTunes music libraries metadata that

CLASS ACTION COMPLAINT

identifies the titles of particular artists' albums that the applications' users have purchased from Apple, as illustrated in the graphic below:



*See* Ex. G (section titled "Getting Media Items Programmatically").

57.     The metadata disclosed by Apple to these mobile application developers, by way of its proprietary MediaPlayer Framework API and/or similar such functionality, not only identifies the specific titles and/or the nature of the digitally-recorded music purchased by Apple's customers, but also is linked to data that identifies the individuals who purchased the music reflected in the metadata and/or the specific devices these individuals used to make such purchases, including in many cases the names and addresses of the purchasers of the music reflected in the metadata (including where a purchaser provided such personally-identifying information to the application developer as a prerequisite to installing the application or enrolling in services offered by the developer in its application, as is required of users of, for example, Pandora, Spotify, and innumerable other iOS mobile applications).

CLASS ACTION COMPLAINT

Accordingly, by engaging in these practices, Apple disclosed the Personal Listening Information of its customers to various third-party mobile application developers.

58.     On January 13, 2016, an iOS application developer named Ben Dodson found the foregoing capabilities of Apple's MediaPlayer Framework API so invasive of privacy that he submitted a publicly-accessible "bug report" to Apple about it, describing the issue as a "security" hole in which "[a]ll metadata can be pulled from the [iTunes] library without the user knowing." *See* Ex. F. Dodson's bug report went on to state as follows:

> In recent years, iOS has made a concerted push to being privacy focussed. However, one area this is not the case is with the MediaPlayer framework and in particular the MPMediaQuery.songsQuery() method. With that one line of code, you can get the full metadata for every song in a user's library without them ever knowing. This information could be sent back to a server silently and then used for various nefarious purposes such as:
>
> - Building up a profile of that user in order to produce targeted advertising
>
> - Using the information as a reliable way of tracking someone across multiple apps (as it can act as a unique identifier)
>
> In my opinion, access to the music library should be protected in much the same way as location, contacts, calendars, or photos are with a requirement from the developer to ask permission and for the user to be able to grant permission and subsequently revoke it via the standard iOS system preferences.
> …
> I make use of this feature in my app Music Tracker (https://dodoapps.io/music-tracker) but I'd feel much happier about it if the user was allowing me access to their library rather than it being automatic without their knowledge.

*Id*. Dobson noted that Apple's MediaPlayer Framework API enabled developers of mobile applications to use the "MPMediaQuery.songsQuery()" function of the API to

21

CLASS ACTION COMPLAINT

1    instruct Apple to transmit the "full music library metadata" from "any iOS device"

2    using "iOS 3.0 and above" on which the application had been installed. *See id.*

3        59.    On January 22, 2016, Apple responded to Dobson's "bug report," stating

4    in pertinent part:

5            We are aware of this issue. It is being investigated. Thank
             you for taking the time to pass it along to us. For the
6            protection of our customers, Apple does not publicly
             disclose, discuss or confirm security issues until a full
7            investigation has occurred and any necessary patches or
             releases are available.
8
     *Id.*
9
         60.    Apple nonetheless failed to take any corrective measure to address the
10
     issue until the public release of iOS 10.0, which occurred nearly eight months later on
11
     or about September 13, 2016, and even then Apple merely began informing users that
12
     their iTunes libraries may be "accessed" by developers of mobile applications utilizing
13
     the MediaPlayer Framework API or similar functionality built with the iOS SDK.
14
     Thus, the disclosures that Apple implemented in response to Dobson's bug report (in
15
     versions 10.0 and later of iOS) plainly fail to adequately put users on notice that their
16
     Personal Listening Information will be extracted from their iTunes libraries and
17
     disclosed by Apple to the developers of such applications. Accordingly, this disclosure
18
     language has at all times material hereto been incapable of manifesting anyone's
19
     informed written consent to Apple's practices of disclosing its customers' Personal
20
     Listening Information, even though the company was required to obtain such consent
21
     prior to disclosing its customers' Personal Listening Information pursuant to the
22
     MIPPPA and the RIVRPA.
23

24

CLASS ACTION COMPLAINT

61.     Still today, Apple permits application developers to use its APIs and other developers' functionality in the same or substantially the same way as described above, and thus still transfers to application developers the metadata containing its customers' Personal Listening Information on demand.

62.     For example, the current version of Apple's "Apple Music API," which is part of Apple's "MusicKit" framework and is presently used by developers in conjunction with the MediaPlayer Framework API, as discussed above, allows developers to access information about the particular media – such as albums, songs, artists, and playlists – that are located in a particular user's personal iCloud library. Apple describes the Apple Music API as providing developers the following functionality:

> The Apple Music API is a web service that lets you access information about the media found in the Apple Music Catalog and the user's personal iCloud Music Library. Here's what each one includes:
>
> - The Apple Music Catalog includes all resources available in Apple Music.
>
> - The user's iCloud Music Library contains only those resources that the user added to their personal library. For example, it contains items from Apple Music, songs purchased from iTunes Store, and imports from discs and other apps. This library may include content not found in the Apple Music Catalog.
>
> Use this service to retrieve information about albums, songs, artists, playlists, music videos, Apple Music stations, ratings, charts, recommendations, and the user's most recently played content. With proper authorization from the user, you can also create or modify playlists and apply ratings to the user's content.

CLASS ACTION COMPLAINT

1  *See*    Apple    Inc.,    *Apple    Music    API*,    *available    at*

2  https://developer.apple.com/documentation/applemusicapi (last accessed May 24,

3  2019) (section titled "Overview") (emphasis added), a copy of which is attached hereto

4  as **Exhibit H**.  Notably, the Apple Music API only requires "proper authorization from

5  the user" in order for the developer to "create or modify playlists and apply ratings to

6  the user's content."  Thus, developers using this API still have "read only" access to

7  metadata reflecting the contents of users' iCloud Music Library (reflecting, inter alia,

8  the specific titles of the music and other items purchased from Apple via its iTunes

9  Store), via transmissions of such metadata by Apple to such developers on demand.

10       63.    Developers are also able to access identifying information associated with

11  particular users, including via music user "tokens," which are capable of association

12  with uniquely identifying information pertaining to individual users (including, for

13  example, by the numerous application developers who store the names and addresses

14  of their users collected during enrollment or otherwise). Requests to the Apple Music

15  API are sent using HTTPS commands and are associated with particular developers'

16  apps, by way of developer tokens that authenticate certain developers as "trusted

17  developers" and members of the Apple Developer Program.  Thus, Plaintiffs are

18  informed and believe, and thereupon allege, that Apple readily possesses information

19  reflecting each of the instances in which it has disclosured its customers' Personal

20  Listening Information, as well as data reflecting when and to whom such disclosures

21  were made.

22       64.    Further, Apple has developed its own applications, web-based and

23  otherwise, to facilitate the transmission of its own customers' Personal Listening

24

Information to other Apple customers. For example, during the relevant time period, Apple has transmitted or otherwise disclosed its customers' Personal Listening Information to other iTunes accountholders, including on information and belief entities engaged in the practices of collecting Personal Listening Information, in order to monetize Apple-developed platforms for its customers to "gift" songs from their iTunes playlists to other Apple customers, and to otherwise share content that its customers have purchased.[21]  Thus, during the relevant time period, when an iTunes user used Apple's functionality for "gifting" content to another user, including gifting a digitally-recorded song purchased on iTunes to another iTunes user, the gifter-user was presented a screen depicted, in pertinent part, as following:



To the extent a user to whom a particular song was being gifted had already purchased that song, Apple disclosed to the gifter that the giftee "has already purchased" that particular song, as shown in the following portion of a screenshot of such a disclosure:

[21] *See* A. McAfee, *SpyTunes*, *available at* http://andrewmcafee.org/2011/02/mcafee-apple-itunes-privacy-hole-violation/ (last accessed May 10, 2019) (attached hereto as **Exhibit I**); A. Howard, *Apple iTunes Gifts Users with a Privacy Hole*, Radar, *available at* http://radar.oreilly.com/2011/02/itunes-privacy-hole.html (last accessed May 11, 2019).

CLASS ACTION COMPLAINT

1   *See* Ex. G. By way of the foregoing tool, designed by Apple to further monetize content

2   that had already been purchased by its customers, as well as through other similar

3   publicly-accessible functionality provided by Apple, any person with an iTunes

4   account or any other entity (including those engaged in the business of collecting and

5   trafficking in Personal Listening Information) had the ability during at least a portion

6   of the relevant time period to obtain the Personal Listening Information of particular

7   Apple customers, via disclosures made to them by Apple. *See id.* ("This strikes me as

8   problematic. A person's taste in media can be highly personal, yet all of Apple's more

9   than 10 billion song and 200 million TV and movie downloads are potentially traceable

10  by . . .  the world's spies, stalkers, yellow journalists, and opposition researchers.").

11       65.    Plaintiffs are informed and believe, and thereupon allege, that Apple has

12  also sold, rented, transmitted, or otherwise disclosed its customers Personal Listening

13  Information to third party data analytics companies, including without limitation

14  Gracenote, Inc., The Nielsen Company, and MusicMetric.

15       66.    As a result of Apple's data compiling and sharing practices, companies

16  have obtained and continue to obtain the Personal Listening Information of Apple's

17  customers, including those in Michigan and Rhode Island, together with additional

18  sensitive personal information that has been appended thereto by data appenders and

19  others (such as, for example, the income, gender, marital status, education, and family

20  composition (including the presence of children) of Apple's customers).

21       67.    Plaintiffs are informed and believe, and thereupon allege, that numerous

22  mobile application developers and other third parties to whom Apple has transmited

23  and/or otherwise disclosed its customers' Personal Listening Information (including

24

26

CLASS ACTION COMPLAINT

1  via its MediaPlayer, Apple Music and MusicKit APIs), either directly or indirectly

2  through an intermediary or intermediaries, have in turn sold, rented, transmitted, and

3  otherwise disclosed that Personal Listening Information (together with other sensitive

4  personal demographic and lifestyle information appended thereto by data appenders

5  and other entities) to other third parties, including other data brokers, data miners, data

6  appenders, and marketing companies.

7  68.  Apple's disclosures of Personal Listening Information have put its

8  customers, especially the more vulnerable members of society, at risk of serious harm

9  from scammers. For example, as a result of Apple's disclosures of Personal Listening

10  Information, any person or entity could rent a list with the names and addresses of all

11  unmarried, college-educated women over the age of 70 with a household income of

12  over $80,000 who have purchased country music from Apple using the iTunes Store

13  application that came pre-installed on their iPhones. Such a list is available for sale for

14  approximately $136 per thousand customers listed.

15  69.  Apple does not seek its customers' prior written consent to the disclosure

16  of their Personal Listening Information and its customers remain unaware that their

17  Personal Listening Information and other sensitive data is being sold, rented and

18  exchanged on the open market.

19  70.  By disclosing the nature and titles of its customers' music purchases,

20  music-listening preferences, and personally-identifying information – which can

21  collectively "reveal intimate facts about our lives"[22] – Apple has intentionally disclosed

22

23  _____
[22]  California's Reader Privacy Act Signed into Law, EFF (Oct. 3, 2011),
24  https://www.eff.org/press/archives/2011/10/03 (last visited May 14, 2019).

27
CLASS ACTION COMPLAINT

to third parties its customers' Personal Listening Information, without their consent, in direct violation of Michigan's MIPPPA and Rhode Island's RIVRPA.

## PLAINTIFFS' EXPERIENCES

### I.   Plaintiff Leigh Wheaton

71.   Plaintiff Wheaton has on numerous occasions over the past three years, while residing in Rhode Island, used an iPhone to purchase digital music, including rock music, directly from Apple via its iTunes Store.

72.   Prior to and at the time she purchased digital music, including rock music, from Apple via its iTunes Store, Apple did not notify Plaintiff Wheaton that it would disclose the Personal Listening Information of its customers to third parties, including, but not limited to, developers of various mobile applications available for download in its App Store, data aggregators, data appenders, data cooperatives, analytics companies, and list brokers, and Plaintiff Wheaton has never authorized Apple to do so. Furthermore, Plaintiff Wheaton was never provided any written notice that Apple licenses, rents, exchanges, or otherwise discloses its customers' Personal Listening Information to third parties, including, but not limited to, developers of various mobile applications available for download in its App Store, data aggregators, data appenders, data cooperatives, analytics companies, and list brokers, or any means of opting out of such disclosures of her Personal Listening Information.

73.   Apple nonetheless sold, rented, transmitted and/or otherwise disclosed Plaintiff Wheaton's Personal Listening Information, either directly or through an intermediary or intermediaries, to numerous third parties, including data miners,

CLASS ACTION COMPLAINT

1  appenders, aggregators, and analytics companies; mobile application developers; and

2  other third parties during the relevant time period.

3      74.   Plaintiff Wheaton is informed and believes, and thereupon alleges, that

4  multiple mobile application developers and/or other third parties to whom Apple has

5  transmited and/or otherwise disclosed her Personal Listening Information have in turn

6  sold, rented, transmitted, and otherwise disclosed her Personal Listening Information

7  (together with other sensitive personal demographic and lifestyle information appended

8  thereto by data appenders and other entities) to other third parties, including other data

9  brokers, data miners, data appenders, and marketing companies.

10      75.   Because Apple sold, rented, transmitted and/or otherwise disclosed

11  Plaintiff Wheaton's Personal Listening Information, Plaintiff Wheaton now receives

12  junk mail from various companies and other organizations that do not offer products

13  or services through the mail. These unwarranted mailings waste Plaintiff Wheaton's

14  time, money, and resources. These unwarranted and harassing junk mailings, which are

15  attributable to Apple's unauthorized sale, rental, and/or other disclosure of her Personal

16  Listening Information, have wasted Plaintiff Wheaton's time, money, and resources.

17      76.   Because Plaintiff Wheaton is entitled by law to privacy in her Personal

18  Listening Information, and paid money for the music she purchased and downloaded

19  from Apple via its iTunes Store, Apple's disclosure of her Personal Listening

20  Information deprived Plaintiff Wheaton of the full set of benefits to which she was

21  entitled as a part of her digital music purchases, thereby causing her economic harm.

22  Accordingly, what Plaintiff Wheaton received (digital music purchases without

23  statutory privacy protections) was less valuable than what she paid for (digital music

24

CLASS ACTION COMPLAINT

1    purchases with statutory privacy protections), and she would not have been willing to

2    pay as much, if at all, for the music she purchased from Apple via its iTunes Store had

3    she known that Apple would disclose her Personal Listening Information.

4    **II.    Plaintiff Jill Paul**

5          77.    Plaintiff Jill Paul has on numerous occasions over the past three years,

6    while residing in Michigan, used an iPhone to purchase digital music, including rock

7    music, directly from Apple via its iTunes Store.

8          78.    Prior to and at the time she purchased digital music, including rock music,

9    from Apple via its iTunes Store, Apple did not notify Plaintiff Jill Paul that it would

10   disclose the Personal Listening Information of its customers to third parties, including,

11   but not limited to, developers of various mobile applications available for download in

12   its App Store, data aggregators, data appenders, data cooperatives, analytics

13   companies, and list brokers, and Plaintiff Jill Paul has never authorized Apple to do so.

14   Furthermore, Plaintiff Jill Paul was never provided any written notice that Apple

15   licenses, rents, exchanges, or otherwise discloses its customers' Personal Listening

16   Information to third parties, including, but not limited to, developers of various mobile

17   applications available for download in its App Store, data aggregators, data appenders,

18   data cooperatives, analytics companies, and list brokers, or any means of opting out of

19   such disclosures of her Personal Listening Information.

20         79.    Apple nonetheless sold, rented, transmitted and/or otherwise disclosed

21   Plaintiff Jill Paul's Personal Listening Information, either directly or through an

22   intermediary or intermediaries, to numerous third parties, including data miners,

23

24

30
CLASS ACTION COMPLAINT

1   appenders, aggregators, and analytics companies; mobile application developers; and

2   other third parties during the relevant time period.

3       80.    Plaintiff Jill Paul is informed and believes, and thereupon alleges, that

4   multiple mobile application developers and/or other third parties to whom Apple has

5   transmited and/or otherwise disclosed her Personal Listening Information have in turn

6   sold, rented, transmitted, and otherwise disclosed her Personal Listening Information

7   (together with other sensitive personal demographic and lifestyle information appended

8   thereto by data appenders and other entities) to other third parties, including other data

9   brokers, data miners, data appenders, and marketing companies.

10      81.    Because Apple sold, rented, transmitted and/or otherwise disclosed

11  Plaintiff Jill Paul's Personal Listening Information, Plaintiff Jill Paul now receives junk

12  mail from various companies and other organizations that do not offer products or

13  services through the mail. These unwarranted and harassing junk mailings, which are

14  attributable to Apple's unauthorized sale, rental, and/or other disclosure of her Personal

15  Listening Information, have wasted Plaintiff Jill Paul's time, money, and resources.

16      82.    Because Plaintiff Jill Paul is entitled by law to privacy in her Personal

17  Listening Information, and paid money for the music she purchased and downloaded

18  from Apple via its iTunes Store, Apple's disclosure of her Personal Listening

19  Information deprived Plaintiff Jill Paul of the full set of benefits to which she was

20  entitled as a part of her digital music purchases, thereby causing her economic harm.

21  Accordingly, what Plaintiff Jill Paul received (digital music purchases without

22  statutory privacy protections) was less valuable than what she paid for (digital music

23  purchases with statutory privacy protections), and she would not have been willing to

24

CLASS ACTION COMPLAINT

1   pay as much, if at all, for the music she purchased from Apple via its iTunes Store had

2   she known that Apple would disclose her Personal Listening Information.

3   **III.    Plaintiff Trevor Paul**

4          83.    Plaintiff Trevor Paul has on numerous occasions over the past three years,

5   while residing in Michigan, used an iPhone to purchase digital music, including rock

6   music, directly from Apple via its iTunes Store.

7          84.    Prior to and at the time he purchased digital music, including rock music,

8   from Apple via its iTunes Store, Apple did not notify Plaintiff Trevor Paul that it would

9   disclose the Personal Listening Information of its customers to third parties, including,

10  but not limited to, developers of various mobile applications available for download in

11  its App Store, data aggregators, data appenders, data cooperatives, analytics

12  companies, and list brokers, and Plaintiff Trevor Paul has never authorized Apple to

13  do so. Furthermore, Plaintiff Trevor Paul was never provided any written notice that

14  Apple licenses, rents, exchanges, or otherwise discloses its customers' Personal

15  Listening Information to third parties, including, but not limited to, developers of

16  various mobile applications available for download in its App Store, data aggregators,

17  data appenders, data cooperatives, analytics companies, and list brokers, or any means

18  of opting out of such disclosures of his Personal Listening Information.

19         85.    Apple nonetheless sold, rented, transmitted and/or otherwise disclosed

20  Plaintiff Trevor Paul's Personal Listening Information, either directly or through an

21  intermediary or intermediaries, to numerous third parties, including data miners,

22  appenders, aggregators, and analytics companies; mobile application developers; and

23  other third parties during the relevant time period.

24

**CLASS ACTION COMPLAINT**

86.     Plaintiff Trevor Paul is informed and believes, and thereupon alleges, that multiple mobile application developers and/or other third parties to whom Apple has transmitted and/or otherwise disclosed his Personal Listening Information have in turn sold, rented, transmitted, and otherwise disclosed his Personal Listening Information (together with other sensitive personal demographic and lifestyle information appended thereto by data appenders and other entities) to other third parties, including other data brokers, data miners, data appenders, and marketing companies.

87.     Because Apple sold, rented, transmitted and/or otherwise disclosed Plaintiff Trevor Paul's Personal Listening Information, Plaintiff Trevor Paul now receives junk mail from various companies and other organizations that do not offer products or services through the mail. These unwarranted and harassing junk mailings, which are attributable to Apple's unauthorized sale, rental, and/or other disclosure of his Personal Listening Information, have wasted Plaintiff Trevor Paul's time, money, and resources.

88.     Because Plaintiff Trevor Paul is entitled by law to privacy in his Personal Listening Information, and paid money for the music he purchased and downloaded from Apple via its iTunes Store, Apple's disclosure of his Personal Listening Information deprived Plaintiff Trevor Paul of the full set of benefits to which he was entitled as a part of his digital music purchases, thereby causing him economic harm. Accordingly, what Plaintiff Trevor Paul received (digital music purchases without statutory privacy protections) was less valuable than what he paid for (digital music purchases with statutory privacy protections), and he would not have been willing to

CLASS ACTION COMPLAINT

1  pay as much, if at all, for the music he purchased from Apple via its iTunes Store had

2  he known that Apple would disclose his Personal Listening Information.

3  **CLASS ACTION ALLEGATIONS**

4  89.  Plaintiff Wheaton brings this action pursuant to Federal Rules of Civil

5  Procedure 23(a), (b)(2), and (b)(3) on behalf of herself and a class of similarly-situated

6  Rhode Island residents (the "RI Class"), defined as follows:

7
8  > All residents of Rhode Island who, at any time during the
> applicable statutory period, had their Personal Listening
> Information disclosed to third parties by Apple without their
> consent.

9
10  90.  Plaintiffs Jill Paul and Trevor Paul bring this action pursuant to Federal

11  Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of themselves and a class

12  of similarly-situated Michigan residents (the "MI Class"), defined as follows:

13  > All residents of Michigan who, at any time between May 24,
> 2016 and July 30, 2016, had their Personal Listening
> Information disclosed to third parties by Apple without their
14  > consent.

15  91.  The RI Class and the MI Class are referred to herein collectively at times

16  as the "Classes".

17  92.  Excluded from the Classes is any entity in which Apple has a controlling

18  interest, and officers or directors of Apple.

19  93.  Members of the Classes are so numerous that their individual joinder

20  herein is impracticable, as they number, on information and belief, in the tens of

21  thousands for the RI Class and the hundreds of thousands for the MI Class. The precise

22  number of members of the Classes and their identities are unknown to Plaintiffs at this

23  time but may be determined through discovery. Members of the Classes may be

24

34

CLASS ACTION COMPLAINT

1  notified of the pendency of this action by mail and/or publication through the
2  distribution records of Apple.

3     94.    Common questions of law and fact exist as to all members of the Classes
4  and predominate over questions affecting only individual members of the Classes.
5  Common legal and factual questions include, but are not limited to:

6     (a)    For the RI Class: (1) whether Apple is a "retailer or distributor" of music
7  products; (2) whether Apple disclosed the "nature" of the music purchased by Plaintiff
8  Wheaton and the RI Class; (3) whether Apple obtained the requisite consent before
9  disclosing to third parties Plaintiff Wheaton's and the RI Class's Personal Listening
10  Information; (4) whether Apple's disclosure of Plaintiff Wheaton' and the RI Class's
11  Personal Listening Information violated Rhode Island General Laws § 11-18-32; and
12  (5) whether Apple's sale, rental, transmission, and/or disclosure of Plaintiff Wheaton's
13  and the RI Class's Personal Listening Information constitutes unjust enrichment.

14     (b)    For the MI Class: (1) whether Apple is "engaged in the business of selling
15  at retail" digitally-recorded and downloadable "sound recordings"; (2) whether Apple
16  obtained the requisite consent before disclosing to third parties Plaintiffs' and the MI
17  Class's Personal Listening Information; (3) whether Apple's disclosure of Plaintiffs'
18  and the MI Class's Personal Listening Information violated the MIPPPA § 2; and (4)
19  whether Apple's sale, rental, transmission, and/or disclosure of Plaintiffs' and the MI
20  Class's Personal Listening Information constitutes unjust enrichment.

21     95.    The claims of the named Plaintiffs are typical of the claims of each of the
22  Classes in that the Classes and the named Plaintiffs sustained damages as a result of

35
CLASS ACTION COMPLAINT

1   Apple's uniform wrongful conduct, based upon Apple's disclosures of Plaintiffs' and

2   the Classes' Personal Listening Information.

3       96.     Plaintiffs are adequate representatives of the Classes because their

4   interests do not conflict with the interests of the members of the Classes they seek to

5   represent, they have retained competent counsel experienced in prosecuting class

6   actions, and they intend to prosecute this action vigorously. The interests of the

7   members of the Classes will be fairly and adequately protected by Plaintiffs and their

8   counsel.

9       97.     The class mechanism is superior to other available means for the fair and

10  efficient adjudication of the claims of the members of the Classes. Each individual

11  member of each of the Classes may lack the resources to undergo the burden and

12  expense of individual prosecution of the complex and extensive litigation necessary to

13  establish Apple's liability. Individualized litigation increases the delay and expense to

14  all parties and multiplies the burden on the judicial system presented by the complex

15  legal and factual issues of this case. Individualized litigation also presents a potential

16  for inconsistent or contradictory judgments. In contrast, the class action device presents

17  far fewer management difficulties and provides the benefits of single adjudication,

18  economy of scale, and comprehensive supervision by a single court on the issue of

19  Apple's liability. Class treatment of the liability issues will ensure that all claims and

20  claimants are before this Court for consistent adjudication of the liability issues.

21

22

23

24

CLASS ACTION COMPLAINT

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### VIOLATION OF THE RIVRPA (R.I. Gen. Laws § 11-18-32)
### (By Plaintiff Wheaton on Behalf of Herself and the RI Class Against Apple)

98.   Plaintiff Wheaton repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

99.   Plaintiff Wheaton brings this claim on behalf of herself and the members of the RI Class against Defendant Apple.

100.   Through its iTunes Store mobile application, Apple sells and rents digitally-recorded music products to consumers at retail and distributes those products to consumers. *See* R.I. Gen. Laws § 11-18-32(a).

101.   The digitally-recorded music that Plaintiff Wheaton purchased from Apple via its iTunes Store are published materials that are "like" "records" and/or "cassettes" within the meaning of R.I. Gen. Laws § 11-18-32(a).

102.   By purchasing digitally-recorded music from Apple via its iTunes Store platform, Plaintiff Wheaton purchased materials that are "like" "records" and/or "cassettes," from a "retailer or distributor of those products" within the meaning of R.I. Gen. Laws § 11-18-32(a). *See* R.I. Gen. Laws § 11-18-32(a).

103.   At all times relevant, and beginning on the dates that Plaintiff Wheaton first purchased music from Apple via the iTunes Store, Apple disclosed to third persons Plaintiff Wheaton's Personal Listening Information — which identified her address and identified her as a purchaser of music of the rock genre, as well as a purchaser of particular titles of music — in at least two ways.

104.   First, Apple disclosed mailing lists containing Plaintiff Wheaton's Personal Listening Information, including the genres of music she has purchased, to data aggregators, data appenders, marketing companies, mobile application developers, and other third parties, who then supplemented the mailing lists with additional sensitive information from their own databases and re-disclosed the lists to other third parties for profit.

105.   Second, Apple disclosed the Personal Listening Information of Plaintiff Wheaton, including the genres and titles of music she has purchased, to numerous iOS mobile application developers and other third parties, who have in turn disclosed such data to other third parties for profit.

106.   Additionally, Plaintiff Wheaton is informed and believes, and thereupon alleges, that Apple has also sold, rented, transmitted, or otherwise disclosed her Personal Listening Information and that of the other members of the RI Class to third party data analytics companies, without their consent, including without limitation  to Gracenote, Inc., The Nielsen Company, and MusicMetric.

107.   At all times relevant, and beginning on the dates that Plaintiff Wheaton first purchased music from Apple via the iTunes Store, various third parties have, upon receiving the Personal Listening Information of Plaintiff Wheaton and the other members of the RI Class from Apple, further re-disclosed Plaintiff Wheaton's and the RI Class's Personal Listening Information to other third persons, including data aggregators, data appenders, marketing companies, mobile application developers, and other third parties.

CLASS ACTION COMPLAINT

108.   Because the mailing lists disclosed by Apple and redisclosed by other downstream entities included additional information from the data aggregators and appenders, the lists were more valuable, and Apple and the other third-party traffickers of such data were able to increase their profits gained from the mailing list rentals and/or exchanges.

109.   By selling, renting, transmitting, and/or otherwise disclosing its customer lists, together with its customers' addresses and the genres and/or titles of the music they puchased, Apple disclosed to persons other than Plaintiff Wheaton records which would identify her name, address, and the "nature" of the music she purchased from Apple. *See* R.I. Gen. Laws § 11-18-32(a).

110.   Plaintiff Wheaton and the members of the RI Class never consented to Apple disclosing their Personal Listening Information to anyone.

111.   Worse yet, Plaintiff Wheaton and the members of the RI Class did not receive notice before Apple disclosed their Personal Listening Information to third parties.

112.   Apple's disclosures of Plaintiff Wheaton's and the RI Class's Personal Listening Information were not made pursuant to lawful compulsion.

113.   Apple's disclosures of Plaintiff Wheaton's and the RI Class's Personal Listening Information were made to third parties, including, but not limited to, data aggregators, data appenders, data cooperatives, direct-mail advertisers, marketers, mobile application developers, and other third parties, in order to increase Apple's revenue.

CLASS ACTION COMPLAINT

114.   By disclosing Plaintiff Wheaton's and the RI Class's Personal Listening Information, Apple violated Plaintiff's and the RI Class's statutorily-protected right to privacy in their music-listening habits. *See* R.I. Gen. Laws § 11-18-32(a).

115.   Additionally, because Plaintiff Wheaton and the members of the RI Class paid Apple for the music they purchased from Apple's iTunes Store platform, and because Apple was obligated to comply with the RIVRPA, Apple's unlawful disclosure of Plaintiff Wheaton's and the other RI Class members' Personal Listening Information deprived Plaintiff Wheaton and the RI Class members of the full value of their paid-for digitally-recorded music. Because Plaintiff Wheaton and the other RI Class members ascribe monetary value to the privacy of their Personal Listening Information, Apple's unlawful sales, rentals, transmissions, and/or other disclosures of their Personal Listening Information caused them to receive less value than they paid for, thereby causing them economic harm.

116.   Likewise, because Plaintiff Wheaton and the other RI Class members ascribe monetary value to the privacy of their Personal Listening Information, a purchase of digitally-recorded that includes privacy protections for their Personal Listening Information is more valuable than one that does not.

117.   Accordingly, had Plaintiff Wheaton been adequately informed of Apple's disclosure practices, she would not have been willing to purchase the digitally-recorded music that she bought from Apple via its iTunes Store at the prices charged, if at all. Thus, Apple's unlawful disclosures caused Plaintiff Wheaton economic harm.

CLASS ACTION COMPLAINT

118. Apple's disclosures of Plaintiff Wheaton's Personal Listening Information to third parties has also caused an influx of third party print advertisements and e-mail spam to Plaintiff Wheaton's postal mailbox and e-mail inbox.

119. As a result of Apple's unlawful disclosures of their Personal Listening Information, Plaintiff Wheaton and the members of the RI Class have suffered privacy and economic injuries. On behalf of herself and the RI Class, Plaintiff Wheaton seeks: (1) an injunction requiring Apple to obtain consent from Rhode Island customers prior to disclosing their Personal Listening Information as required by the RIVRPA; (2) $250.00 for each RI Class member for each violation committed by Apple pursuant to R.I. Gen. Laws § 11-18-32(d); and (3) costs and reasonable attorneys' fees pursuant to R.I. Gen. Laws § 11-18-32(d).

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE MIPPPA**
**(H.B. 5331, 84th Leg., Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988)**
**(By the MI Plaintiffs on Behalf of Themselves and the MI Class Against Apple)**

120. Plaintiffs Jill Paul and Trevor Paul (hereinafter the "MI Plaintiffs") repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

121. The MI Plaintiffs bring this claim on behalf of themselves and the members of the MI Class against Apple.

122. The digitally-recorded music that Apple sells via its iTunes Store application constitute "sound recordings" within the meaning of MIPPPA § 2.

123. Through its iTunes Store mobile application, Apple is engaged in the business of selling and renting digitally-recorded music products to consumers at retail.

41

124. By purchasing and/or renting digitally-recorded rock music via the iTunes Store platform, each of the MI Plaintiffs purchased "sound recordings" directly from Apple. *See id.*

125. Because the MI Plaintiffs purchased sound recordings directly from Apple, the MI Plaintiffs are "customers" within the meaning of the MIPPPA. *See* MIPPPA § 1(a).

126. At various times between May 24, 2016 and July 30, 2016, Apple disclosed to third persons the MI Plaintiffs' Personal Listening Information, which identified them as purchasers of particular genres of music and of particular titles of music, in at least two ways.

127. First, between May 24, 2016 and July 30, 2016, Apple disclosed mailing lists containing the MI Plaintiffs' Personal Listening Information, including the genres of music they have purchased, to data aggregators, data appenders, marketing companies, mobile application developers, and other third parties, who then supplemented the mailing lists with additional sensitive information from their own databases and re-disclosed the lists to other third parties for profit.

128. Second, between May 24, 2016 and July 30, 2016, Apple disclosed the Personal Listening Information of the MI Plaintiffs, including the genres and titles of music they have purchased, to numerous third-party iOS mobile application developers and other third parties, who have in turn disclosed such data to other third parties for profit.

129. Additionally, the MI Plaintiffs are informed and believe, and thereupon allege, that Apple has also sold, rented, transmitted, or otherwise disclosed their

CLASS ACTION COMPLAINT

Personal Listening Information and that of the other members of the MI Class to third party data analytics companies, without their consent, including without limitation to Gracenote, Inc., The Nielsen Company, and MusicMetric.

130. By selling, renting, transmitting, and/or otherwise disclosing its customer lists together with the genres and/or titles of the music purchased by its customers between May 24, 2016 and July 30, 2016, Apple disclosed to persons other than the MI Plaintiffs records or information concerning the MI Plaintiffs' purchases of digitally-recorded music, i.e., "sound recordings," from Apple. *See* R.I. Gen. Laws § 11-18-32(a).

131. The information Apple disclosed indicates the MI Plaintiffs' names and addresses, as well as information indicating that they had purchased particular genres and titles of music from Apple. Accordingly, the records or information disclosed by Apple indicated the MI Plaintiffs' identities. *See* MIPPPA § 2.

132. The MI Plaintiffs and the members of the MI Class never consented to Apple disclosing their Personal Listening Information to anyone.

133. The MI Plaintiffs and the members of the MI Class did not receive notice before Apple disclosed their Personal Listening Information to third parties.

134. Apple's disclosures of the MI Plaintiffs' and the MI Class's Personal Listening Information between May 24, 2016 and July 30, 2016 were not made pursuant to a court order, search warrant, or grand jury subpoena.

135. Apple's disclosures of the MI Plaintiffs' and the MI Class's Personal Listening Information between May 24, 2016 and July 30, 2016 were not made to collect payment for their music purchases.

CLASS ACTION COMPLAINT

1  136.   Apple's disclosures of the MI Plaintiffs' Personal Listening Information

2  between May 24, 2016 and July 30, 2016 were made to third parties, including, but not

3  limited to, data aggregators, data appenders, data cooperatives, direct-mail advertisers,

4  marketers, mobile application developers, and other third parties, in order to increase

5  Apple's revenue.  Accordingly, Apple's disclosures were not made for the exclusive

6  purpose of marketing goods and services directly to the MI Plaintiffs and the members

7  of the MI Class.

8  137.   By disclosing the MI Plaintiffs' Personal Listening Information between

9  May 24, 2016 and July 30, 2016, Apple violated Plaintiff's and the Class's statutorily-

10  protected right to privacy in their music-listening habits. *See* MIPPPA § 2.

11  138.   Additionally, because the MI Plaintiffs and the members of the MI Class

12  paid Apple for the music they purchased from Apple's iTunes Store platform, and

13  because Apple was obligated to comply with the MIPPPA, Apple's unlawful disclosure

14  of the MI Plaintiffs' and the other MI Class members' Personal Listening Information

15  deprived Plaintiffs and the RI Class members of the full value of their paid-for digitally-

16  recorded music. Because the MI Plaintiffs and the other MI Class members ascribe

17  monetary value to the privacy of their Personal Listening Information, Apple's

18  unlawful sales, rentals, transmissions, and/or other disclosures of their Personal

19  Listening Information caused them to receive less value than they paid for, thereby

20  causing them economic harm.

21  139.   Likewise, because the MI Plaintiffs and the other MI Class members

22  ascribe monetary value to the privacy of their Personal Listening Information, a

23

24

CLASS ACTION COMPLAINT

purchase of digitally-recorded that includes privacy protections for their Personal Listening Information is more valuable than one that does not.

140. Accordingly, had the MI Plaintiffs been adequately informed of Apple's disclosure practices, they would not have been willing to purchase the digitally-recorded music that they bought from Apple via its iTunes Store at the prices charged, if at all. Thus, Apple's unlawful disclosures caused the MI Plaintiffs economic harm.

141. Apple's disclosure of the MI Plaintiffs' Personal Listening Information to third parties between May 24, 2016 and July 30, 2016 has also caused an influx of third party print advertisements and e-mail spam to the MI Plaintiffs' mailboxes and inboxes.

142. As a result of Apple's unlawful disclosures of their Personal Listening Information, the MI Plaintiffs and the members of the MI Class have suffered privacy and economic injuries. On behalf of themselves and the MI Class, the MI Plaintiffs seek: (1) an injunction requiring Apple to obtain consent from Michigan customers prior to disclosing their Personal Listening Information as required by the MIPPPA; (2) $5,000.00 for each MI Class member for each violation committed by Apple pursuant to MIPPPA § 5(a); and (3) costs and reasonable attorneys' fees pursuant to MIPPPA § 5(b).

### THIRD CLAIM FOR RELIEF
### UNJUST ENRICHMENT
**(Brought by all Plaintiffs on Behalf of Themselves
And Members of Both Classes Against Apple)**

143. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

144. Plaintiffs all bring this claim individually and on behalf of the members of both Classes against Apple.

CLASS ACTION COMPLAINT

145.   Plaintiffs and the members of the Classes conferred benefits on Apple by providing Apple with their Personal Listening Information and paying Apple for the digitally-recorded music they purchased from Apple via its iTunes Store platform.

146.   Apple received and retained the information and money belonging to Plaintiffs and the Classes when Plaintiffs and the members of the Classes purchased digitally-recorded music from Apple via its iTunes Store platform.

147.   Because Apple received and processed payments for music purchases from Plaintiffs and the members of the Classes, together with their Personal Listening Information, and because Apple has employees and/or agents handling customer accounts and billing as well as customer data, Apple appreciates or has knowledge of such benefits.

148.   Under the MIPPPA and RIVRPA, Plaintiffs and the members of the Classes were entitled to confidentiality in their Personal Listening Information as part of their purchases.

149.   Under principles of equity and good conscience, because Apple failed to comply with the MIPPPA and RIVRPA, Apple should not be allowed to retain the full amount of money Plaintiffs and the members of the Classes paid for their purchases or the money it received by selling, renting, transmitting, and/or otherwise disclosing the Personal Listening Information of Plaintiffs and the members of the Classes.

150.   Plaintiffs and the members of the Classes have suffered actual damages as a result of Apple's unlawful conduct in the form of the value Plaintiffs and the members of the Classes paid for and ascribed to the confidentiality of their Personal Listening Information. This amount is tangible and will be calculated at trial.

CLASS ACTION COMPLAINT

151.    Additionally, Plaintiffs and the members of the Classes have suffered actual damages inasmuch as Apple's failure to inform them that it would disclose their Personal Listening Information caused them to purchase digitally-recorded music via the iTunes Store when they otherwise would not have.

152.    Further, a portion of the purchase price of each song or album of music sold to Plaintiffs and the members of the Classes was intended to ensure the confidentiality of their Personal Listening Information, as required by the MIPPPA and the RIVRPA. Because Plaintiffs and the members of the Classes were denied services that they paid for and were entitled to receive—i.e., confidentiality in their Personal Listening Information—and because Plaintiffs and the members of the Classes would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

153.    To prevent inequity, Apple should return to Plaintiffs and the members of the Classes: (1) the value they ascribe to maintaining the confidentiality of their Personal Listening Information, and (2) all money derived from Apple's sales, rentals, transmissions, and/or other disclosures of the Personal Listening Information of Plaintiffs and the members of the Classes.

154.    Accordingly, Plaintiffs and the members of the Classes seek an order declaring that Apple's conduct constitutes unjust enrichment, and awarding Plaintiffs and the members of the Classes restitution in an amount to be calculated at trial equal to the amount of money obtained by Apple through its sales, rentals, transmissions, and/or other disclosures of the Personal Listening Information of Plaintiffs and the members of the Classes.

CLASS ACTION COMPLAINT

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek a judgment against Apple, individually and on behalf of all others similarly situated, as follows:

A.    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Classes and Plaintiffs' attorneys as Class Counsel to represent the Classes.

B.    For an order declaring that Apple's conduct as described herein violates the Video, Audio, And Publication Rentals Privacy Act, R.I. Gen. Laws § 11-18-32;

C.    For an order declaring that Apple's conduct as described herein violates Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg., Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg., Reg. Sess., P.A. No. 206, § 1 (Mich. 1989);

D.    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

E.    For Apple to pay $250 to Plaintiff Wheaton and each unnamed RI Class member, as provided by the Video, Audio, And Publication Rentals Privacy Act, R.I. Gen. Laws § 11-18-32(d);

F.    For Apple to pay $5,000 to Plaintiffs Jill Paul and Trevor Paul and each MI Class member, as provided by the Preservation of Personal Privacy Act, H.B. 5331, 84th Leg., Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg., Reg. Sess., P.A. No. 206, § 1 (Mich. 1989);

G.    For prejudgment interest on all amounts awarded;

H.    For an order of restitution and all other forms of equitable monetary relief;

CLASS ACTION COMPLAINT

I.      For injunctive relief as pleaded or as the Court may deem proper; and

J.      For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

### DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the Classes, hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all claims so triable.

Dated:  May 24, 2019                    Respectfully submitted,

By: /s/ Frank S. Hedin
Frank S. Hedin

FRANK S. HEDIN (SBN 291289)
fhedin@hedinhall.com
DAVID W. HALL (SBN 274921)
dhall@hedinhall.com
**HEDIN HALL LLP**
Four Embarcadero Center, Suite 1400
San Francisco, California 94104
Telephone:  (415) 766-3534
Facsimile:   (415) 402-0058

TINA WOLFSON (SBN 174806)
twolfson@ahdootwolfson.com
ROBERT AHDOOT (SBN 172098)
rahdoot@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Dr.
Los Angeles, California 90024
Telephone:  (310) 474-9111
Facsimile:   (310) 474-8585

L. TIMOTHY FISHER (SBN 191626)
ltfisher@bursor.com
**BURSOR & FISHER, P.A.**
1990 North California Blvd., Suite 940
Walnut Creek, California 94596
Telephone:  (925) 300-4455
Facsimile:   (925) 407-2700

49
CLASS ACTION COMPLAINT

JOSEPH I. MARCHESE*
jmarchese@bursor.com
PHILIP L. FRAIETTA*
pfraietta@bursor.com
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, NY 10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163

\* *Pro Hac Vice* Application Forthcoming

*Counsel for Plaintiffs and the Putative Classes*

# Exhibit B

(First Amended Class Action Complaint [Dkt. No. 16]
*John Nashel and Tim Robinson v. The New York Times Company*
USDC, Eastern District of Michigan
Case No. 2:22-CV-10633)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JOHN NASHEL and TIM ROBINSON, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE NEW YORK TIMES COMPANY, <br><br> Defendant. | Case No. 22-cv-10633-SJM-DRG <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs John Nashel and Tim Robinson, individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

### INTRODUCTION

1.      Defendant The New York Times Company ("NYT") rented, exchanged, and/or otherwise disclosed detailed information about Plaintiffs' *The New York Times* newspaper subscriptions to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed Plaintiffs' information to aggressive advertisers, political organizations, and non-profit

companies. As a result, Plaintiffs have received a barrage of unwanted junk mail. By renting, exchanging, and/or otherwise disclosing Plaintiffs' Private Reading Information (defined below) during the relevant pre-July 31, 2016 time period,[1] NYT violated Michigan's Video Rental Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "VRPA").[2]

2. During the relevant pre-July 31, 2016 time period, *i.e.*, between March 24, 2016 and July 30, 2016, numerous list brokers, data aggregators, data cooperatives, data brokers, and others, including but not limited to NextMark, Experian, Direct Magazine, and, on information and belief, Infogroup (now known as Data Axle), acting as third-party intermediaries on behalf of NYT, obtained from NYT and then disclosed to numerous other third parties the Private Reading

---

[1]    The statutory period for this action is six years. *See* M.C.L. § 600.5813.

[2]    In May 2016, the Michigan legislature amended the VRPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the VRPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the VRPA, the pre-amendment version of the VRPA applies in this case. *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. Sept. 28, 2018).

Information of all of the subscribers and recently expired subscribers to *The New York Times* and NYT's other publications. In addition to disclosing to numerous list brokers, data aggregators, data cooperatives, data brokers, and other such entities during the relevant pre-July 31, 2016 time period, NYT also disclosed all of its customers' Private Reading Information to other publishers (and their agents and affiliates) in exchange for the private reading information of individuals who had purchased publications from those publishers.

3.     Documented evidence confirms these facts. For example, in 2007, a list broker, NextMark, Inc. ("NextMark"), offered to provide renters access to the mailing list titled "The New York Times Mailing List", which contained the Private Reading Information of 1,144,786 of NYT's active U.S. subscribers at a base price of "$135.00/M [per thousand]," (*i.e.*, 13.5 cents apiece), as shown in the screenshot below:



*See* **Exhibit A** hereto.

4.     And in 2008, another list broker, Direct Magazine, offered to provide renters access to the mailing list titled "The New York Times Enhanced Database", which contained the Private Reading Information of 1,148,550 of NYT's active U.S. subscribers at a base price of "$135.00/M [per thousand]," (*i.e.*, 13.5 cents apiece), as shown in the screenshot below:

4



*See* **Exhibit B** hereto.[3]

5. Notably, the Direct Magazine offering confirms that *The New York Times* subscriber information has been shared and supplemented, or enhanced, with third-party Experian's demographic data prior to being rented out to third-party mailers including "[f]undraiser[s]." For example, the "DESCRIPTION" portion of the offering reads, "While subscribers to The New York Times share many interests from the arts to sports, Experian INSOURCE data lets you target over 35 different

---

[3] *See also* **Exhibit C,** Chris Jay Hoofnagle & Jennifer King, *Consumer Information Sharing: Where the Sun Still Don't Shine*, at 12, Univ. of California School of Law, 2008, http://www.law.berkeley.edu/files/sb27report.pdf.

lifestyle and demographic selects.  The INSOURCE Database is updated continually in a transactional environment from thousands of public and proprietary sources to identify the prime New York Times subscribers who are most likely to respond to specific types of offers. . . .  Mailers serving the needs of an upscale, educated audience will reach their target with these readers as identified by INSOURCE lifestyle and demographics enhanced."

6.     Although at some point NYT ceased making its "data cards" available on list brokers' publicly accessible websites (the data cards shown above are no longer publicly advertised online), NYT nonetheless continued to sell, rent, exchange, and/or otherwise disclose all of its subscribers' Private Reading Information to data aggregators, data appenders, data cooperatives, and list brokers, among others, throughout the relevant pre-July 31, 2016 time period.  Indeed, Plaintiffs' counsel's investigation into this matter has revealed that, throughout the relevant pre-July 31, 2016 time period, NYT stated in its "Privacy Policy" on its website that it was actively selling, renting, exchanging, or otherwise disclosing its subscribers' Private Reading Information:

> If you are a print subscriber, we may exchange or rent your name and mailing address (but not your email address) and certain other information, such as when you first subscribed to The New York Times with other reputable companies that offer marketing information or products

through direct mail.[4]

7. Moreover, in 2020, a publication titled "Direct Digital Data Drive Marketing 5th Edition" was released that featured a "case study" on the marketing strategies employed by Virginia Beach, Virginia to boost the city's tourism.[5] The publication described how Virginia Beach had rented *The New York Times* subscriber list as part of this effort, stating in pertinent part:

> Virginia Beach employs a multi-media marketing strategy, including magazines, interactive/online, broadcast television and radio, as well as select newspapers. Its marketing strategy is designed to achieve two objectives: (1) to generate awareness of Virginia Beach as a quality, year- round destination; and (2) to drive traffic to its tourism websites, VisitVirginiaBeach.com and LiveTheLife.com. Virginia Beach marketers have used list-rental strategies to identify e-mail lists that might prove to be useful in connecting with prospective tourists. They have recently run a dedicated Virginia Beach e-mail campaign with lists from WeatherBug, eTarget Media, iExplore, Orbitz, Sherman's Travel, Daily Candy, *The New York Times*, *The Washington Post*, *The News & Observer* (Raleigh, NC), eBrains, and *The Baltimore Sun*.[6]

---

[4]     **Exhibit D**, The New York Times, *Privacy Policy*, June 10, 2015, https://web.archive.org/web/20160731042525/http://www.nytimes.com/content/help/rights/privacy/policy/privacy-policy.html (last visited June 20, 2022).

[5]     Lisa Spiller, *Direct, Digital & Data-Driven Marketing 5th Ed.*, SAGE Publications Ltd. (2020), http://books.google.com/books?id=fSPLDwAAQBAJ.

[6]     *Id.* at 272.

8. These are but a handful of examples to illustrate NYT's practices of selling, renting, exchanging, and/or otherwise disclosing the Private Reading Information of its entire subscriber-base during the relevant pre-July 31, 2016 time period. The reality is that NYT disclosed its subscribers' Private Reading Information, including that of the Plaintiffs and the members of the Class, to numerous third parties (the identities of which are not fully known at this time) without consent during this time frame. A reasonable opportunity for discovery will reveal the depth of NYT's wrongdoing.

9. The VRPA clearly prohibits what NYT has done. Subsection 2 of the VRPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

VRPA § 2. Thus, by renting, exchanging, or otherwise disclosing the Private Reading Information of its Michigan-based subscribers during the relevant pre-July 31, 2016 time period, NYT violated the VRPA.

10. Accordingly, Plaintiffs bring this First Amended Class Action Complaint against NYT for its intentional and unlawful disclosure of its customers' Private Reading Information in violation of the VRPA.

8

## NATURE OF THE CASE

11.　　To supplement its revenues, NYT rents, exchanges, or otherwise discloses its customers' information—including their full names, titles of publications subscribed to, and home addresses (collectively "Private Reading Information"), as well as myriad other categories of individualized data and demographic information such as gender and age—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers.

12.　　By renting, exchanging, or otherwise disclosing—rather than selling—its customers' Private Reading Information, NYT is able to disclose the information time and time again to countless third parties.

13.　　NYT's disclosures of Private Reading Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.  For example, anyone could buy a customer list provided by NYT that contains the names and addresses of all women over the age of 80 who subscribe to *The New York Times* and live in Detroit.

14.　　While NYT profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Reading Information and other individualized information, it does so at the expense of its customers' statutory

9

privacy rights (afforded by the VRPA) because NYT does not obtain its customers' written consent prior to disclosing their Private Reading Information.

## **PARTIES**

15.　　Plaintiff John Nashel is a natural person and citizen of the State of Michigan and resides in Allen Park, Michigan.

16.　　Plaintiff Tim Robinson is a natural person and citizen of the State of Michigan and resides in Howell, Michigan.

17.　　Plaintiffs were subscribers to *The New York Times*, including during the relevant pre-July 31, 2016 time period.  *The New York Times* is published by NYT.  While residing in, citizens of, and present in Michigan, Plaintiffs purchased their subscriptions to *The New York Times* newspaper directly from NYT.  Prior to and at the time Plaintiffs subscribed to *The New York Times*, NYT did not notify Plaintiffs that it discloses the Private Reading Information of its customers, and Plaintiffs have never authorized NYT to do so.  Furthermore, Plaintiffs were never provided any written notice that NYT rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out.　After subscribing to *The New York Times*, and during the relevant pre-July 31, 2016 time period, NYT disclosed, without the requisite consent or prior notice, Plaintiffs' Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files.

10

Moreover, during that same period, NYT rented or exchanged mailing lists containing Plaintiffs' Private Reading Information to third parties seeking to contact NYT subscribers, without first obtaining the requisite written consent from Plaintiffs or even giving them prior notice of the rentals, exchanges, and/or other disclosures. As a result of NYT's practices of disclosing their Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiffs saw a dramatic uptick of junk mail in their mailboxes over the same time period.

18.    Defendant The New York Times Company is a New York corporation with its headquarters and principal place of business in New York, New York. NYT does business throughout Michigan and the entire United States. NYT is the publisher of the newspapers *The New York Times* and *The New York Times International Edition* and the magazine *The New York Times Magazine*.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

20.    The Court has personal jurisdiction over NYT because Plaintiffs' claims arose in substantial part from actions and omissions in Michigan, including

11

from Plaintiffs' purchase of *The New York Times* subscriptions in Michigan, NYT's direction of such *The New York Times* subscriptions into Michigan, and NYT's failure to obtain Plaintiffs' written consent in Michigan prior to disclosing their Private Reading Information, including their residential addresses in Michigan, to another person, the effects of which were felt from within Michigan by a citizen and resident of Michigan. Personal jurisdiction also exists over NYT in Michigan because NYT conducts substantial business within Michigan, such that NYT has significant, continuous, and pervasive contacts with the State of Michigan.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because NYT is subject to personal jurisdiction in this judicial District, Plaintiffs reside in this judicial District, NYT does substantial business in this judicial District, and a substantial part of the events giving rise to Plaintiffs' claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Michigan's Video Rental Privacy Act*

22. In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."

12

S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

23.    Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the VRPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

24.    Subsection 2 of the VRPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

VRPA § 2 (emphasis added).

25.    Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.  This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

13

26.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

27.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities . . . reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id.*

28.     Michigan's passage of the VRPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter."  *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit E**).

29.     Despite the fact that thousands of Michigan residents subscribe to *The New York Times* and NYT's other publications, NYT disregarded its legal responsibility to these individuals by systematically violating the VRPA.

14

### *The Private Information Market:*
### *Consumers' Private Information Has Real Value*

30.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson

Swindle remarked that "the digital revolution . . . has given an enormous capacity

to the acts of collecting and transmitting and flowing of information, unlike anything

we've ever seen in our lifetimes . . . [and] individuals are concerned about being

defined by the existing data on themselves."[7]

31.     More than a decade later, Commissioner Swindle's comments ring

truer than ever, as consumer data feeds an information marketplace that supports a

$26 billion dollar per year online advertising industry in the United States.[8]

32.     The FTC has also recognized that consumer data possesses inherent

monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types
> and amount of information collected by businesses, or why
> their information may be commercially valuable. Data is
> currency. The larger the data set, the greater potential for

---

[7]     **Exhibit F**, The Information Marketplace:  Merging and Exchanging
Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at*
https://www.ftc.gov/sites/default/files/documents/public_events/information-
marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited
July 30, 2021).

[8]     *See* **Exhibit G**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011),
http://online.wsj.com/article/SB10001424052748703529004576160764037920274
.html (last visited July 30, 2021).

analysis—and profit.[9]

33.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[10]

34.    The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[11]

35.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of

---

[9]    **Exhibit H**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at*: https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021) (emphasis added).

[10]    *See* **Exhibit I**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

[11]    **Exhibit J**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N120616S.pdf (last visited July 30, 2021).

16

information about consumers that are now available."[12]

36.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[13]

37.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[14]

38.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure

---

[12]     **Exhibit K**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

[13]     *See* **Exhibit L**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[14]     *Id.*

unsuspecting consumers into various scams,[15] including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like NYT share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[16]

39.     Information disclosures like those made by NYT are particularly dangerous to the elderly. As NYT has itself recognized in its own newspaper, "[o]lder Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[17] Indeed, the FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly

---

[15]    *See* **Exhibit M**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

[16]    **Exhibit N**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

[17]    *Id.*

18

attractive offers."[18] Consequently, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

40. Thus, information disclosures like NYT's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[19]

41. NYT is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

42. Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

---

[18] **Exhibit O**, *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited June 20, 2022).

[19] *See id.*

### *Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases*

43.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

44.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[20]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[21]

45.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

46.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell

---

[20]     *See* **Exhibit P**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

[21]     *Id.*

their information themselves.[22]

47.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace:  consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[23]

48.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[24]

**NYT *Unlawfully Rents, Exchanges, And Discloses Its Customers' Private Reading Information***

49.     NYT maintains a vast digital database comprised of its customers'

---

[22]     *See* **Exhibit Q**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

[23]     *See* **Exhibit R**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[24]     *See* **Exhibit S**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

21

Private Reading Information. NYT discloses its customers' Private Reading Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each NYT customer, including his or her gender and age.

50.     NYT then rents and/or exchanges its mailing lists—which include subscribers' Private Reading Information identifying which individuals purchased subscriptions to particular newspapers, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts.

51.     NYT also discloses its customers' Private Reading Information to data cooperatives, who in turn give NYT access to their own mailing list databases.

52.     As a result of NYT's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from NYT that identify NYT's customers by their most intimate details such as their gender and age. NYT's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

53.     NYT does not seek its customers' prior consent, written or otherwise, before making these disclosures and its customers remain unaware that their Private

Reading Information and other sensitive information is being rented and exchanged on the open market.

54.     NYT was engaged in these practices throughout the relevant pre-July 31, 2016 time period.  During that time period, NYT rented, sold, exchanged, or otherwise disclosed all of its subscribers' Private Reading Information to various data aggregators and appenders, data brokers, list managers, and other third parties, including, on information and belief, and without limitation, Infogroup (now known as Data Axle).

55.     Consumers can sign up for subscriptions to NYT's publications through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribes, NYT never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period. Consequently, during the relevant pre-July 31, 2016 time period, NYT uniformly failed to obtain any form of consent from—or even provide effective notice to—its customers before disclosing their Private Reading Information.

56.     As a result, during the relevant pre-July 31, 2016 time period, NYT disclosed its customers' Private Reading Information—including their reading habits and preferences that can "reveal intimate facts about our lives, from our

political and religious beliefs to our health concerns"[25]—to anybody willing to pay for it.

57.     By and through these actions, NYT intentionally disclosed to third parties its Michigan customers' Private Reading Information without consent during the relevant pre-July 31, 2016 time period, in direct violation of the VRPA.

## CLASS ACTION ALLEGATIONS

58.     Plaintiffs seek to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Reading Information disclosed to third parties by NYT without consent (the "Class"). Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

59.     Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the tens or hundreds of thousands. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

---

[25]     **Exhibit T**, *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

24

60. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether NYT is a "retailer or distributor" of publications (*i.e.*, newspapers); (b) whether NYT obtained consent before disclosing to third parties Plaintiffs' and the Class's Private Reading Information; and (c) whether NYT's disclosure of Plaintiffs' and the Class's Private Reading Information violated the VRPA.

61. The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the VRPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiffs' and the Class's Private Reading Information.

62. Plaintiffs are an adequate representative of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

63. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual

prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION
### Violation of Michigan's Video Rental Privacy Act
### (VRPA § 2)

64. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

65. Plaintiffs bring this claim individually and on behalf of members of the Class against Defendant NYT.

66. As a newspaper publisher that sells subscriptions to consumers, NYT is engaged in the business of selling written materials at retail. *See* VRPA § 2.

67. By purchasing a subscription to *The New York Times*, each of the Plaintiffs purchased written materials directly from NYT. *See* VRPA § 2.

26

68.     Because Plaintiffs purchased written materials directly from NYT, each is a "customer" within the meaning of the VRPA. *See* VRPA § 1.

69.     At various times during the pre-July 31, 2016 time period, NYT disclosed Plaintiffs' Private Reading Information, which identified each as a *The New York Times* customer, in at least three ways.

70.     First, NYT disclosed mailing lists containing Plaintiffs' Private Reading Information (along with all of its other subscribers' Private Reading Information) to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to NYT.

71.     Second, NYT disclosed mailing lists containing Plaintiffs' Private Reading Information (along with all of its other subscribers' Private Reading Information) to data cooperatives, who in turn gave NYT access to their own mailing list databases.

72.     Third, NYT rented and/or exchanged its mailing lists containing Plaintiffs' Private Reading Information (along with all of its other subscribers' Private Reading Information)—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

27

73. Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and NYT was able to increase its profits gained from the mailing list rentals and/or exchanges.

74. By renting, exchanging, or otherwise disclosing its customer lists during the relevant pre-July 31, 2016 time period, NYT disclosed to persons other than Plaintiffs records or information concerning their purchases of written materials from NYT. *See* VRPA § 2.

75. The information NYT disclosed indicates Plaintiffs' names and addresses, as well as the fact that they subscribed to *The New York Times*. Accordingly, the records or information disclosed by NYT indicated Plaintiffs' identities. *See* VRPA § 2.

76. Plaintiffs and the members of the Class never consented to NYT disclosing their Private Reading Information to anyone.

77. Worse yet, Plaintiffs and the members of the Class did not receive notice before NYT disclosed their Private Reading Information to third parties.

78. NYT's disclosures of Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

79. NYT's disclosures of Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made to

collect payment for their subscriptions.

80.     NYT's disclosures of Plaintiffs' Private Reading Information during the relevant pre-July 31, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase NYT's revenue.  Accordingly, NYT's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiffs and the members of the Class.

81.     By disclosing Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period, NYT violated Plaintiffs' and the Class's statutorily protected right to privacy in their reading habits.  *See* VRPA § 2.

82.     As a result of NYT's unlawful disclosure of their Private Reading Information, Plaintiffs and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the VRPA).   On behalf of themselves and the Class, Plaintiffs seek: (1) $5,000.00 to each of the Plaintiffs and each Class member pursuant to VRPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to VRPA § 5(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the

Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

B.     For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

C.     For an award of $5,000 to each of the Plaintiffs and each Class member, as provided by the Video Rental Privacy Act, VRPA § 5(a);

D.     For prejudgment interest on all amounts awarded; and

E.     For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: June 28, 2022         Respectfully submitted,

**JOHN NASHEL & TIM ROBINSON**

By: */s/ E. Powell Miller*
One of Plaintiffs' Attorneys

E. Powell Miller
epm@millerlawpc.com
THE MILLER LAW FIRM
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248.841.2200

Philip L. Fraietta
pfraietta@bursor.com
Joseph I. Marchese
jmarchese@bursor.com
BURSOR & FISHER, P.A.

888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163

Frank S. Hedin
fhedin@hedinhall.com
Arun G. Ravindran
aravindran@hedinhall.com
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801

*Counsel for Plaintiffs and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I, E. Powell Miller, an attorney, hereby certify that on June 28, 2022, I served the above and foregoing ***Plaintiffs' First Amended Class Action Complaint*** on all counsel of record by filing it electronically with the Clerk of the Court using the CM/ECF filing system.


<u>      /s E. Powell Miller</u>
E. Powell Miller

2