## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MARY LOU PETT; KATHLEEN FICK-GEE; DIANE BRYCE; PATTI DELVALLE; MICHELLE HOLCOMB; KIM READUS; ALICE REESE; ERIKA VAN ALLER; and LINDA WHITE, individually and on behalf of all others similarly situated, | Case No. 2:22-cv-11389-DPH-EAS

Hon. Denise Page Hood |
| Plaintiffs, | |
| v. | |
| PUBLISHERS CLEARING HOUSE, INC., | |
| Defendant. | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

## STATEMENT OF ISSUES PRESENTED

1.    Are the Second Amended Class Action Complaint's factual allegations that Defendant, during the relevant pre-July 31, 2016 time period, disclosed Plaintiffs' Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, as well as rented or exchanged mailing lists containing Plaintiffs' Private Purchase Information to third parties seeking to contact Defendant's customers, without first obtaining the requisite written consent from Plaintiffs – allegations which are bolstered by various exhibits from Defendant's and its business partners' own websites – sufficient to plausibly suggest an entitlement to relief under the version of Michigan's Preservation of Personal Privacy Act in effect through July 30, 2016?

**Plaintiffs' Answer: Yes.**

## CONTROLLING AND MOST APPROPRIATE AUTHORITIES

Fed. R. Civ. P. 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)

*Kinder v. Meredith Corp.*, 2014 WL 4209575 (E.D. Mich. Aug. 26, 2014)

*Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 682 (W.D. Mich. 2018)

*Nashel v. New York Times Co.*, 2022 WL 6775657 (E.D. Mich. Oct. 11, 2022)

*Mediacom Se. LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396 (6th Cir. 2012)

*Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674 (E.D. Mich. 2013)

*Haitayan v. 7-Eleven, Inc.*, 762 F. App'x 393, 395 (9th Cir. 2019)

## TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED ......................................................................i

CONTROLLING AND MOST APPROPRIATE AUTHORITIES............................ii

TABLE OF AUTHORITIES ............................................................................. iv

    INTRODUCTION ................................................................................. 1

    ARGUMENT ....................................................................................... 5

    CONCLUSION .................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................... 4, 23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................... 4, 23

*Boelter v. Advance Mag. Publishers Inc.*,
210 F. Supp. 3d 579 (S.D.N.Y. 2016) ......................................................... 6

*Boelter v. Hearst Commc'ns, Inc.*,
192 F. Supp. 3d 427 (S.D.N.Y. 2016) ......................................................... 1

*Bownes v. Borroughs Corp.*,
2021 WL 1921066 (W.D. Mich. May 13, 2021) ......................................... 2

*Cain v. Redbox Automated Retail, LLC*,
981 F. Supp. 2d 674 (E.D. Mich. 2013) .................................................... 10

*Doe v. Michigan State Univ.*,
989 F.3d 418 (6th Cir. 2021) .................................................................... 10

*Edwards v. Hearst Communications, Inc.*,
No. 1:15-cv-09279-AT-JLC (S.D.N.Y.) ....................................................... 8

*Foman v. Davis*,
371 U.S. 178 (1962) ................................................................................. 24

*Haitayan v. 7-Eleven, Inc.*,
762 F. App'x 393 (9th Cir. 2019) ............................................................... 4

*Horton v. GameStop Corp.*,
380 F. Supp. 3d 679 (W.D. Mich. 2018) ............................................ 1, 6, 10

*Howard v. Onion*,
2022 WL 2065950 (6th Cir. May 17, 2022) ................................................ 3

*Hufford v. Maxim Inc.*,
No. 1:19-cv-04452-ALC-RWL (S.D.N.Y.) .................................................... 8

*Kain v. The Economist Newspaper NA, Inc.*,
No. 4:21-cv-11807-MFL-CI (E.D. Mich.) ..................................................... 8

*Kinder v. Meredith Corp.*,
No. 1:14-cv-11284-TLL-CEB (E.D. Mich.) ................................................... 8

*Kokoszki v. Playboy Enterprises, Inc.*,
No. 2:19-cv-10302-BAF-RSW (E.D. Mich.) .................................................. 8

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) ................................................................................... 1

*Loftus v. Outside Integrated Media*,
No. 2:21-cv-11809-MAG-DRG (E.D. Mich.) ................................................ 8

*Mackey v. Rising,*
    2021 WL 4034226 (E.D. Mich. Sept. 3, 2021) ................................................ 2

*Mediacom Se. LLC v. BellSouth Telecommunications, Inc.,*
    672 F.3d 396 (6th Cir. 2012) ........................................................................ 4, 23

*Moeller v. Advance Mag. Publishers, Inc.,*
    No. 1:15-cv-05671-NRB (S.D.N.Y.) ............................................................... 8

*Moeller v. Am. Media, Inc.,*
    No. 5:16-cv-11367-JEL-EAS (E.D. Mich.) ...................................................... 8

*Moeller v. Am. Media, Inc.,*
    235 F. Supp. 3d 868 (E.D. Mich. 2017) ........................................................... 6

*Moeller v. The Week Publications, Inc.,*
    No. 1:22-cv-10666-TLL-PTM (E.D. Mich.) ................................................... 8

*Nashel v. New York Times Co.,*
    2022 WL 6775657 (E.D. Mich. Oct. 11, 2022) ......................................... 9, 10, 12, 13

*Perlin v. Time Inc.,*
    No. 2:16-cv-10635-GCS-MKM (E.D. Mich.) ................................................ 8

*Perlin v. Time Inc.,*
    237 F. Supp. 3d 623 (E.D. Mich. 2017) ........................................................... 6

*Pratt v. KSE Sportsman Media, Inc.,*
    586 F. Supp. 3d 666 (E.D. Mich. 2022) ....................................................... 2, 3

*Ruppel v. Consumers Union of United States, Inc.,*
    No. 7:16-cv-02444-KMK (S.D.N.Y.) ............................................................... 8

*Strano v. Kiplinger Washington Editors, Inc.,*
    No. 1:21-cv-12987-TLL-PTM (E.D. Mich.) ................................................... 8

*Wheaton v. Apple Inc.,*
    2019 WL 5536214 (N.D. Cal. Oct. 25, 2019) ..................................... 9, 13, 14

*Wheaton v. Apple Inc.,*
    Case No. 19-cv-02883, dkt. 51 (N.D. Cal. Sept. 20, 2019) ......................... 14

**Statutes**

H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206 (Mich. 1989) ........................................... 1

H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378 (Mich. 1988) ........................................... 1

M.C.L. § 600.5813 .............................................................................................................. 2

PPPA § 445.1711, 1988 Mich. Legis. Serv. 378 .................................................... 1, 17, 18

**Other Authorities**

Mich. Executive Order 2020-122 ...................................................................................... 2

Mich. Executive Order 2020-58 ........................................................................................ 2

Mich. Supreme Court Administrative Order 2020-18 ...................................................... 2

Mich. Supreme Court Administrative Order 2020-3 ........................................................ 2

*Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331,
     Jan. 20, 1989 ............................................................................................................... 19

**Rules**

Fed. R. Civ. P. 8 ..................................................................................................... passim

Fed. R. Civ. P. 9(b) ......................................................................................................... 19

Fed. R. Civ. P. 12(b)(6) ........................................................................................... passim

Mary Lou Pett, Kathleen Fick-Gee, Diane Bryce, Patti DelValle, Michelle Holcomb, Kim Readus, Alice Reese, Erika Van Aller, and Linda White (collectively, "Plaintiffs") respectfully submit this response in opposition to the Motion to Dismiss (ECF No. 25 (the "Motion" or "Mot.")) the Second Amended Complaint (ECF No. 22 ("SAC")) filed by Publishers Clearing House, Inc. ("Defendant").

## INTRODUCTION

In this putative consumer class action, Plaintiffs allege that Defendant violated Michigan's Preservation of Personal Privacy Act ("PPPA")[1] by disclosing, without their consent, information that identified them as (*inter alia*) purchasers of certain types of written materials and sound and video recordings sold by Defendant. On behalf of themselves and others similarly situated, Plaintiffs seek to recover $5,000, as provided by the PPPA, for each of Defendant's violations of the statute.

---

[1]     The PPPA (occasionally referred to in the caselaw as the "Video Rental Privacy Act" or the "VRPA") is found at H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989). In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PPPA] does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).

1

Defendant moves to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that Plaintiffs fail to adequately allege that Defendant disclosed their Private Purchase Information (or "PPI") to third parties during the relevant time period. The Motion is completely without merit.

As a threshold matter, Defendant does not dispute in the Motion that the six-year limitation period set forth in M.C.L. 600.5813 governs Plaintiffs' PPPA claims, or that the governing six-year limitation period was tolled for 101 days pursuant to the Governor of Michigan's Executive Orders issued during the COVID-19 pandemic.[2]

---

[2]     Nor could it in good faith. It is now well established that "[a] six-year statute of limitations applies to PPPA claims." *Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666, 673 (E.D. Mich. 2022). Four federal district courts in Michigan (in both the Eastern and Western Districts) have uniformly held that PPPA claims are subject to the six-year period found in section 600.5813 (not the three-year period found in 600.5805(2)). As this Court and each of those other courts explained, any attempt to invoke the three-year limitation period found in section 600.5805(2) is foreclosed by controlling Sixth Circuit precedent holding that all statutory claims under Michigan law are subject to the six-year period found in section 600.5813. This Court should adopt the reasoning of these prior decisions on the same issue and hold that section 600.5813's six-year limitation period governs Plaintiff's claim. It is likewise well established that the six-year limitation period governing Plaintiffs' claims was tolled for 101 days from March 10, 2020, through June 20, 2020, by Governor Whitmer's Executive Orders and the Michigan Supreme Court's Administrative Order (together, the "COVID-19 Orders") tolling the statute of limitations for all Michigan claims due to COVID-19. *See* Mich. Executive Order 2020-58; Mich. Supreme Court Administrative Order 2020-3; Executive Order 2020-122; Mich. Supreme Court Administrative Order 2020-18; *see also, e.g.*, *Bownes v. Borroughs Corp.*, 2021 WL 1921066, at *2 (W.D. Mich. May 13, 2021) ("the Michigan Supreme Court tolled the statutes of limitations in Michigan for at least 100 days due to the COVID-19 pandemic" and thus "filers shall have the number of days to submit their filings on June 20, 2020, as they had when the exclusion went into effect on March 23, 2020"); *Mackey v. Rising*, 2021 WL 4034226, at *2 (E.D. Mich. Sept. 3, 2021) (same); *Bowles v. Sabree*, 2022 WL 141666, at *9 (E.D. Mich. Jan. 14, 2022)

2

Thus, pursuant to the applicable six-year limitation period, and affording Plaintiffs and Class members the benefit of 101 days of tolling, any disclosures of Plaintiffs' PPI that occurred between March 14, 2016[3] and July 30, 2016 (i.e., the "relevant pre-July 31, 2016 time period," as used in the SAC and herein) are actionable in this case.

Plaintiffs have adequately stated claims for violation of the PPPA that accrued during that time period. The SAC specifically alleges that, for the entire duration of the pre-July 31, 2016 time period, Defendant was actively renting, selling, exchanging, and otherwise disclosing all of its customers' Private Purchase Information (including Plaintiffs' and all Class members' Private Purchase Information) to various "list managers," "data appenders," and third party renters and exchangers, on a systematic and continuous basis (at least as frequently as once a month). The SAC specifically alleges how this occurred in detail, and attaches numerous supporting exhibits, including webpages from Defendant's own website, many of which were in existence during the relevant pre-July 31, 2016 time period, in corroboration. Plaintiffs' allegations, and the materials accompanying them, are detailed and robust and easily satisfy Rule 8.

---

(same); *see also, c.f., Howard v. Onion*, 2022 WL 2065950, at *2 (6th Cir. May 17, 2022) (concluding same under Ohio law).

[3]       Six years is 2,190 days. Six years plus 101 days is 2,291 days. And the 2,291st day prior to June 22, 2022 (the date the original Complaint commencing this action was filed) was March 14, 2016. *See Pratt*, 586 F. Supp. 3d at 675 n.6 (calculating limitation period the same way).

Defendant overreaches in its Motion by attacking Plaintiffs' allegations as "implausible." *See, e.g.*, Mot. at 4 (referring to Plaintiffs' "allegations related to third-party marketing websites" as "implausible"). But the plausibility of Plaintiffs' allegations is not a question for the Court to resolve in deciding the Motion. *See, e.g.*, *Haitayan v. 7-Eleven, Inc.*, 762 F. App'x 393, 395 (9th Cir. 2019) (holding that the district court erred in dismissing plaintiffs' case because "it considered the persuasiveness of the plaintiffs' factual allegations rather than the plausibility of the plaintiffs' legal claims").

Rather, pursuant to Rule 8 and well-established Supreme Court precedent, the Court must accept Plaintiffs' well-pled factual allegations as true, including those "related to third-party marketing websites," and determine whether those alleged facts, viewed in the light most favorable to Plaintiffs, give rise to a reasonable inference that Plaintiffs are plausibly entitled to relief under PPPA. *See, e.g.*, *Mediacom Se. LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) ("The district court's construction of Fed. R. Civ. P. 12(b)(6)—crediting the defendant's, rather than the plaintiff's version of facts—unduly raises the pleading standard beyond the heightened level of *Iqbal* and *Twombly*, forcing the plaintiff's well-pleaded facts to be not only plausible, but persuasive. That is not the appropriate burden at this stage of the litigation."). By any reasonable measure, the answer to this question is a resounding "yes".

The SAC states a claim for relief, and the Motion should be denied.

## ARGUMENT

Defendant argues that Plaintiffs do not "allege[] sufficient facts to state a PPPA claim against [Defendant] under which relief can be granted." Mot. at 5. The argument is without merit. The SAC's allegations more than plausibly demonstrate that Defendant disclosed Plaintiffs' Private Purchase Information to third parties, in violation of the PPPA, during the relevant pre-July 31, 2016 time period.

The SAC alleges that during the relevant pre-July 31, 2016 time period, Defendant disclosed the Private Purchase Information of its Michigan-based customers, including Plaintiffs and all Class members, to various third-parties, including data appenders, data aggregators, list brokers, marketing companies, and many others. SAC ¶¶ 1-11, 14, 18-27, 58, 62-63, 79-83, 85. Specifically, the SAC alleges that, "for the entire duration of the pre-July 31, 2016 time period, [Defendant] was actively renting, selling, exchanging, and otherwise disclosing all of its customers' Private Purchase Information (including Plaintiffs' and all Class members' Private Purchase Information) to LSC for management and appending, as well as to numerous other third party renters and exchangers of this data, on a systematic and continuous basis[,]" for the purpose of making money, all without its customers' consent. SAC ¶ 10; *see also* SAC ¶¶ 14, 17. The SAC pushes these allegations across the line of plausibility by attaching screenshots depicting Defendant's publicly accessible "data cards" in existence today, which offers for sale Defendant's customers' Private Purchase Information "THROUGH 06/30/2022," *see* SAC ¶¶ 2-3, 7 (citing *id.*, Exs. A-B, F-G).

Numerous courts across the country, including in this District, have held such factual allegations sufficient to state a claim for a violation of the PPPA. *See, e.g.*, *Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 682 (W.D. Mich. 2018); *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 642 (E.D. Mich. 2017); *Moeller v. Am. Media, Inc.*, 235 F. Supp. 3d 868, 873 (E.D. Mich. 2017); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 453 (S.D.N.Y. 2016); *Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579, 590 (S.D.N.Y. 2016).

But the SAC does not stop there. Here, the SAC specifically alleges that "[f]rom April 2002 through present day, and for the entire duration of the pre-July 31, 2016 time period, [Defendant] continually and systematically disclosed – at least as frequently as once a month – all of its customers' Private Purchase Information via list rentals, exchanges, and transfers to LSC and other third-party entities." SAC ¶ 6. And Plaintiffs bolster these allegations by including in the SAC:

(1) screenshots of a substantially identical data card published online on September 11, 2014, prior to the relevant pre-July 31, 2016 time period (in which the company also admits to disclosing its customers' Private Purchase Information, and which the SAC alleges continued to be in existence during the relevant pre-July 31, 2016 time period), SAC ¶ 7 (citing *id.*, Ex. E);

(2) a screenshot of Defendant's privacy policy in effect squarely within the relevant pre-July 31, 2016 time period, SAC ¶ 7 (citing *id.*, Ex. H);

6

(3) a screenshot of Defendant's "Mailing Lists" page (describing the process of prospecting names via list exchanges and rentals) in effect squarely within the relevant pre-July 31, 2016 time period, SAC ¶ 7 (citing *id.*, Ex. I);

(4) a press release from 2002 reflecting that Defendant had selected LSC to "manage" (and, as we now know, enhance) its customer data "files" for rental, sale, and exchange to third parties, SAC ¶ 5, *id.*, Ex. C;

(5) screenshots of LSC's website, in effect during the relevant time period, that describe and offer a testimonial from Defendant's marketing director concerning Defendant's practices of disclosing its customers' PPI to LSC and others, SAC ¶¶ 7-9 (citing *id.*, Exs. D, J, K); and

(6) allegations that, "[a]s a result of [Defendant]'s practices of disclosing [their] Private Purchase Information during the relevant pre-July 31, 2016 time period, . . . Plaintiffs saw a dramatic uptick of junk mail in their mailboxes over the same time period." *Id.* ¶ 11; *see also id.* ¶ 1 ("As a result [of Defendant's disclosure practices during the relevant pre-July 31, 2016 time period], Plaintiffs have received a barrage of unwanted junk mail.").

These additional factual allegations and exhibits – which did not appear in the complaints in the above-cited cases (complaints which were nonetheless found to adequately state PPPA claims) – further confirm that Plaintiffs have stated plausible claims for relief here.

According to Defendant, "[o]n at least two prior occasions, two different courts have rejected the very claims presented here [pursuant to Rule 12(b)(6)][.]" (Mot. at 10.) That is remarkably misleading. While it is true that courts have twice dismissed a PPPA case for failure to state a claim pursuant to Rule 12(b)(6), the vast majority of cases brought under the statute have taken a decidedly different path to resolution. Since 2014, approximately 100 cases have been filed against sellers of written materials and sound and video recordings for alleged violations of the PPPA, all of which contained core allegations similar to those made by Plaintiffs in this case. The majority of these prior cases settled (some are still being litigated), including many on a class-wide basis – for sums totaling well over $100 million in the aggregate.[4] And the reason most of them settled was because discovery revealed, almost across the board, that the defendants had indeed been systemically violating the PPPA by systemically

---

[4]    *See, e.g., Moeller v. The Week Publications, Inc.*, No. 1:22-cv-10666-TLL-PTM (E.D. Mich.) ($5 million class settlement); *Strano v. Kiplinger Washington Editors, Inc.*, No. 1:21-cv-12987-TLL-PTM (E.D. Mich.) ($6.8 million class settlement); *Kokoszki v. Playboy Enterprises, Inc.*, No. 2:19-cv-10302-BAF-RSW (E.D. Mich.) ($3.8 million class settlement); *Loftus v. Outside Integrated Media*, No. 2:21-cv-11809-MAG-DRG (E.D. Mich.) ($850,000 class settlement); *Kain v. The Economist Newspaper NA, Inc.*, No. 4:21-cv-11807-MFL-CI (E.D. Mich.) ($9.5 million class settlement); *Moeller v. Am. Media, Inc.*, No. 5:16-cv-11367-JEL-EAS (E.D. Mich.) ($7.6 million class settlement); *Perlin v. Time Inc.*, No. 2:16-cv-10635-GCS-MKM (E.D. Mich.) ($7.4 million class settlement); *Kinder v. Meredith Corp.*, No. 1:14-cv-11284-TLL-CEB (E.D. Mich.) ($7.5 million class settlement); *Edwards v. Hearst Commc'ns, Inc.*, No. 1:15-cv-09279-AT-JLC (S.D.N.Y.) ($50 million class settlement); *Moeller v. Advance Mag. Publishers, Inc.*, No. 1:15-cv-05671-NRB (S.D.N.Y.) ($13.75 million class settlement); *Ruppel v. Consumers Union of United States, Inc.*, No. 7:16-cv-02444-KMK (S.D.N.Y.) ($16.375 million class settlement); *Hufford v. Maxim Inc.*, No. 1:19-cv-04452-ALC-RWL (S.D.N.Y.) ($228,000 class settlement).

transmitting their entire customer files to third party data companies and list renters and exchangers, precisely as the plaintiffs had alleged in the complaints in those cases, and just as the Plaintiffs allege in the SAC in this case.

Of the over 100 defendants to have been sued for violating the PPPA to date, only a handful have filed a motion to dismiss pursuant to Rule 12(b)(6) – and, of the defendants who did, only two succeeded in obtaining a dismissal. *See Nashel v. New York Times Co.*, 2022 WL 6775657 (E.D. Mich. Oct. 11, 2022); *Wheaton v. Apple Inc.*, 2019 WL 5536214 (N.D. Cal. Oct. 25, 2019). The vast majority either didn't even try, or tried but failed. *See, e.g.*, *Horton*, 380 F. Supp. 3d at 682 ("Given that GameStop possessed the *Game Informer* subscription information and that NextMark purported to sell that information, the implication that GameStop disclosed the information to NextMark or other data-mining companies passes the threshold of plausibility."). And in this case, rather than answering the SAC and denying its allegations, or reaching out to Plaintiffs' counsel with a declaration or some other evidence showing that it is not liable (as typically happens in these cases where a defendant actually had not disclosed the plaintiffs' data in violation of the statute), Defendant has decided to wager all of its chips on the reasoning of the two decisions in which a defendant was successful in challenging the adequacy of a PPPA complaint's allegations – *Nashel* and *Wheaton*. While Plaintiffs firmly belief that *Nashel* and *Wheaton* were wrongly decided[5], even if they were

---

[5]     The *Nashel* decision applied a pleading standard far more stringent than Rule 8 imposes, and required specificity that no PPPA plaintiff could ever satisfy. For instance,

decided correctly, both of these (outlying) decisions turned on factual allegations readily

distinguishable from the facts alleged by Plaintiffs in this case.

In *Nashel,* the plaintiffs pointed to data cards "published online in 2007 and

2008" to support their allegations that the Defendant disclosed its customers'

information eight years <u>later</u> during the applicable limitation period—and the court in

*Nashel*, in a non-binding, unpublished decision, seized on this "timing issue" in its order

granting defendant's motion to dismiss. *See Nashel*, 2022 WL 6775657, at *1, 5. In this

case, on the other hand, there is no such "timing issue" because the SAC not only

attaches cached copies of Defendant's data cards that pre-date the relevant pre-July 31,

2016 time period, *see* SAC, Exs. D-E, but also attaches copies of Defendant's data cards

---

*Nashel* improperly analyzed the plausibility of *the complaint's allegations. See Nashel*, 2022 WL 6775657, at *5 (stating that "the data cards make the complaint's allegations merely *possible* rather than plausible" (emphasis in original)). This was a plain error. On a motion to dismiss pursuant to Rule 12(b)(6), the question is not whether the complaint's allegations are plausible. Instead, the complaint's allegations must be accepted as true, and the question is whether those allegations, viewed together and with all reasonable inferences drawn in the plaintiff's favor, are plausibly suggestive of a claim for relief. *See, e.g.*, *Doe v. Michigan State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021). *Nashel* also recast allegations that were plainly factual in nature (such as, e.g., allegations that defendant systematically disclosed subscriber lists containing the plaintiff's Private Purchase Information to specific third parties over a specific period of time) as "legal conclusions" merely because that underlying conduct happened to give rise to a PPPA claim. *See Nashel*, 2022 WL 6775657, at *5. As previously mentioned, every other court that presided over similar PPPA actions against publishers of written materials, arising from substantially the same allegations as those made by Plaintiffs here, has held that these allegations adequately stated a claim under the PPPA—including, most recently, in a well-reasoned, published decision from the Hon. Gordon J. Quist of the Western District of Michigan in *Horton. See Horton*, 380 F. Supp. 3d at 682; *see also Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 685 (E.D. Mich. 2013) (Rosen, J.).

that post-date the relevant pre-July 31, 2016 time period, *see* SAC, Exs. A-B, F-G, which is <u>still today offered for sale</u> on NextMark's website (on which Defendant offers for sale all of its customers' Private Purchase Information through June 30, 2022), as well as cached copies of a substantially identical data card published online on September 11, 2014, prior to the relevant pre-July 31, 2016 time period (in which the company also admits to disclosing its customers' Private Purchase Information, and which the SAC alleges continued to be in existence during the relevant pre-July 31, 2016 time period), SAC ¶ 7 (citing *id.*, Ex. E); Defendant's privacy policy in effect squarely within the relevant pre-July 31, 2016 time period, SAC ¶ 7 (citing *id.*, Ex. H); Defendant's "Mailing Lists" page (describing the process of prospecting names via list exchanges and rentals) in effect squarely within the relevant pre-July 31, 2016 time period, SAC ¶ 7 (citing *id.*, Ex. I); a press release from 2002 reflecting that Defendant had selected LSC to "manage" (and, as we now know, enhance) its customer data "files" for rental, sale, and exchange to third parties, SAC ¶ 5, *id.*, Ex. C; and pages from LSC's website, in effect during the relevant time period, that describe and offer a testimonial from Defendant's marketing director concerning Defendant's practices of disclosing its customers' PPI to LSC and others, SAC ¶¶ 7-9 (citing *id.*, Exs. D, J, K).[6] These allegations collectively

---

[6]      The Wayback Machine Internet Archive (archive.org) has cached copies of webpages on sites across the Internet from various dates on which its "crawlers" were active and were collecting data. *See* "Internet Archive: Web archiving," Wikipedia, available at: https://en.wikipedia.org/wiki/Internet_Archive#Web_archiving (last accessed Nov. 30, 2022) ("The service can be used to see what previous versions of web sites used to look like, to grab original source code from web sites that may no

show that Defendant's practices of systematically disclosing all of its customers' Private

Purchase Information and other data (to third party data appenders, aggregators,

renters, and others, including but not limited to LSC) began as early as 2002 and

persisted "THROUGH 06/30/2022," and were thus ongoing during the relevant pre-

July 31, 2016 time period. SAC ¶¶ 2-11, 14, 18-27, 58, 62-63, 79-83, 85; *see also id.*, Exs.

A-B & E-G.[7] Therefore, unlike in *Nashel*, where the plaintiff's allegations of 2015-16

_____

longer be directly available, or to visit web sites that no longer even exist. Not all web
sites are available because many web site owners choose to exclude their sites. As with
all sites based on data from web crawlers, the Internet Archive misses large areas of the
web for a variety of other reasons."). Thus, the fact that cached copies of Defendant's
data card were only accessible for dates before and after the relevant pre-July 31, 2016
time period, as shown on the cached webpages attached as Exhibits A-B & E-G to the
SAC, in no way indicates that those data cards were not also publicly accessible on
NextMark's and LSC's websites during the relevant pre-July 31, 2016 time period.
Indeed, the SAC attaches a copy of Defendant's privacy policy in effect on its website
during the relevant pre-July 31, 2016 time period in which Defendant admits that its
same disclosure practices in effect prior to and after the relevant pre-July 31, 2016 time
period (as evidenced in the data cards attached to the SAC) were also in effect
throughout the relevant pre-July 31, 2016 time period. And as the SAC specifically
alleges, the same disclosure practices in which Defendant was engaged prior to the
relevant pre-July 31, 2016 time period, as far back as 2002, have persisted unabated up
through at least June 20, 2022 (as shown in the data cards attached as Exhibits A-B &
F-G to the SAC), including for the duration of the relevant pre-July 31, 2016 time
period. *See* SAC ¶ 6 (alleging that "[f]rom April 2002 through present day, and for the
entire duration of the pre-July 31, 2016 time period, [Defendant] continually and
systematically disclosed – at least as frequently as once a month – all of its customers'
Private Purchase Information via list rentals, exchanges, and transfers to LSC and other
third-party entities").

[7]      The screenshots of the data cards attached to the SAC establish that Defendant's
customer lists continued to be available online <u>after</u> the relevant pre-July 31, 2016 time
period, whereas the screenshots in *Nashel* from 2007 and 2008 showed only that the
New York Times mailing lists were available <u>before</u> the relevant pre-July 31, 2016 time
period. Data sets comprise information gathered in the past. That is, a 2022 data set

disclosures were unsupported by a data card that post-dated that timeframe, here Plaintiffs have pled facts clearly establishing (and at the very least plausibly suggesting) that Defendant disclosed their and Class members' (and all of its other customers') Private Purchase Information to third parties between at least as early as 2002 and at least as recently as June 30, 2022.

Thus, unconstrained by the timing issue related to the data cards identified in *Nashel*, the allegations of the SAC state a claim for violation of the PPPA. The SAC specifically alleges that Defendant disclosed its entire customer database, including Plaintiffs' and all other Michigan customers' Private Purchase Information, to numerous third parties during the relevant pre-July 31, 2016 time period.

The Motion also relies on another non-binding, unpublished decision in *Wheaton v. Apple Inc.*, 2019 WL 5536214 (N.D. Cal. Oct. 25, 2019), but it too is readily distinguishable. For one, the SAC here contains many factual allegations concerning disclosures (made by a seller of written and audiovisual materials—pursuant to standard, industry-wide practices—not by a technology company like Apple) that were not alleged in *Wheaton. See* SAC ¶ 50. Moreover, in *Wheaton*, the plaintiffs alleged PPPA violations arising from alleged disclosures of music stored on their phones and relied

---

concerns actions taken in or prior to 2022—evidenced by the language of the mailing list itself ("COUNTS THROUGH") and as corroborated by numerous factual allegations of the SAC and the exhibits thereto (*see, e.g.*, SAC ¶¶ 2-11, 14, 18-27, 58, 62-63, 79-83, 85 & Ex. A-B, F-G to the SAC). The same may not be said of the 2007 and 2008 *Nashel* data cards screenshots, all of which pre-dated the relevant pre-July 31, 2016 time period.

on NextMark data cards advertising the sale of this *sort* of data to bolster those allegations. *Wheaton*, 2019 WL 5536214 at *4. However, the defendant argued that it was not plausible to infer that Apple was even responsible for disclosing the data offered for sale on the data cards (neither directly nor indirectly) because that information (the existence of music files on a phone), *unlike* the Private Purchase Information at issue in a case like this, against a company whose only source of such information is data pertaining to its direct sales of such materials, may not have even been disclosed by Apple; indeed, the defendant in *Wheaton*, in its motion to dismiss briefing, focused on this distinction, explaining that the information there was "not information that would uniquely come from the defendant (as actual lists of the names of who subscribes to a magazine plus their delivery addresses would likely come from the magazine publisher)." *See Wheaton*, Case No. 19-cv-02883, dkt. 51 (N.D. Cal. Sept. 20, 2019) (def.'s reply in support of mot. to dismiss) (**Exhibit A** hereto at p. 7). Here, on the other hand, Defendant does not deny the reasonableness of inferring that the rental, sale, or exchange of records reflecting customers' purchases of subscriptions to magazines (or of music, books, or videos) sold by Defendant would necessarily have originated from Defendant (either directly or indirectly through intermediaries), including during the relevant pre-July 31, 2016 time period.

"[N]owhere in the SAC," Defendant asserts, "do any of the nine Plaintiffs identify what it is they claim to have purchased from [Defendant,]" or when they purchased it. Mot. at 14; *see id.* (stating that "Plaintiffs should know (and should have

alleged) which 'written materials,' 'sound recordings,' or 'video recordings' they purchased from [Defendant,]" and that "Plaintiffs fail to allege when they purchased whatever it is they purchased"). Wrong on both counts. All of the Plaintiffs allege that they purchased "written materials, sound recordings, and/or video recordings sold by [Defendant], including but not limited to subscriptions to magazines," from Defendant, and that they made those purchases "prior to July 31, 2016 (including during the relevant pre-July 31, 2016 time period)," i.e., between March 14, 2016 and July 30, 2016. SAC ¶¶ 18-26.

Defendant reads Exhibits A-B & E-G to the SAC, the NextMark and LSC data cards, as "stat[ing] that the individuals included on the [lists] 'have purchased from over 100 popular titles in a wide variety of interest categories' but not what titles they actually purchased." Mot. at 18; *see also id.* at 18-19 (stating, in regard to Exhibit B to the SAC, that "Identifying people as 'music, book & video enthusiasts' does not equate to identifying the specific music, books, and videos those people purchased."); Mot. at 20 (arguing, with respect to Exhibit D to the SAC, that "Plaintiffs do not allege, and . . . their attachments do not support, . . . that the 'files' and 'lists' [Defendant] allegedly provided to LSC actually identified the products purchased by the individuals included within those 'files' and on those 'lists'"); Mot. at 22 (arguing that Exhibits E and F do not demonstrate that LSC "claim[s] to possess information that would specifically identify the product purchased by each individual[,]" and that "disclosing the 'product category' purchased by an individual does not equate to disclosing what book, written

15

material, music, or video the individual purchased"). Thus, according to Defendant's interpretation of the data cards attached to the SAC, "[a] list of prospects that could be interested in a wide variety of topics is not a list of Private Purchase Information." *Id.* This argument fails for several reasons.

For one thing, even if a disclosure by Defendant of "the exact products purchased by [Defendant] customers" was required in order to give rise to an actionable PPPA claim, the SAC alleges that Defendant did in fact disclose the exact titles of the magazines and other audiovisual products purchased by each of its customers, including Plaintiffs, and nothing in the SAC's exhibits demonstrates otherwise. *See* SAC ¶¶ 4, 14.

But more importantly, the premise of Defendant's argument – that a disclosure of a customer's data is only violative of the PPPA if the disclosure indicated that the customer "purchased, leased, or rented a *specific 'book[] or other written materials[], sound recording[], or video recording[]*'" – is simply wrong as a matter of law. Mot. at 21 (emphasis in original). The unamended, pre-July 31, 2016 version of the PPPA invoked in this case provides, in pertinent part:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not disclose to any person, other than the customer, a record or information *concerning the purchase, lease, rental, or borrowing of those materials* by a customer that indicates the identity of the customer.

PPPA § 445.1711, 1988 Mich. Legis. Serv. 378.[8] In this case, Plaintiffs plainly allege that

Defendant disclosed records "concerning [their] purchase . . . of" "written materials,

sound recordings, or video recordings." *See id.* Specifically, Plaintiffs allege that each of

them purchased magazine subscriptions, *inter alia*, from Defendant prior to July 31,

2016, *see* SAC ¶¶ 18-26, and that, during the relevant pre-July 31, 2016 time period,

Defendant disclosed, to LSC and numerous other third parties, lists that contained "the

full names and addresses, of each person who purchased a product from [Defendant,]"

including of the Plaintiffs, as well as "the <u>types, titles, and genres of the products</u>

(including of the written materials, video records, and sound recordings) that each of

them purchased[.]" SAC ¶ 4 (emphasis added); *see also* SAC ¶ 14. These allegations are

significant, because even if exact titles were not disclosed by Defendant (but the SAC

alleges that they were), disclosures of the "genre" and "type" of the magazines and other

audiovisual products that Plaintiffs purchased would nonetheless be actionable because

such disclosures would plainly "concern" Plaintiffs' purchases of written materials or

---

[8]     Without citation to any legal authority, Defendant baldly asserts: "What matters
is whether [Defendant] discloses to a third party, without the customer's consent and
outside the scope of the exceptions to the PPPA, that a specific customer located at a
specific address purchased, leased, or rented *a specific 'book[] or other written material[], sound
recording[], or video recording[].'* Without that information, there is no violation of the
PPPA." Mot. at 21 (emphasis in original). But as demonstrated above, this is simply
wrong. The PPPA prohibits disclosures that "concern" the purchase, lease, rental of
"written materials, sound recordings, or video recordings" – not just disclosures that
"specif[y]" the exact title of one of those materials that was purchased, leased, or rented,
as Defendant would have the Court believe. *See id.*

17

audio or video recordings from Defendant. *See* PPPA § 445.1711, 1988 Mich. Legis. Serv. 378.

And in fact, the data cards attached to the SAC indisputably show that Defendant was disclosing that sort of information to LSC and to other downstream renters and exchangers of this data. Specifically, Exhibit D to the SAC, a screenshot from LSC's website in effect in 2014, titled "About Publishers Clearing House Data[,]" indicates that the data from Defendant's customer database that was available for rental, purchase, or exchange (and was thus already in LSC's possession) included the "select" of "Product/Subscription Category" for each of Defendant's customers. *See* SAC, Ex. D; *see also id.*, Ex. E. The document further specifies that the following "subscription categories" for the "discounted magazine subscriptions" sold by Defendant "to consumers" included "Fashion[,] Business/Financial[,] Computer/Electronics[,] Entertainment[,] Ethnic[,] Food/Cooking[,] Games/Contests[,] Fitness[,] Hobbies[,] Home/Garden[,] Kids/Education[,] Mature[,] Men's Interest[,] Nature[,] News[,] Outdoors/Sports[,] Pets[,] Religious[,] Travel[.]" *See* SAC, Ex. D. Moreover, the data cards in existence after the relevant pre-July 31, 2016 time period, which were cached on the Wayback Machine and are attached to the SAC, show that the same "select" category pertaining to the genres of magazines purchased by a consumer from Defendant were still available for rental and exchange at that time. *See* SAC, Exs. A-B, F-G. Thus, these document show, or at the very least plausibly suggest, that Defendant's disclosures to LSC during the relevant pre-July 31, 2016 time period,

18

reflected one of at least 19 "categories," i.e., genres, of the types of magazine subscriptions (or audio or video recordings) that each customer whose PPI appeared on the list had purchased from Defendant. These disclosures, by any reasonable measure, "concern[ed]" the customers' "purchase[s] . . . of . . . written materials, sound recordings, or video recordings" from Defendant, and would have revealed "a person's choice in reading, music, and video entertainment," which "is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *See* SAC ¶ 37 (citing *id.*, Ex. L, *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989). And in enacting the version of the PPPA invoked in this case, the Michigan legislature exercised its sound judgment in prohibiting the disclosure of precisely this type of information.

Defendant also says that Plaintiffs "fail to specifically identify any third-party entity" to whom Defendant disclosed their PPI during the relevant pre-July 31, 2016 time period. *See* Mot. at 14-15. For one thing, the Motion is governed by the liberal pleading standard set forth in Rule 8, not the heightened standard set forth in Rule 9(b) (applicable to claims sounding in fraud) that Defendant appears to be asking the Court to apply. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Moreover, the SAC specifically alleges, in great detail, that Defendant disclosed Plaintiffs' PPI to LSC and other appenders and aggregators on a systematic and continuous basis from 2002

19

through the present, including between March 14, 2016 and July 30, 2016, *see, e.g.*, SAC ¶¶ 5, 14, 63, and that LSC and other appenders and aggregators in turn disclosed that PPI to numerous other downstream renters, exchangers, and purchasers of this data, all of whom Plaintiffs cannot possibly identify at this time. Indeed, the crux of this lawsuit is that Defendant *failed to inform* Plaintiffs and the proposed Class members that it would disclose their Private Purchase Information to others and *failed to obtain their consent* prior to disclosing that information to others. Plaintiffs and the Class members cannot possibly be expected to allege the exact dates of each disclosure or all of the entities to whom Defendant made these non-consensual, uninformed disclosures, absent a reasonable opportunity for discovery. By demanding such specificity, Defendant asks the Court to adopt a pleading standard no PPPA plaintiff could ever satisfy, emasculating this important consumer protection statute and absolving Defendant of its liability under it in the process. This Court need not go along, and it should decline Defendant's invitation to turn the PPPA into a toothless tiger.

Grasping at straws, Defendant argues that the screenshot of the NextMark data card shown in the SAC as demonstrating that "the lists were 'generated from [Defendant]'s sweepstakes mailings,'" which Defendant says "none of the Plaintiffs claim to have received." Mot. at 19. But while Plaintiffs do not specifically allege having received Defendant's sweepstakes mailings, they do not allege that they did not receive them. The reality is that all of the Plaintiffs did receive Defendant's sweepstakes mailings, but they chose not to allege that because it is irrelevant in their view. It is

20

irrelevant because the fact remains, as they allege in the SAC, that each of them had their PPI disclosed by Defendant to LSC and various other third parties during the relevant time period. That is what gives rise to a claim for violation of the PPPA. But to the extent the Court finds it relevant, they are happy to include in an amended complaint that they received Defendant's sweepstakes mailings, and respectfully request leave to do so.

Finally, Defendant says that "whether the entity selling or renting the lists was [Defendant] is left entirely to impermissible speculation." Mot. at 20. But the SAC specifically alleges that it was in fact Defendant who was (and still is) selling, renting, and otherwise disclosing its own customer lists. *See, e.g.*, SAC ¶¶ 2-10. And several documents attached to the SAC show that LSC, whom Defendant hired to be its list manager and appender, published Defendant's data card on its own website, pursuant to the business relationship between the companies, and that the LSC data card is identical in all material respects to the NextMark data cards also attached to the SAC. *See, e.g.*, SAC, Exs. A-B, E-G. Moreover, the LSC data cards and other pages from LSC's website contain Defendant's trademarked logo, from which it can reasonably be inferred that Defendant authorized the publication of those data cards and webpages on LSC's website (including its logo that appears on them), further demonstrating the significance of those documents' contents and the plausibility of Plaintiffs' allegations. *See* SAC, Exs. D-F. This eminently reasonable conclusion is further supported by other materials accompanying the SAC, including screenshots of LSC's website and press

releases concerning LSC's retention by Defendant. *See, e.g.*, SAC, Exs. C & J. But the coup de grâce on this issue is the testimonial from Defendant's marketing director that still today appears on LSC's website: "LSC Marketing Group has been a great partner, managing our list since it was put on the market in 2002. They have built a strong list rental program for [Defendant] and we would not trust the management of our list to anyone else." SAC, Ex. K. The SAC adequately alleges that Defendant was the entity selling, renting, exchanging, and otherwise disclosing its customer lists, to LSC, other appenders and aggregators, and other downstream entities.

Defendant's attempts to dispense with Exhibits E and F to the SAC (screenshots from LSC's website during the relevant time period) fare no better. Defendant argues that neither exhibit plausibly suggests a violative disclosure because "both exhibits cite back to NextMark, suggesting that LSC relies on NextMark for the mailing lists [], and NextMark has indicated that it does not actually possess or sell mailing lists." Mot. at 22. This is yet another attempt by Defendant to lead the Court into error. The fact that NextMark is referenced on these exhibits does not "suggest[] that LSC relies on NextMark for the mailing lists." *Id.* As the SAC alleges, LSC received Defendant's entire customer database on a periodic basis (at least once monthly) from Defendant, and then rents, exchanges, and sells those lists (after appending other data about each customer to them) to other downstream entities. The fact that LSC advertised Defendant's data cards on NextMark's system does nothing to contradict these factual allegations, which the Court must accept as true for purposes of deciding the Motion. *See, e.g.*, as cited

*supra*, *Mediacom Se. LLC*, 672 F.3d at 400 ("The district court's construction of Fed.R.Civ.P. 12(b)(6)—crediting the defendant's, rather than the plaintiff's version of facts—unduly raises the pleading standard beyond the heightened level of *Iqbal* and *Twombly*, forcing the plaintiff's well-pleaded facts to be not only plausible, but persuasive. That is not the appropriate burden at this stage of the litigation.").

Notably, Defendant does not deny publicly advertising data cards offering to rent and exchange all of its customers' Private Purchase Information to third parties during the relevant pre-July 31, 2016 time period just as it did through June 30, 2022 (*see* SAC, Ex A-B) and as it did as far back as 2002 (*see* SAC, Ex. C). Nor does Defendant deny making the admissions shown in its privacy policy attached as Exhibit H to the SAC, squarely during the relevant pre-July 31, 2016 time period time period. Defendant does not even deny disclosing Plaintiffs' and Class members' Private Purchase Information to third parties during the relevant time period, via declaration, any statement in its brief, or otherwise. Defendant's attack on the sufficiency of the SAC's allegations is thus an attempt to evade liability under a statute that Defendant itself knows it violated, on the grounds that Plaintiffs' allegations do not conclusively prove a violation with hard evidence. That is not the standard that Rule 8 imposes. After accepting the SAC's allegations as true and drawing all reasonable inferences from them in Plaintiffs' favor, Plaintiffs' allegations easily state a claim under Rule 8's low bar.

# CONCLUSION

For the foregoing reasons, the Motion should be denied.[9]

Dated: December 27, 2022                    Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
fhedin@hedinhall.com
aravindran@hedinhall.com

Joseph I. Marchese
Philip L. Fraietta
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
jmarchese@bursor.com
pfraietta@bursor.com

*Counsel for Plaintiffs and the Putative Class*

---

[9]     Defendant argues that any dismissal in this action should be with prejudice. Mot. at 6. But "[R]ule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). If any part of the SAC is dismissed, Plaintiffs respectfully request leave to amend to afford them an opportunity to cure any deficiencies in the SAC identified by the Court.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 27, 2022, I electronically filed the foregoing

documents using the Court's electronic filing system, which will notify all counsel of

record authorized to receive such filings.

<u>/s/ E. Powell Miller</u>
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com
