**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARY LOU PETT, et al.,

    Plaintiff,                        Case No. 22-11389

v.                                   Hon. Denise Page Hood

PUBLISHERS CLEARING
HOUSE, INC.

    Defendant.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART**

**DEFENDANT'S MOTION TO DISMISS [ECF No. 25] and DENYING AS SUPERSEDED DEFENDANT'S MOTION TO DISMISS [ECF No. 20]**

**I.    INTRODUCTION**

The nine named Plaintiffs filed this putative class action on June 22, 2022, alleging that Defendant Publishers Clearing House, Inc.[1] ("Defendant" or "PCH") violated Michigan's Preservation of Personal Privacy Act, M.C.L. § 445.1712 ("PPPA"), when it disclosed, without Plaintiffs' consent, information that identified Plaintiffs as purchasers of certain types of written materials and sound and video recordings sold by Defendant. Plaintiffs have filed two amended class

---

[1] Defendant represents that its proper name is Publishers Clearing House, LLC, not Publishers Clearing House, Inc., as Plaintiffs have set forth in their pleadings.

1

action complaints, the most recent on November 8, 2022 (the "Complaint"). ECF No. 22.[2] Defendant filed its Motion to Dismiss Second Amended Class Action Complaint on December 6, 2022 (the "Motion"), and the Motion is fully briefed and numerous supplemental filings were filed by the parties. *See* ECF Nos. 33-34, 36-42. The Court held a hearing on the Motion on February 1, 2023. For the reasons that follow, the Motion is granted in part and denied in part.

## II.   BACKGROUND

It is undisputed that the relevant provision of the PPPA, in the version that existed prior to July 31, 2016, provided:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not disclose to any person, other than the customer, a record or information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer. ... [A] person who violates this act shall be liable in a civil action for damages to the customer identified in a record or other information that is disclosed in violation of this act.

M.C.L. § 445.1712.

---

[2] In light of: (a) Plaintiffs filing a Second Amended Complaint in response to Defendant filing a motion to dismiss the first amended complaint (ECF No. 20); and (b) Defendant filing the instant motion in response to the Second Amended Complaint, the Court denies as superseded the motion to dismiss the first amended complaint.

2

Each of the nine Plaintiffs makes identical allegations in the Complaint:

Plaintiff [] is a natural person and citizen of the State of Michigan and resides in [], Michigan. Plaintiff [] purchased written materials, sound recordings, and/or video recordings sold by PCH, including but not limited to subscriptions to magazines, prior to July 31, 2016 (including during the relevant pre-July 31, 2016 time period). While residing in, a citizen of, and present in Michigan, Plaintiff [] purchased such products, including such magazine subscriptions, directly from PCH. Prior to and at the time Plaintiff [] purchased such products (including magazine subscriptions) from PCH, PCH did not notify Plaintiff [] that it discloses the Private Purchase Information of its customers, and Plaintiff [] has never authorized PCH to do so. Furthermore, Plaintiff [] was never provided any written notice that PCH rents, exchanges, or otherwise discloses its customers' Private Purchase Information, or any means of opting out. Since purchasing products (including magazine subscriptions) from PCH, and during the relevant pre-July 31, 2016 time period, PCH disclosed, without the requisite consent or prior notice, Plaintiff []'s Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files. Moreover, during that same period, PCH rented or exchanged mailing lists containing Plaintiff []'s Private Purchase Information to third parties seeking to contact PCH customers, without first obtaining the requisite written consent from Plaintiff [] or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

ECF No. 22, PageID.1240-49 (¶¶ 18-26). Plaintiffs define "Private Purchase Information" as Defendant's "customers' information---including their full names, titles of the written materials (*i.e.*, magazines, books, journals, newsletters, or newspapers) and/or audiovisual materials (*i.e.*, sound recordings, including music

3

or audiobooks, and video recordings, including television shows or movies) they purchased, and home addresses." ECF No. 22, at ¶14.

The only "data aggregators, data appenders, and/or data cooperatives" (or any other similar entity)[3] that Plaintiffs specifically identify in the Complaint as possessing Plaintiffs' PPI are NextMark, Inc. ("NextMark") and List Services Corp. ("LSC"). The Complaint alleges that NextMark is a "list broker" on whose website "PCH offers to provide renters access to the mailing list titled 'Publishers Clearing House Magazine Buyers Mailing List', which contains the Private Purchase Information of all 647,541 of PCH's U.S.-based magazine subscription purchasers at a base price of '$100.00/M [per thousand][.]" ECF No. 22 (at ¶ 2) (alterations in original). Plaintiffs allege that, on NextMark's website, "PCH also offers to provide renters access to the mailing list titled 'Publishers Clearing House Book, Music & Video Buyers Mailing List', which contains the Private Purchase Information of 1,429,511 of PCH's U.S.-based book, music, and video purchasers at a base price of '$100.00/M [per thousand][.]' *Id*. at ¶ 3 (alterations in original).

---

[3] Defendant notes that the third parties to which Plaintiffs claim it disclosed PPI included: "list brokers," "other consumer-facing businesses," "non-profit companies," "non-profit organizations seeking to raise awareness and solicit donations," "political organizations soliciting donations, votes, and volunteer efforts," "organizations soliciting monetary contributions, volunteer work, and votes," "direct-mail advertisers," "other third parties," and "anybody willing to pay for it." ECF No. 25, PageID.1822 (citations to Complaint omitted).

In support of these two allegations, Plaintiffs include within and attach to the Complaint two screenshots from NextMark's website. *Id*. at ¶¶ 2-3, Exs. A and B.

The Complaint alleges that LSC "serves as [PCH's] list manager" and has served PCH in that role since "April 1, 2002." *Id.* at ¶ 5. Plaintiffs allege that LSC manages PCH "mailing lists" that "include magazine buyers, merchandise buyers, sweeps nos entries and pch.com buyers and entrants…." *Id*. Plaintiffs further allege that, "for the entire duration of the pre-July 31, 2016 time period, PCH continuously and systematically disclosed—at least as frequently as once a month—all of its customer's Private Purchase Information via list rentals, exchanges, and transfer to LSC and other third-party entities." *Id*. at ¶ 6.

In support of their claims, Plaintiffs attach to the Complaint four exhibits that Plaintiffs assert demonstrate that PCH violated the PPPA. *Id.* at Exs. D-G.

### III. APPLICABLE LAW

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the plaintiff's complaint. Accepting all factual allegations as true, the court will review the complaint in the light most favorable to the plaintiff. *Eidson v. Tennessee Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). As a general rule, to survive a motion to dismiss, the complaint must state sufficient "facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550

5

U.S. 544, 570 (2007). The complaint must demonstrate more than a sheer possibility that the defendant's conduct was unlawful. *Id.* at 556. Claims comprised of "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV. ANALYSIS

The Court notes that the Complaint's allegations must be accepted as true, and the question is whether those allegations, viewed together and with all reasonable inferences drawn in the plaintiff's favor, are plausibly suggestive of a claim for relief. *See, e.g., Doe v. Michigan State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021). The Court therefore must view Plaintiffs' allegations as true and determine whether they give rise to a reasonable inference that Plaintiffs are entitled to relief under the PPPA. *Mediacom Se. LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 400 (6th Cir. 2012).

The Complaint alleges, in part:

1. "[F]or the entire duration of the pre-July 31, 2016 time period, PCH continually and systematically disclosed – at least as frequently as once a month – all of its customers' Private Purchase Information via list rentals, exchanges, and transfers to LSC and other third-party entities. For

example, in 2014, LSC's website advertised for rental the PCH customer list (and all of the related "selects" available for purchase for each customer, in addition to every customer's Private Purchase Information)" (¶6);

2. "Copies of the data cards on LSC's website advertising the availability of the PCH "Masterfile" – i.e., PCH's entire customer database, which PCH transmitted to LSC (and innumerable other renters and exchangers of this data) – which were cached by The Wayback Machine in 2014, were available on LSC's website (and other websites, including Nextmark's) throughout the relevant pre-July 31, 2016 time period, and are still publicly accessible today on both LSC's and Nextmark's websites, thus demonstrating that, during the relevant pre-July 31, 2016 time period, PCH was disclosing its entire customer database to LSC, to various third party renters of the database, and to other companies who exchanged their own customer database with PCH in return for PCH's customer database." (¶7);

3. "[F]rom 2002 through the present, including throughout the entire pre-July 31, 2016 time period, LSC has also acted as PCH's data appender by continuously using PCH's customer database (transmitted to it by PCH on at least as frequently as a monthly basis) to "enhance" PCH's consumer data files and LSC's other data files, including both its own consumer data files and other clients' consumer data files that it managed, by appending to the files other "demographic, ethnic, lifestyle, . . . and e-mail" information about each consumer listed in these files – which made PCH's list and LSC's other proprietary and client lists more valuable and allowed LSC (on PCH's and on each of its other customers' behalf) to rent PCH's lists to third parties for more money and to exchange PCH's lists to third parties on more favorable terms. (¶8);

4. "Further confirming that PCH was continuously and systematically disclosing its entire customer database to LSC (and to innumerable other downstream entities who exchanged or rented PCH's customer database and "enhanced" customer database), in the manner alleged herein, is the following "testimonial" that Linda Gewirtz, Senior Marketing Director for Publisher's Clearing House, provides on the current version of LSC's website: "LSC Marketing Group has been a great partner, managing our

7

> file since it was put on the market in 2002. They have built a strong list rental program for PCH and we would not trust the management of our file to anyone else." (¶9);
>
> 5. "Thus, for the entire duration of the pre-July 31, 2016 time period, PCH was actively renting, selling, exchanging, and otherwise disclosing all of its customers' Private Purchase Information (including Plaintiffs' and all Class members' Private Purchase Information) to LSC for management and appending, as well as to numerous other third party renters and exchangers of this data, on a systematic and continuous basis for the duration (at least as frequently as once a month)." (¶10);
>
> 6. "[F]or the entire duration of the pre-July 31, 2016 time period, [Defendant] was actively renting, selling, exchanging, and otherwise disclosing all of its customers' Private Purchase Information (including Plaintiffs' and all Class members' Private Purchase Information) to LSC for management and appending, as well as to numerous other third party renters and exchangers of this data, on a systematic and continuous basis[,]" for the purpose of making money, all without its customers' consent." (¶ 10; *see also* ¶ 14); and
>
> 7. "While PCH profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Purchase Information and other individualized information, it does so at the expense of its customers' statutory privacy rights (afforded by the PPPA) because PCH does not obtain its customers' written consent prior to disclosing their Private Purchase Information." (¶17).

ECF No. 22.

In support of the foregoing allegations, Plaintiffs include in, and attach to, the Complaint: (a) screenshots of a substantially identical data card published online on September 11, 2014, *id.* at ¶7, Ex. E; (b) a screenshot of Defendant's privacy policy in effect on July 29, 2016, *id.* at ¶7, Ex. H; (c) a screenshot of Defendant's

8

"Mailing Lists" page (describing the process of prospecting names via list exchanges and rentals) in effect on July 30, 2016, *id.* at ¶7, Ex. I; (d) a press release from 2002 reflecting that Defendant had selected LSC to "manage" Defendant's customer data "files" for rental, sale, and exchange to third parties, *id.* at ¶5, Ex. C; (5) screenshots of LSC's website, in effect during the relevant time period, that describe and offer a testimonial from Defendant's marketing director concerning Defendant's practices of disclosing Defendant's customers' PPI to LSC and others, *id.* at ¶¶7-9, Exs. D, J, K; and (6) allegations that, "[a]s a result of [Defendant]'s practices of disclosing [their] Private Purchase Information during the relevant pre-July 31, 2016 time period, . . . Plaintiffs saw a dramatic uptick of junk mail in their mailboxes over the same time period." *Id.* at ¶ 11.

Defendant argues that Plaintiffs' allegations are insufficient to state a plausible, viable claim under the PPPA. Defendants state that Plaintiffs admittedly have not alleged facts specific to each individual's claim against Defendant, but instead are engaged in a class-wide discovery fishing expedition. Defendant believes that Plaintiffs allegations, at best, set forth the "mere possibility" that Defendant violated the PPPA, as Plaintiffs posit only "if:" (1) Plaintiffs purchased PPPA-protected materials from Defendant (because they don't allege <u>what</u> they purchased); (2) Plaintiffs purchased such materials before July 31, 2016 (because

9

they don't say <u>when</u> they purchased anything); (3) Defendant disclosed such materials; and (4) such disclosures were made during the relevant time period.

Defendant primarily relies upon two cases it believes are similar to the instant case: *Wheaton v. Apple Inc.* ("*Wheaton*"), No. C 19-02883 WHA, 2019 WL 5536214, at *4 (N.D. Cal. Oct. 25, 2019); and *John Nashel, et al. v. The New York Times Company* ("*Nashel*"), No. 2:22-CV-10633, 2022 WL 6775657 (E.D. Mich. Oct. 11, 2022). In *Wheaton*, the United States District Court for the Northern District of California dismissed a PPPA claim, filed by these same Plaintiffs' attorneys, because questionable marketing screenshots did not "provide sufficient facts to support" the plaintiffs' claims, and plaintiffs had "failed to explain anything about" what, in fact, the third party operating the website actually possessed.

In *Nashel*, Judge Stephen J. Murphy recently dismissed another PPPA putative class action filed by Plaintiffs' counsel in the Eastern District of Michigan. In *Nashel*, Plaintiffs relied on screenshots from NextMark's website, about which the court stated, (a) "Plaintiffs relied on evidence that creates only suspicion as to whether Defendant violated the PPPA during the pre-July 31, 2016 period;" and (b) "a complaint containing a statement of facts that merely creates a suspicion of a legally cognizable right of action is insufficient."

10

Defendant argues that the Complaint in this case is similar – that, at best, Plaintiffs raise only the suspicion of a PPPA claim against Defendant. Defendant contends that, if Plaintiffs truly believed that PCH disclosed their Private Purchase Information, Plaintiffs could have: (1) alleged exactly <u>what</u> they purchased; (2) alleged <u>when</u> they made that purchase; and (3) provided some proof that NextMark and/or LSC is or was actually in possession of a mailing list that included any of the Plaintiff's Private Purchase Information. Defendants assert, however, that Plaintiffs did not do any of those things.

Defendant further claims that the PPPA makes clear that it only prohibits the unconsented-to disclosure to third parties of "a record or information that personally identifies the customer as having purchased, leased, rented, or borrowed" "books or other written materials, sound recordings, or video recordings[.]" Citing M.C.L. § 445.1712, Sec. 2(a). Defendant argues that the Complaint fails to identify with respect to any Plaintiff what Plaintiffs claim to have purchased from PCH, alleging only that they "purchased written materials, sound recordings, and/or video recordings sold by PCH, including but not limited to subscriptions to magazines, prior to July 31, 2016." ECF No. 22 (at ¶¶ 18-26). Defendant believes Plaintiffs should know (and should have alleged) the actual "written materials," "sound recordings," or "video recordings" they purchased

11

from PCH. Defendant notes that Plaintiffs also fail to allege when they purchased whatever it is they purchased, stating only that they purchased something at some time prior to July 31, 2016.

Other than NextMark and LSC, Defendants assert that Plaintiffs fail to specifically identify any third-party entity that: (1) claims to have PCH customer Private Purchase Information; (2) claims to have Plaintiffs' Private Purchase Information; or (3) claims to have received from PCH Private Purchase Information prior to July 31, 2016. Defendant maintains that Plaintiffs only generically identify categories of third parties to whom PCH could have disclosed their Private Purchase Information.

Plaintiffs note that, although PPPA actions were dismissed in *Wheaton* and *Nashel*, most of the 100 cases PPPA cases filed since 2014 resulted in different resolutions, including settlements and denials of Rule 12(b)(6) motions. Citing *Horton v. GameStop Corp.*, 380 F.Supp.3d 679 (W.D. Mich. 2018) ("Given that GameStop possessed the *Game Informer* subscription information and that NextMark purported to sell that information, the implication that GameStop disclosed the information to NextMark or other data-mining companies passes the threshold of plausibility.").

Defendant counters that the courts cited by Plaintiff that have found factual allegations sufficient to states a claim for a violation of the PPPA were decided prior to *Wheaton* and *Nashel*. Defendant suggests that shows that the "growing trend" is to dismiss cases premised on unreliable third-party marketing websites (such as LSC and Next Mark), but the Court does not find that argument, without more, persuasive.

Defendant argues that the *Nashel* court concluded that the content of the evidence does not create a reasonable inference that there was a violation of the PPPA because "[t]he data cards . . . fail to support a crucial element of [p]laintiffs' alleged action: that [d]efendant 'engaged in the business of selling written material to disclose information personally identifying the customer.'" Citing *Nashel*, 2022 WL 6775657, at *5. Defendant suggests that this case is the same, as none of the screenshots demonstrates that Defendant disclosed that any Plaintiff purchased PPPA-protected materials or that such information was being disclosed in any manner during the critical time period. Defendant further argues that it offers many products that do not qualify for protection under the PPPA, and Plaintiffs failure to identify the products they purchased from Defendant reflects that Plaintiffs claims are "mere possibilities."

13

Defendant argues that, in this case, as in *Wheaton*, the mail icon on the screenshots attached to the Complaint do not "explicitly disclose any names, addresses, or personally identifying information of customers. It is merely a picture of an envelope." *Wheaton*, 2019 WL 5536214, at *4. For this reason, Defendant asserts that the Court should not "speculate that the mail icon explicitly would lead to [Defendant's] customers' names and addresses." *Id.*

Plaintiffs state that the Complaint "not only attaches cached copies of Defendant's data cards that pre-date the relevant pre-July 31, 2016 time period, [citing] Exs. D-E, but also attaches copies of Defendant's data cards that post-date the relevant pre-July 31, 2016 time period, [citing] Exs. A-B, F-G[.]" ECF No. 27, PageID.1943-44. Plaintiffs note that the data cards are still offered for sale on NextMark's website (where Plaintiff alleges Defendant offers for sale all of its customers' Private Purchase Information, both prior to, during, and after the relevant time period predating July 31, 2016). And, pages from LSC's website in effect during the relevant time period describe and offer testimonials from Defendant's marketing director concerning Defendant's practice of disclosing Defendant's customers' Private Purchase Information to LSC and others, as discussed above.

14

Plaintiffs assert that these allegations "show that Defendant's practices of systematically disclosing all of its customers' Private Purchase Information and other data (to third party data appenders, aggregators, renters, and others, including but not limited to LSC) began as early as 2002 and persisted 'THROUGH 06/30/2022,' and were thus ongoing during the relevant pre-July 31, 2016 time period." Citing ECF No. 22, at ¶¶ 2-11, 14, 18-27, 58, 62-63, 79-83, 85 and Exs. A-B & E-G. Plaintiffs believe that such factual allegations clearly establish a plausible claim that Defendant disclosed Plaintiffs' (and all of its other customers') Private Purchase Information to third parties between at least as early as 2002 and at least as recently as June 30, 2022, as well as the time in between, including the relevant time period prior to July 31, 2016.

In response to Defendant's contentions that the Complaint fails to identify "what it is they claim to have purchased from [Defendant,]" or when they purchased it, Plaintiffs argue that they:

> allege that they purchased "written materials, sound recordings, and/or video recordings sold by [Defendant], including but not limited to subscriptions to magazines," from Defendant, and that they made those purchases "prior to July 31, 2016 (including during the relevant pre-July 31, 2016 time period)," i.e., between March 14, 2016 and July 30, 2016.

ECF No. 27, at PageID.1948 (citing ECF No. 22, at ¶¶ 18-26). Plaintiffs insist that the premise of Defendant's argument – that the PPPA is violated only if the

15

disclosure of a customer's data identifies a specific "book . . . or other written materials . . . , sound recording . . . , or video recording" is wrong as a matter of law.

Plaintiffs first note, accurately, Defendant does not cite any authority for that proposition. Plaintiffs then state that the unamended, pre-July 31, 2016 version of the PPPA prohibits the disclosure of "a record or information **concerning** the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer." For that reason, Plaintiffs maintain that the PPPA prohibits disclosures that "concern" the purchase, lease, rental, or borrowing of written materials or recordings, not just disclosures that "specify" the title of any such materials.

Defendant claims that Plaintiffs' interpretation of the "concerning" provision (that Defendant need only disclose a record relating to a purchase, not what a Plaintiff purchased) leads to absurd results. Defendant insists that interpretation would mean that the PPPA prohibits Defendant from disclosing the purchase of "a magazine" without disclosing what the magazine was, *i.e.,* without requiring any of the specific information that the PPPA was intended to protect. Citing *Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666, 670 (E.D. Mich. 2022) ("Congress enacted the VPPA 'after a newspaper 'published a profile of…Judge Robert H.

16

Bork[,]' which contained the titles of 146 films he and his family had rented….'"); *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 626 (E.D. Mich. 2017) ("The [PP]PA—like the federal [VPPA]…—was enacted…in the wake of the disclosure of Robert Bork's video-rental records…".).

Defendant further suggests that the amendment to the PPPA in 2016 reflects that the PPPA was always intended to prohibit the disclosure of "information that personally identifies the customer *as having purchased, leased, rented, or borrowed those materials* from the person engaged in the business." (emphasis added by Defendant). Defendant concludes that none of the screenshots indicated that Defendant ever disclosed the specific products purchased (as opposed to the category of product purchased).

Plaintiffs note that the Complaint alleges that Defendant disclosed to LSC, NextMark and other entities lists that contained "the full names and addresses, of each person who purchased a product from" Defendant, including "the types, titles, and genres of the products (including of the written materials, video records, and sound recordings) that each of them purchased[.]" ECF No. 22, at ¶ 4. Such allegations of disclosures by Defendant are actionable, Plaintiffs argue, because they "concern" Plaintiffs' purchases of relevant materials and recordings from Defendant.

Plaintiffs also contend that the data cards plausibly show that Defendant was disclosing the information to LSC, NextMark (and others), since LSC (and NextMark) were advertising that they had or could refer customers to a place where customers could access "Publishers Clearing House Data" or the "Product/Subscription Category" for each of Defendant's customers. One or more of the exhibits to the Complaint identifies 19 "subscription categories" for "discounted magazine subscriptions" sold by Defendant. *Id.* at Exs. D, E.

The Court agrees with Defendant that Plaintiffs had the burden of alleging the entities to which Defendant allegedly was disclosing the lists/personal information. To conclude otherwise would relieve Plaintiffs of any obligation to plead anything that would identify the scope of Defendant's disclosures. The Court rejects, however, Defendant's argument that "whether the entity selling or renting the lists was [Defendant] is left entirely to impermissible speculation." ECF No. 25, PageID.1835. The Complaint specifically alleges that Defendant was (and is) selling, renting, leasing, or otherwise disclosing Defendant's customer lists. ECF No. 22, at ¶¶ 18-26 ("during the relevant pre-July 31, 2016 time period, PCH disclosed, without the requisite consent or prior notice, Plaintiff [] Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files. Moreover, during

18

that same period, PCH rented or exchanged mailing lists containing Plaintiff []'s Private Purchase Information to third parties . . .").

Plaintiffs also allege that the following representation by Defendant's marketing director' was and is on LSC's website: "LSC Marketing Group has been a great partner, managing our list since it was put on the market in 2002. They have built a strong list rental program for [Defendant] and we would not trust the management of our list to anyone else." ECF No. 22, Ex. K. The Court finds, however, that except as to alleged disclosures to LSC and NextMark, Plaintiffs' allegations are not sufficient, despite Plaintiffs' argument that there is a liberal pleading standard. Plaintiffs' contention that the crux of the lawsuit is that Defendant failed to inform Plaintiffs that Defendant would disclose Plaintiffs' Private Purchase Information to others and obtain Plaintiffs' consent does not change the Court's analysis, as it is not relevant to whom Defendant allegedly disclosed prohibited information.

## V.     CONCLUSION

Accordingly, and for the reasons set forth above,

IT IS ORDERED that Defendant's Motion to Dismiss, ECF No. 25, is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that the Motion to Dismiss is DENIED with respect to Plaintiffs' claims of disclosures to NextMark and LSC.

IT IS FURTHER ORDERED that the Motion to Dismiss is GRANTED with respect to any third-parties because such third-parties are not specifically identified and are merely speculative.

IT IS FURTHER ORDERED that any discovery shall be limited to only the named Plaintiffs.

IT IS FURTHER ORDERED that the motion to dismiss previously filed by Defendant, ECF No. 20, is DENIED as superseded.

May 23, 2023                               s/Denise Page Hood
                                           DENISE PAGE HOOD
                                           UNITED STATES DISTRICT JUDGE