# Exhibit A -
## Proposed Reply

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| MARY LOU PETT, et al., individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PUBLISHERS CLEARING HOUSE, INC., <br><br> Defendant. | Case No. 22-cv-11389 <br><br> Honorable Denise Page Hood <br><br><br> **CLASS ACTION** <br><br> **JURY DEMANDED** |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION
FOR RECONSIDERATION OF A NON-FINAL ORDER
GRANTING IN PART DEFENDANT'S MOTION TO DISMISS**

Plaintiffs respectfully submit this reply in support of their motion for reconsideration (ECF No. 47 (the "Motion" or "Mot.")) of the Court's Order granting in part and denying in part Defendant Publishers Clearing House's motion to dismiss (ECF No. 44 (the "Order")).

## INTRODUCTION

Desperate to avoid answering for the full scope of its wrongful conduct in violation of Michigan's Preservation of Personal Privacy Act ("PPPA"), Defendant misrepresents what this case is about and misstates the applicable law throughout its opposition brief (ECF No. 54 (the "Opposition" or "Opp.")).

This case concerns Defendant's practices of advertising and selling lists of its customers' PPPA-protected information to anyone and everyone interested in purchasing this information during the relevant pre-July 31, 2016 time frame. As the operative Second Amended Complaint ("SAC") alleges, during the relevant time period Defendant actively advertised the availability of its customers' data on Nextmark's and LSC's websites, on publicly accessible "data cards." In the data cards, Defendant offered to provide (i.e. "rent") the purchase-related data of all of its customers, at the prices listed on the data cards, to literally anyone who wanted to acquire this data. These lists "rentals" were facilitated by multiple intermediaries, including but not limited to Nextmark, which brokered the rentals of Defendant's lists, and LSC, which managed Defendant's lists and transferred them to the third

parties that rented them. Thus, one of the reasons Defendant routinely transmitted these customer lists to LSC during the relevant pre-July 31, 2016 time period was to enable LSC to then transmit the lists on Defendant's behalf to the third parties that rented them during the same time frame. While the identities of the third parties who rented the lists and to whom LSC (on Defendant's behalf and at Defendant's direction) transferred the lists is impossible to determine at this time – because the information needed to identify these third parties is in the exclusive possession of Defendant and LSC – there can be no dispute that the SAC adequately alleges that Nextmark and LSC were actively advertising, renting, and, in the case of LSC, actually transmitting on Defendant's behalf this data to third parties throughout the relevant pre-July 31, 2016 time period. The identities of these third-party renters of Plaintiffs' and Class members' PPPA-protected information will be revealed in short order in discovery.

Against this backdrop, the SAC clearly alleges facts that plausibly state a claim for violation of the PPPA against Defendant based upon its disclosures of its customers' data to not only LSC and Nextmark, but also to the third parties that rented and received this data from LSC on Defendant's behalf and at its direction. Accordingly, the SAC alleges a single claim for violation of the PPPA against Defendant arising from multiple theories of liability – namely, Defendant's multiple disclosures of this information to various third parties, any one of which is sufficient

2

to establish Defendant's liability under the statute. And because the SAC alleges only a single claim for relief under the PPPA, the SAC seeks only a single $5,000 statutory damage award to each Plaintiff and each Class member whose information was disclosed to a third party in violation of the statute, regardless of the number of or the identities of the third parties to whom Defendant disclosed Plaintiffs' and Class members' PPPA-protected information during the relevant time period.

In deciding Defendant's motion to dismiss the SAC, the Court correctly found that the SAC adequately stated a PPPA claim based upon Plaintiffs' allegations concerning Defendant's disclosures of their PPPA-protected information to Nextmark and LSC. Upon finding that Plaintiffs' PPPA claim was sufficient to survive dismissal based on these allegations, the Court should have ended its analysis there and denied Defendant's motion to dismiss in its entirety. Instead, the Court went on to find the SAC's allegations insufficient to state a PPPA claim based upon Plaintiffs' alternative theories of liability – namely, Defendant's disclosures of the same PPPA-protected information to various other third parties (including renters of this information), which are adequately alleged to exist but are incapable of being specifically identified by name at this time (because their identities are presently within the exclusive possession of Defendant and LSC). Here the Court committed clear legal error, in two ways.

First, the SAC pleads a single claim for relief under the PPPA, arising from multiple disclosure theories. Having found the claim sufficiently pled under one of Plaintiffs' disclosure theories, the Court should not have "partially" dismissed the claim with respect to any of the other disclosure theories. Indeed, it is well established that courts may not partially dismiss claims at the motion to dismiss stage, but rather may only do so at summary judgment. On this basis alone, the Court should reconsider its Order and deny Defendant's motion to dismiss in its entirety.

Second, even if it were appropriate (and it is not) for the Court, after finding that the SAC adequately alleges disclosures to LSC and Nextmark, to then consider the sufficiency of the SAC's allegations concerning Defendant's disclosures to unidentified third parties (rather than denying the motion to dismiss in its entirety at that point), the factual allegations of the SAC are plainly sufficient on that front as well. As explained in the Motion, Michigan's federal courts are in unanimous agreement that the facts alleged here adequately state a PPPA claim based upon disclosures to any third party, regardless of whether that third party was specifically identified in the complaint or not. *See, e.g.*, *Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 682 (W.D. Mich. 2018) (holding that because the defendant had the "subscription information and that NextMark purported to sell that information, the implication that GameStop disclosed the information to NextMark **or other data-mining companies** passes the threshold of plausibility.") (emphasis added); *Gaines*

4

*v. Nat'l Wildlife Fed'n*, No. 22-11173, 2023 WL 3186284, at *4 (E.D. Mich. May 1, 2023) (relying on *Horton* in holding, "the Amended Complaint sufficiently alleges that Defendant disclosed PRI in violation of the PPPA, as evidenced by that information being available for sale from NextMark.") (cleaned up). Indeed, upon finding that the plaintiffs adequately stated PPPA claims in each of those cases, each of the presiding courts denied the defendant's motion to dismiss in its entirety, and permitted the plaintiffs to proceed to discovery and seek redress for the defendant's disclosures to any third party, identified or unidentified by name in the complaint, during the relevant pre-July 31, 2016 time period. And in some of those cases, the plaintiffs ultimately established Defendant's liability under the statute based upon its disclosures to third parties that were not specifically identified by name in the complaint. *See, e.g.*, *Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172, 201-02, 206-07 (S.D.N.Y. 2017) (granting plaintiff's motion for summary judgment in a PPPA case as to disclosures to two third party data companies that were not named in complaint).

In its Opposition to the Motion, Defendant says that Plaintiffs actually brought three separate PPPA claims (one based on disclosures to LSC, one based on disclosures to Nextmark, and one collectively based on disclosures to all unidentified third parties) and argues that the Court properly dismissed the claim concerning disclosures to unidentified third parties. Defendant also argues that the Court

5

correctly determined that the SAC fails to adequately allege that Defendant disclosed customer information to third party list renters or to any other third parties not specifically identified by name, and in support cites to two cherry-picked PPPA decisions in factually inapposite cases – even though every other court, representing a clear majority, has reached the exact opposite conclusion on this issue, in cases with facts materially identical to the facts here. None of Defendant's arguments in its Opposition stand up to scrutiny. The SAC explicitly alleges a single claim for violation of the PPPA, and the Court erred by partially dismissing that claim rather than denying the motion to dismiss in its entirety and permitting discovery to proceed in the ordinary course. Any reasonable opportunity Plaintiffs are afforded for discovery will quickly reveal the identities of each of the third parties to whom Defendant rented and otherwise disclosed customer information during the relevant time period – third parties that, again, we know exist but whose identities are presently in Defendant's and LSC's exclusive possession.

The Motion should be granted. The Court should reconsider its Order and deny Defendant's motion to dismiss in its entirety.

## ARGUMENT

### I.     Plaintiffs Allege a Single Claim for Relief, Part of Which the Court Erroneously Dismissed in Its Order

As explained in the Motion, it is well established that partial dismissals of claims or defenses are improper at the motion to dismiss stage of litigation. (Mot. at

6 n.3 (citing *Winstead v. Lafayette Cty. Bd. of Cty. Commissioners*, 197 F. Supp. 3d 1334, 1341 (N.D. Fla. 2016)).) Defendant attempts to get around this well-established principle in its Opposition by arguing that Plaintiffs actually alleged three separate PPPA claims – one based on disclosures to Nextmark, one based on disclosures to LSC, and one based on disclosures to all other third parties collectively – and that the Court dismissed the third claim (based on disclosures to all other third parties) but not the first two claims. (Opp. at 2, 11 ("That the Court dismissed the latter in no way is a partial dismissal of the first two claims. Indeed, it has no effect on the first two claims. It is a *complete* dismissal of a separate claim, which the Court is clearly authorized to do.") That is a remarkably sloppy misreading of the SAC and the Court's Order.

As the plain language of the SAC demonstrates, Plaintiffs allege a single claim for violation of the PPPA, arising from disclosures of Plaintiffs' and Class members' PPPA-protected information to any third party during the relevant pre-July 31, 2016 time period, and accordingly seek a single $5,000 statutory damage award to each of the Plaintiffs and Class members to redress any and all such disclosures, to any and all third parties, made in violation of the statute. SAC ¶¶ 73-92 (Plaintiffs' single cause of action). In fact, in the motion to dismiss the SAC, Defendant itself described the SAC as alleging a single claim for relief under the PPPA. (Opp. at 2 (referring to "[t]heir claim"), 3 ("They assert this claim on behalf of themselves and on behalf

of a putative class of Michigan residents.") & 14 ("Plaintiffs Deliberate Omissions Kill <u>Their Claim</u>.") (emphasis added).) It is simply beyond dispute that the SAC alleges a single claim for relief under the PPPA. And because the SAC alleges a single claim for relief, the Court's dismissal of part of that claim (with respect to disclosures to third parties not specifically identified by name in the SAC) was procedurally improper and should be remedied through reconsideration.

Defendant says that the SAC alleges "three distinct claims for which Plaintiffs seek separate redress." (Opp. at 13.) That is incorrect. Consistent with the statute, Plaintiffs seek a single $5,000 statutory damage award for each Plaintiff and each class member regardless of the number of violative disclosures – not $5,000 for each violative disclosure to each Plaintiff or each class member. *See* PPPA § 5 (providing that "[t]he customer may bring a civil action against the person and may recover both of the following . . . [a]ctual damages . . . or $5,000.00, whichever is greater [and] costs and reasonable attorney fees," without any provision entitling a plaintiff to per-violation $5,000 awards). In other words, the redress Plaintiffs seek, individually and on behalf of each member of the class, does not depend on the number of disclosures of a particular Plaintiff's or class member's protected information or on the third parties to whom those disclosures were made. (SAC ¶ 92, "On behalf of themselves and the Class, Plaintiffs seek: (1) $5,000.00 to each of the Plaintiffs and each Class member pursuant to PPPA § 5(a)"; *see also* CAC,

Prayer for Relief (D), "For an award of $5,000 to each of the Plaintiffs and each Class member, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a)".) Simply put: any and all disclosures to any of the third parties alleged in the SAC, identified or unidentified, are redressable by Plaintiffs' single claim for relief under the PPPA, which affords a single $5,000 statutory damage award to each Plaintiff and Class member whose information was disclosed in violation of it. Thus, the nature of the redress sought by Plaintiffs and Class members only further confirms that the SAC alleges a single claim for violation of the PPPA, not the three separate claims (seeking three separate $5,000 statutory damage awards to each Plaintiff and Class member) that Defendant has concocted in its Opposition brief.

Indeed, Plaintiffs have alleged a single claim for relief that rests on multiple theories of disclosure, each of which offers an independent basis for Defendant's liability under the statute. Instructive on this point is the Seventh Circuit's decision in *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587-89 (7th Cir. 2021), where, as here, the plaintiff alleged a single claim for relief against the defendant based upon multiple theories of liability, each of which provided an independent basis for holding the defendant liable. After determining that the plaintiff had adequately stated a plausible claim for relief under one of those multiple theories of liability, the Seventh Circuit reversed the district court's partial dismissal of the plaintiff's claim with respect to the other theories of liability, explaining that the court should have instead

denied defendant's motion to dismiss in its entirety and permitted discovery to
proceed on all of the alleged theories of liability:

> Bilek alleged that Federal Insurance Company is liable for
> the lead generators' unauthorized robocalling under actual
> authority, apparent authority, and ratification principles of
> agency liability. Each agency theory offers an independent
> basis for Federal Insurance Company's vicarious liability.
> . . . But we need not reach all three agency theories here.
> Since "[a] motion to dismiss under Rule 12(b)(6) doesn't
> permit piecemeal dismissal of *parts* of claims," our inquiry
> is limited to only whether Bilek's complaint "includes
> factual allegations that state a plausible claim for relief."
> *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir.
> 2015) (explaining that unlike a motion to dismiss,
> summary judgment explicitly allows for the parties to
> move for judgment on parts of claims to narrow individual
> factual issues for trial). Bilek's complaint does so. By way
> of example, Bilek states a plausible claim for relief under
> his actual authority theory of agency liability, so we start
> and end there.
>
> . . .
>
> With a viable agency claim on its actual authority theory,
> Bilek's complaint moves forward at this pleading stage. In
> reaching this result, we need not and do not reach Bilek's
> apparent authority and ratification theories of agency
> liability. Of course, the parties may pursue discovery on
> these theories. And the parties may move for summary
> judgment on all or any part of Bilek's claims. Fed. R. Civ.
> P. 56(a). At this stage, we hold only that Bilek's complaint
> should not have been dismissed under Rule 12(b)(6).

*Bilek*, 8 F.4th at 587-89 (emphasis added). This Court should have reached the same
conclusion here. Upon finding Plaintiffs' PPPA claim adequately pled under any one
of their multiple theories of liability (including Defendant's alleged disclosures to

LSC and Nextmark), the Court should have denied the motion to dismiss the claim in its entirety and permitted discovery to proceed in the ordinary course.

According to Defendant, "Plaintiffs' argument here, if taken to its logical extreme, would result in absurd results," such as "preventing" the Court "from dismissing" claims based on time-barred disclosures (Opp. at 12.). While difficult to follow, Defendant appears to be conflating disclosures that give rise to a claim with a claim that seeks to redress disclosures. A disclosure made outside the limitation period is simply not actionable under the statute and is plainly not the subject of Plaintiff's claim (nor would it be subject to discovery in the litigation). *See* SAC ¶ 1 n.3 (specifying that Plaintiff's claim focuses exclusively on disclosures to third parties made during the applicable limitation period). Given that Plaintiffs' claim, by definition, does not seek to redress disclosures outside of the limitation period, Defendant's convoluted hypothetical is a total red herring.

Finally, Defendant attempts to distinguish several of the decisions cited in the Motion where courts rejected attempts to partially dismiss claims at the pleadings stage, but in so doing fails to demonstrate any material factual differences between those cases and the instant matter that would render this Court's partial dismissal of Plaintiffs' PPPA claim proper. So while the claim and the parts of that claim that were dismissed in *BBL, Inc. v. City of Angola*, 809 F.3d 317 (7th Cir. 2015) were undoubtedly different than the PPPA claim partially dismissed here, *BBL*'s holding

(which is consistent with the reasoning of *Bilek*, discussed above) is clear and unequivocal and applies with equal force in this case: "A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc.*, 809 F.3d at 325. And in *Snell v. G4S Secure Solutions (USA) Inc.*, 424 F. Supp. 3d 892 (E.D. Cal. Dec. 19, 2019), *Kruger v. Lely N. Am., Inc.*, 518 F. Supp. 3d 1281 (D. Minn. 2021), *In re Netopia, Inc., Sec. Litig.*, 2005 WL 3445631 (N.D. Cal. Dec. 15, 2005), and *Jones v. City of Los Angeles*, 2021 WL 6496719 (C.D. Cal. June 25, 2021), none of which turned on facts materially different from the facts here, each of the presiding courts likewise broadly explained that the dismissal of part of a claim, including one of many theories in support of a claim, is procedurally improper at the motion to dismiss stage. *See Snell*, 424 F. Supp. 3d at 903-04 (explaining that the court "cannot partially dismiss either of the two causes of action under Rule 12(b)(6) as it would be procedurally improper," and that "'the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible'") (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)); *Kruger*, 518 F. Supp. 3d at 1292 ("To the extent that Lely urges the Court to curtail Kruger's tort claims to the degree they seek to recover for damage to the A4 system and Kruger's barn, the Court cannot do so. On a Rule 12(b)(6) motion, the Court may only dismiss a claim,

not part of a claim.") (citation omitted); *In re Netopia, Inc., Sec. Litig.*, 2005 WL 3445631, at *3 (explaining that "Fed. R. Civ. P. 12(b)(6)'s language 'failure to state a claim' means the rule should not be used on subparts of claims; a cause of action either fails totally or remains in the complaint under Fed. R. Civ. P. 12(b)(6)," and denying defendant's motion to dismiss part of a claim), and *Jones*, 2021 WL 6496719, at *6 & *6 n.10 (refusing to dismiss part of plaintiff's claims arising from violations of several statutory provisions, even where "he fails to allege or support that those provisions create an adequate basis for municipal liability[,]" because the complaint separately alleges facts adequately demonstrating "Plaintiff's entitlement to injunctive relief against the City on those claims," and explaining that "[t]he Court cannot dismiss part of a claim").

As the above-cited decisions further explain, Defendant will have an opportunity to seek the dismissal of any part of Plaintiffs' PPPA claim at summary judgment, after the completion of a reasonable period of discovery on all matters (including any of the theories of liability) relevant to Plaintiffs' claim as alleged, and the Court may properly grant such relief at that time. *See BBL, Inc.*, 809 F.3d at 325 ("Summary judgment is different. The Federal Rules of Civil Procedure explicitly allow for '[p]artial [s]ummary [j]udgment' and require parties to 'identif[y] each claim or defense—*or the part of each claim or defense*—on which summary judgment is sought.' At the summary-judgment stage, the court can properly narrow

13

the individual *factual* issues for trial by identifying the material disputes of fact that continue to exist.") (emphasis in original) (citation omitted).[1]

The Court's partial dismissal of Plaintiffs' PPPA claim at the motion to dismiss stage was procedurally improper, and the Court should remedy the error by granting reconsideration.

## II. The Consensus Across the Federal Judiciary is that the Facts Alleged Here Sufficiently Demonstrate PPPA-Violative Disclosures to all of the Categories of Third Parties Alleged in the Complaint, Regardless Whether a Third Party is Specifically Identified by Name or Not

Even if the Court were permitted to dismiss part of Plaintiffs' PPPA claim (and thus prevent Plaintiffs from seeking relief for themselves and class members based upon disclosures to third parties other than LSC and Nextmark), the Court also clearly erred in finding that the SAC fails to adequately allege facts plausibly establishing that Defendant disclosed its customers' data to other third parties (including to third-party renters by LSC on its behalf) during the relevant period.

Plaintiffs' counsel has litigated dozens of PPPA cases over the past decade. Of the dozens of motions to dismiss for failure to state a claim filed by defendants in these cases, only two have ever been granted, *see Wheaton v. Apple Inc.*, No. C

---

[1]    Tellingly, the Opposition does not even attempt to grapple with the decision in *Winstead v. Lafayette Cty. Bd. of Cty. Commissioners*, 197 F. Supp. 3d 1334, 1341 (N.D. Fla. 2016), which also aptly explains why courts may only dismiss parts of claims at summary judgment. (Mot. at 6 n.3 (quoting *Winstead*).)

19-02883 WHA, 2019 WL 5536214, at *4 (N.D. Cal. Oct. 25, 2019) and *Nashel, et al. v. N.Y. Times Co.*, No. 2:22-CV-10633, 2022 WL 6775657 (E.D. Mich. Oct. 11, 2022), and both of those decisions turned on facts readily distinguishable from the instant matter. *See Gaines v. Nat'l Wildlife Fed'n*, No. 22-11173, 2023 WL 3186284, at *4 (finding "*Nashel* distinguishable," explaining that "the complaint in *Nashel* did not contain the specific allegations regarding the data offered for sale during the relevant pre-July 31, 2016 period and that the defendant sold and disclosed that information"); *id.* at *5 (E.D. Mich. May 1, 2023) (stating that "the court does not find *Wheaton* applicable here," explaining that "there, the district court ruled that similar exhibits did not contain enough information to state a viable claim under Michigan's PPPA or Rhode Island's privacy statute. [] The district court highlighted that the third-party data broker listing proffered by the plaintiff did not contain the name of the third-party broker; the defendant, Apple; or the defendant's app, iTunes, meaning the listing could not be used to establish that the protected information originated from either Apple or iTunes. *Id.* The data card here does not appear to suffer from such defects, and even if it did, the allegations in the Amended Complaint address any such purported deficiencies.") (citation omitted).

Besides the two outlying (and in any event factually inapposite) decisions in *Wheaton* and *Nashel*, every other court called upon to resolve a Rule 12(b)(6) motion to dismiss in a PPPA case has denied the motion in its entirety, and then uniformly

permitted the plaintiffs to take discovery concerning, and to seek redress from, any disclosures of their and class members' PPPA-protected information to any third party, specifically identified in the complaint or not. *See, e.g.*, *Gaines*, No. 22-11173, 2023 WL 3186284, at *5; *Nock v. Boardroom, Inc.*, No. 22-CV-11296, 2023 WL 3572857, at *5 (E.D. Mich. May 19, 2023); *Schreiber v. Mayo Found. for Med. Educ. & Rsch.*, No. 2:22-CV-188, 2023 WL 4512647, at *4 (W.D. Mich. July 13, 2023); *Briscoe v. NTVB Media Inc.*, No. 4:22-CV-10352, 2023 WL 2950623, at *7 (E.D. Mich. Mar. 3, 2023), *report and recommendation adopted as modified sub nom. Russett v. NTVB Media, Inc.*, No. 22-10352, 2023 WL 6315998 (E.D. Mich. Sept. 28, 2023). And in some such cases, the defendant ultimately faced liability under the statute for disclosures made to third parties that the plaintiffs, through no fault of their own, had been unable to specifically identify by name in the complaint but had nonetheless adequately alleged to exist based upon, just like in this case, the publicly accessible data cards advertising the availability of the defendant's customer data on the open market during the relevant time period. *See, e.g.*, *Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. 2017) (granting plaintiff's motion for summary judgment in PPPA case based on disclosures to third parties not specifically identified by name in the complaint, but whose names were quickly revealed in discovery following the court's denial of defendant's motion to dismiss).

Although the core allegations of the SAC in this case are materially the same as the allegations of the complaints in the above-cited cases where courts denied defendant's motions to dismiss in their entirety (given the industry-wide practices at issue in these matters), Plaintiffs here have also supported their PPPA claim with additional factual allegations that are far more comprehensive and detailed than the allegations in most if not all of the above-cited cases. For example, the SAC includes as an exhibit a publicly accessible website, in effect during the relevant time period, containing a quotation from Defendant's own marketing employee praising LSC for having "built a strong list rental program" on its behalf – i.e., confirming, in Defendant's own words, that the customer data it transmitted to LSC to operate its list rental program was in fact disclosed to third-party renters and monetized by LSC at Defendant's direction. SAC ¶ 9 (quoting Ex. K to SAC). Thus, by any reasonable measure, the SAC plausibly demonstrates that LSC, on Defendant's behalf, disclosed Defendant's customer data to third party renters during the relevant time period.

But because the identities of the third-party renters of this PPPA-protected information are exclusively within Defendant's and LSC's (and the third-party renters') knowledge, there is no way for Plaintiffs to specifically identify those parties by name without a reasonable opportunity for discovery. Nevertheless, having adequately alleged the existence of these third-party renters and other third-

17

party recipients of Defendant's PPPA-violative disclosures, Plaintiffs have sufficiently stated a claim for relief arising from disclosures to these third parties, whose identities are at this time completely within Defendant's (and LSC's) knowledge. *See Mauer v. Am. Intercontinental Univ., Inc.*, No. 16 C 1473, 2016 WL 4651395, at *2 (N.D. Ill. Sept. 7, 2016) ("A plaintiff need not allege facts completely within the defendant's knowledge at the pleading stage.") (citation omitted); *see also, e.g.*, *Charvat v. Allstate Corporation*, 29 F.Supp.3d 1147, 1150-51 (N.D. Ill. 2014) (denying the defendants' motion to dismiss a claim alleging unsolicited phone calls in violation of the TCPA despite the plaintiff's failure to identify the third-party telemarketer or lead generator who initiated the call, explaining that "it is defendants, not plaintiff, who can reasonably be expected to know these facts, and plaintiff's allegations, taken together, suffice to entitle him to discovery on the issue"); *Cunningham v. Foresters Fin. Servs., Inc.*, 300 F. Supp. 3d 1004, 1014 (N.D. Ind. 2018) (same result); *Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 682 (W.D. Mich. 2018) (holding that because the defendant had the "subscription information and that NextMark purported to sell that information, the implication that GameStop disclosed the information to NextMark **or other data-mining companies** passes the threshold of plausibility.") (emphasis added). This is especially true given that the statute prohibits disclosures to any third party, regardless of its identity.  *See* PPPA § 2 (prohibiting disclosure to "any person, other

18

than the customer"). Thus, upon finding that Plaintiffs adequately alleged a disclosure sufficient to plausibly state a claim under the statute (Order at 18-19), the Court should have denied the motion to dismiss in its entirety and permitted discovery to proceed in the ordinary course, just as every other court has done upon finding that a PPPA plaintiff adequately alleged a disclosure to any third party. But even if it were appropriate to further analyze the sufficiency of Plaintiffs' allegations of disclosures to third parties not specifically identified by name in the SAC, those allegations were plainly sufficient to state a claim as well.

Finally, Defendant argues that Plaintiffs "cannot, on the one hand, urge this Court to ignore the rulings in [*Wheaton*] and [*Nashel*] . . .while, on the other hand, insist that the court follow decisions that allowed PPPA claims to survive dismissal." (Mot. at 17.) That makes no sense. In considering the sufficiency of the SAC's allegations with respect to the disclosures to third-party renters (and to other third parties not specifically identified by name) – which, again, are known to exist but are unable to be specifically identified by name at this time (as previously discussed) – Plaintiffs certainly do urge this Court to reject the reasoning of the two outlying decisions in *Wheaton* and *Nashel* and to instead adopt the uniform reasoning of the dozens of other decisions denying motions to dismiss in their entirety in PPPA cases involving facts materially identical to the instant matter. There is nothing unusual about urging the Court to adopt the consensus approach taken by the overwhelming

majority of courts in cases with analogous facts rather the minority approach taken by two courts in cases with inapposite facts. What *is* unusual is for Defendant to be urging the Court adopt the two-court minority approach, without even attempting to explain why the consensus approach gets it wrong. (*See* Opp. at 17-18.)[2]

The Court erred in finding the SAC's factual allegations concerning disclosures to unidentified third parties insufficient to state a claim, and the Court should remedy the mistake by granting reconsideration.

### III. Discovery Should Proceed in the Ordinary Course, Consistent with Each of the Dozens of Other PPPA Cases Litigated in Michigan's Federal Courts

Finally, Defendant argues that the Court properly limited discovery "to only the named Plaintiffs" because "the Court has the power to limit discovery." (Opp. at 21.) This argument runs headlong in the Federal Rules of Civil Procedure.

While the Court does have discretion over matters of discovery, the boundaries of the Court's exercise of that discretion are set by the Federal Rules of

---

[2]     Moreover, neither the decision in *Nashel* nor the decision in *Wheaton* dismissed part of a plaintiff's PPPA claim; rather, the courts in those cases each dismissed a PPPA claim in its entirety upon finding, on plainly inapposite facts (as discussed in the Motion), that the plaintiffs had failed to adequately allege that the defendant (as opposed to some other entity unrelated to the defendant) disclosed PPPA-protected information to any third party (specifically identified in the complaint or not) in violation of the statute. This Court, by contrast, has already found that Plaintiffs have adequately alleged that Defendant disclosed their protected information to third parties in violation of the PPPA, leaving nothing left for the Court to do at that point other than deny Defendant's motion to dismiss in its entirety.

Civil Procedure. Rule 26(b)(1) provides that, "unless otherwise limited by court order" issued in accordance with Rule 26(b)(2), "parties may obtain discovery regarding <u>any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case,</u> considering <u>the importance of the issues at stake in the action,</u> the amount in controversy, the parties' relative access to relevant information, the parties' resources, <u>the importance of the discovery in resolving the issues,</u> and <u>whether the burden or expense of the proposed discovery outweighs its likely benefit.</u>" Fed. R. Civ. P. 26(b)(1) (emphasis added)

As explained in the Motion, this is a putative class action lawsuit. In order for Plaintiffs to demonstrate that the requirements of Rule 23 are satisfied, warranting the certification of the proposed class, Plaintiffs must take discovery on matters relevant to those requirements. This is critical, not just "important," discovery for Plaintiffs' case on behalf of the proposed class, and its relevance is readily apparent in light of Rule 23's requirements. *See* Fed. R. Civ. P. 26(b)(1). Nor will Defendant be unduly burdened by producing class certification-related discovery along with discovery relevant to Plaintiffs' individual claims, *see id.*; as alleged in the SAC, Defendant transmitted its *entire* customer database to various third parties during the relevant time period, such that disclosure files containing Plaintiffs' information would surely contain putative class members' information as well. *See* SAC, ¶¶ 6, 9, 14. Defendant's production of class-related materials such as these disclosure files

is therefore both critically important to Plaintiffs' case and less burdensome for Defendant than if discovery were limited to the named Plaintiffs' claims (which would require Defendant to separate the Plaintiffs' information from class members' information in these files prior to production).

Notably, no court has ever totally prohibited a plaintiff from pursuing class-wide discovery in a putative PPPA class action. *See, e.g.*, *Gottsleben v. Informa Media, Inc. f/k/a Penton Media, Inc.*, No. 1:22-CV-00866, ECF No. 47 PageID.1743 (W.D. Mich.) (compelling production of contracts with third party data companies); *see also* Exhibit 1 hereto, Oct. 16, 2017 Hrg. Tr. in *Hearst*, No. 1:15-cv-09279 (S.D.N.Y.), ECF No. 261 at 46:5-47:6 (compelling discovery of contracts and transmissions to third party data companies even where named plaintiff's information was not disclosed to those companies). If the Order stands, this Court would become the first.

The Court erred in prohibiting Plaintiffs from conducting discovery on issues relevant to class certification, and the Court should remedy the mistake by granting reconsideration.[3]

---

[3]     Defendant says that it "plans to move for summary judgment on Plaintiffs' individual claims as soon as the pleadings are set." (Opp. at 3.) Plaintiffs note, however, that Rule 56(d) entitles them to a reasonable period of discovery to obtain the materials needed to adequately oppose any motion for summary judgment Defendant files.

Dated: May 13, 2024                    Respectfully submitted,

                                       */s/ E. Powell Miller*
                                       E. Powell Miller (P39487)
                                       **THE MILLER LAW FIRM, P.C.**
                                       950 W. University Drive, Suite 300
                                       Rochester, MI 48307
                                       Tel: 248-841-2200
                                       epm@millerlawpc.com

                                       Joseph I. Marchese
                                       Philip L. Fraietta (P85228)
                                       **BURSOR & FISHER, P.A.**
                                       1330 Avenue of the Americas, 32nd Floor
                                       New York, New York 10019
                                       Tel: 646.837.7150
                                       jmarchese@bursor.com
                                       pfraietta@bursor.com

                                       Frank S. Hedin
                                       Arun G. Ravindran
                                       **HEDIN LLP**
                                       1395 Brickell Avenue, Suite 1140
                                       Miami, Florida 33131
                                       Tel: 305.357.2107
                                       fhedin@hedinllp.com
                                       aravindran@hedinllp.com

                                       *Counsel for Plaintiffs and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 13, 2024, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

/s/ E. Powell Miller
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com

# Exhibit 1

HaqWedwCredacted

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    JOSEPHINE JAMES EDWARDS,
      Individually, and on Behalf of
 4    All Others Similarly Situated,

 5                    Plaintiff,

 6            v.                              15 Civ. 9279 (AT)(JLC)

 7
      HEARST COMMUNICATIONS, INC.,
 8                                           Conference

 9                    Defendant.

10    ------------------------------x
                                             New York, N.Y.
11                                           October 26, 2017
                                             3:45 p.m.
12
      Before:
13
                            HON. JAMES L. COTT,
14
                                             Magistrate Judge
15

16                           APPEARANCES

17    BURSOR & FISHER, P.A.
           Attorneys for Plaintiff
18    BY:  SCOTT A. BURSOR
           PHILIP L. FRAIETTA
19

20    JONATHAN R. DONNELLAN
      KRISTINA E. FINDIKYAN
21    STEPHEN H. YUHAN
           Attorneys for Defendant
22

23

24

25
```

HaqWedwCredacted

1          (Case called)

2          THE COURT:  Good afternoon.  Everyone may be seated.

3          It was a little bit more than a year ago that I

4    believe that we had our first conference in this case at which

5    I admonished the parties to do better as far as what I'll call

6    professionalism and civility is concerned, and clearly my words

7    were not heeded given the rather excited tone in all of the

8    various correspondence to the Court, including all of the

9    various attachments and the like, and I'm disappointed, to say

10   the least, but at this point I'm just going to proceed because

11   it is, I think, a waste of my time to try and counsel you all

12   to do a better job.  Clearly this is a case that is not

13   functioning properly because there is some dynamic here between

14   counsel that I don't understand but that is causing parties to

15   not work together as officers of the court in order to achieve

16   some modicum of civility as far as working through discovery

17   issues are concerned, and that's of concern to me and great

18   disappointment to me, but I'm not going to belabor the point.

19   I think we're going to have additional disputes between now and

20   the end of discovery because it seems to me you all can't help

21   yourselves, and you think you can just run to the Court anytime

22   you have disputes and inundate the Court with correspondence in

23   extremely complicated and nuanced letters that raise very

24   complicated disputes and either expect me to either drop

25   everything else and resolve them or otherwise require

HaqWedwCredacted

1  significant briefing and set other matters aside in order to

2  put your case front and center, and I think that's unfair to

3  other parties in other cases.

4         Having said that, you've presented a number of issues

5  to me today, some of which I may be able to resolve, some of

6  which I may not, some of which may require briefing, some of

7  which may not.  We'll have to see how that all plays out.

8         What I also will say also at the outset is that I have

9  one goal in mind, which is this is phase II discovery in this

10 case.  We're here to determine what is appropriate class

11 discovery in this case between now and January 18.  That is how

12 I see my role here.  I am not here to make adjudications on a

13 lot of legal questions, many of which have been presented in

14 the papers today in the guise of discovery disputes.

15        I know you have motions for reconsideration pending,

16 which may or may not resolve some of these issues, but we

17 cannot use the forum where discovery disputes are being

18 presented to resolve questions about standing in the class

19 motion that is to follow, and the like.  And I don't know how

20 the parties reasonably can expect me to make those decisions.

21 I'm here to decide discoverability, not what is appropriate for

22 the admissibility of information, evidence on class action

23 motions.  That will be made before Judge Torres in due course.

24 She has staged this case a certain way, and she has tasked me

25 with the responsibility to resolve discovery disputes.  I'm

HaqWedwCredacted

```
1    here to do that.  I'm here to try and create as much of a level
2    playing field as possible.  Obviously the only thing I care
3    about is fairness, and I also want to make sure that I do my
4    best to abide by the dictates of Rule 1 to ensure that the case
5    gets adjudicated in a just, speedy and inexpensive manner,
6    which, by the way, is also the responsibility of counsel, not
7    just the Court.
8            Having said that, rather than have you all get up and
9    make a lot of arguments, I have a lot of questions that I want
10   to ask, and my time is relatively limited.  I want to at least
11   start off by asking questions, and then to the extent there are
12   things that I haven't covered by my questions that counsel
13   believes are necessary for purposes of presenting their
14   positions, I'll hear from you very briefly in that regard.
15           Mr. Donnellan, let's first deal with your letter
16   motion that was filed earlier this month, and in particular,
17   let's focus on the issues with respect to discovery from
18   company 1 and company 2.
19           First of all, how do you even have standing to argue
20   whether discovery taken from those two companies is something
21   that you can address here today?  You can address Hearst's view
22   about that, but company 1 and company 2 have their own
23   independent obligations under Rule 45, and you don't have any
24   standing, as I understand the law, to object if you think the
25   requests are burdensome to them.  So why don't we start with
```

HaqWedwCredacted

1   that.

2           MR. DONNELLAN:  Your Honor, we think that we may have

3   standing because the data actually belongs to us.

4           THE COURT:  Is there a privilege implicated?

5           MR. DONNELLAN:  What's that, your Honor?

6           THE COURT:  Is there a privilege implicated?

7           MR. DONNELLAN:  There is not, but I want to be very

8   clear.  When we brought this issue to you, it's in the context

9   of discovery requests to Hearst for phase II discovery.  The

10  purpose of our motion was simply to bring up two commonsense

11  limitations that we think are consistent with Judge Torres'

12  summary judgment decision, which is to say that on a

13  going-forward basis, any discovery of us should not include

14  company 1 and company 2, because the plaintiff in this case

15  doesn't have a claim with respect to those companies.

16          THE COURT:  But the plaintiff representing other

17  people may have a claim, isn't that true?  And if they do,

18  that's a legal question under Rule 23 that Judge Torres will

19  have to decide in motion practice before her, right?  But it

20  does potentially relate to those claims, which means it comes

21  within the ambit of Rule 26, so it's not like I can read her

22  summary judgment decision and say, Oh, you won on company 1 and

23  company 2, so that's out of the case, because that's not what

24  she said.  Isn't that right?

25          MR. DONNELLAN:  Well, your Honor, the way we read the

1   cases, and I want to put it in the context of this case.  The

2   context of this case is unusual, and it's different from the

3   other cases dealing with class standing and issues of whether

4   or not a particular representative plaintiff can represent

5   others who may have different facts.  Usually the issue is

6   deferred until class certification because there has been no

7   merits discovery or class discovery.

8           What we have here is a unique procedural posture,

9   where there was full merits discovery with respect to the

10  plaintiff's claims and adjudication with respect to her claims

11  as to these particular companies.

12          THE COURT:  Which by the way, as an aside, is what you

13  all wanted.

14          MR. DONNELLAN:  Absolutely, your Honor.  We absolutely

15  did.

16          THE COURT:  You have to be careful what you wish for,

17  as they say.

18          MR. DONNELLAN:  The reason for that, your Honor, and I

19  think we appreciated this, we thought that the case would

20  either be disposed of at the end of phase I entirely or

21  certainly that the scope of it would be narrowed.

22          THE COURT:  Right, but it turns out you were wrong.

23          MR. DONNELLAN:  Well, we do believe that the scope has

24  been narrowed, because what Judge Torres did find, in a very

25  detailed, very fact-intensive, 55-page opinion is that the

HaqWedwCredacted

1    facts with respect to each one of these companies, the nature

2    of the transmissions and the nature of the evidence is very

3    different, and at least with respect to these two companies,

4    this plaintiff was not able to make out a claim.

5         THE COURT:  But can you answer the legal question for

6    me, which is in that in a potential class action, in a putative

7    class action, does the individual plaintiff bringing the class

8    action have the right to seek discovery that could enable

9    others similarly situated to that plaintiff to develop their

10   own claims under Rule 23, which is, as I understand it, at

11   least in part what the plaintiff is arguing here?  Do you take

12   issue with that statement as a legal matter?

13        MR. DONNELLAN:  I do, your Honor.  I take issue with

14   it with respect to company 1 and company 2, because under the

15   governing case law, which includes the case that was cited by

16   both parties, the *NECA* case, but also the cases that

17   distinguish that, *DeMuro* and *Retirement Board of Policemen's*

18   *Annuity and Benefit Fund*, two Second Circuit cases, and a host

19   of Southern District cases which have followed that, if the

20   evidence is going to be sufficiently different so that the

21   evidence as to plaintiff cannot stand in for others in the

22   class, then she doesn't have class standing.

23        THE COURT:  Right, but how do we know whether the

24   evidence is sufficiently different until we know what the

25   evidence is?

HaqWedwCredacted

<pre>
 1          MR. DONNELLAN:  Well, what we do know is that the
 2    evidence as to her doesn't state a claim, so if that's the
 3    evidence that is to stand in for all others, it doesn't state a
 4    claim, your Honor.  We have gotten to the merits.
 5          THE COURT:  But what if someone -- not Ms. Edwards,
 6    someone else -- had factually similar but distinct experiences
 7    with company 1 and company 2 such that it would come within the
 8    ambit of the statute?  Is that not a scenario that could occur?
 9          MR. DONNELLAN:  I think that would be on very
10    different facts, your Honor.
11          THE COURT:  How do I know that?  We don't know what
12    the other facts are, do we?
13          MR. DONNELLAN:  We know it because Judge Torres has
14    said that this plaintiff has no claim with respect to these
15    companies.  And so to the extent to which these other potential
16    plaintiffs might have claims, they need to bring an action and
17    assert those claims, but as to this plaintiff, they don't
18    exist.
19          THE COURT:  Can I ask, as a practical matter, why does
20    this matter so much?  You're going to have other discovery
21    obligations in phase II anyway, right?
22          MR. DONNELLAN:  We certainly will.
23          THE COURT:  So why does it matter that much?  Is it a
24    burden to Hearst to produce this information as it relates to
25    company 1 and company 2?
</pre>

HaqWedwCredacted

1          MR. DONNELLAN:  Your Honor, it is a burden.

2          THE COURT:  Why is it a burden?

3          MR. DONNELLAN:  Well, we're talking about a scope of

4   discovery, which we haven't even really gotten to exactly what

5   the scope is going to be, but any time you're talking about a

6   subscriber base that is large, and as you, your Honor, noted, I

7   anticipate that there are going to be future disputes about

8   what is required and what plaintiff wants with regard to these

9   subscribers on a going-forward basis.  If we multiply that by

10  different, other entities, where this plaintiff had no claim,

11  it's been adjudicated, then her claim is dismissed.  Summary

12  judgment has been granted for Hearst.  That is necessarily

13  going to impose a burden on us.

14         THE COURT:  It may impose a burden, but let's just

15  stick to the facts as they exist right now.  Mr. Bursor wrote a

16  quite technical letter in response to you in some respects, and

17  I certainly can't begin to say I have mastered all of the

18  technology that's implicated here, but why is it so difficult

19  for Hearst to produce to the plaintiff its side of the

20  transmissions regarding Michigan residents from 2009 to 2016

21  along the lines as described by Mr. Bursor in his letter?  I'm

22  not going to do it justice to try and recapitulate it.

23         Can that not be done?  It's just a question of you

24  think it's not in the case but it's not that hard to do that if

25  you tell me it's in the case?

HaqWedwCredacted

1          MR. DONNELLAN:  Your Honor, I don't think it's in the
2     case.
3          THE COURT:  I know you don't.  And by the way, you
4     show me in Judge Torres' 55-page opinion, which I've read
5     twice, where she says, And therefore, there is no need for any
6     further discovery with respect to company 1 and company 2.  She
7     could have said that, and she didn't say that.  And indeed
8     that's part of how I understand the motion for reconsideration,
9     at least with respect to company 1, because she invited that,
10    so I don't think it's quite as tidy as you're suggesting.
11         MR. DONNELLAN:  One thing, and I don't mean to read
12    too much into this, but when we were asking for a discovery
13    schedule in phase II, the plaintiffs had proposed a discovery
14    whereby we would update our responses as to phase I discovery
15    requests, and they were particularly interested in company 1
16    and company 2 going back in time further.  And that was not
17    included in the scheduling order that Judge Torres signed.
18         THE COURT:  The scheduling order she signed is
19    extremely bare bones.
20         MR. DONNELLAN:  Understood.
21         THE COURT:  It just has dates.
22         Just for the record, I mean, I haven't talked to her
23    about any of this, but I don't know how I can draw or you can
24    draw or anybody can draw anything one way or the other from her
25    order of October 3.  I know the joint letter you all submitted

1    that was four pages in length that framed some of the very

2    issues that you're now here to talk to me about were presented

3    to her, but she didn't address them, for whatever reason, and

4    that's her absolute right not to have done so.  She simply set

5    a schedule, and by the way, she set a schedule where phase II

6    discover is supposed to be completed a little bit more than two

7    months from now.  Am I going to be seeing you all on a weekly

8    basis between now and then, because I don't have the time for

9    that?

10              MR. DONNELLAN:  I certainly hope not, your Honor.

11              THE COURT:  At the rate we're going, it sounds like

12   you're going to be fighting like cats and dogs on just every

13   little issue here, and I am interested in ensuring that the

14   record is developed so Judge Torres is not frustrated on the

15   Rule 23 motion as far as the state of the record is concerned,

16   as she clearly expressed in her summary judgment decision, and

17   that makes me want to lean on the side of ensuring the record

18   has more in it rather than less in it.  That's why I'm trying

19   to focus on why you're so upset about further discovery about

20   company 1 and company 2 because your reading of Judge Torres'

21   decision is a certain way.  And by the way, if I rule in your

22   favor, they may well go to Judge Torres and get her to say

23   definitively, "Actually, I didn't mean what Mr. Donnellan is

24   reading my summary judgment decision to mean."

25              You can go through that whole exercise if you want,

HaqWedwCredacted

```
 1    but I'm trying to understand why as a practical matter, and I
 2    want to be practical here today; I don't wand to stand on legal
 3    or factual niceties.  I want to deal in practicalities.
 4    There's a certain amount of discovery that has to be produced
 5    in this case between now and January in order for a class
 6    action motion to be made, and then it will rise or fall on the
 7    merits, period, and my job is to ensure appropriate,
 8    proportional, relevant discovery is produced.  So I go back to
 9    the question.
10          Why is it a big deal for Hearst to produce discovery?
11    And perhaps it needs to be narrowed in some way, which we can
12    talk about, as it relates to the transmissions to company 1 and
13    company 2?  I, with all respect, don't feel like I've gotten a
14    good answer to that yet.
15          MR. DONNELLAN:  Your Honor, it would absolutely, in a
16    very practical sense, would require more searching.  There
17    would be more emails to go through, there would be more lawyer
18    hours, and it would be a burden to find ESI for more parties.
19          THE COURT:  That's a level of generality that doesn't
20    move me.
21          MR. DONNELLAN:  Your Honor, I go back to the initial
22    point, which is that we believe that phasing is unusual in the
23    way that it's been done in this case, to have full merits
24    discovery and adjudication with respect to the plaintiff's
25    claims.  It's different from any of the other cases that have
```

1    been cited here on class standing and the scope of class

2    discovery.  We're not aware of any case where there has been

3    summary judgment against the plaintiff with respect to specific

4    claims and then there was class discovery that was allowed to

5    go forward.  And the cases that we are looking at, your Honor,

6    do say that the plaintiff can't stand in where the proof is not

7    going to be the same as they have, which relates to their

8    claim, in order for others -- then there should not be a

9    prosecution of those claims on that basis.

10           THE COURT:  That's a Rule 23 argument.  That's not a

11   Rule 26 argument.

12           MR. DONNELLAN:  That's a class standing argument.  I

13   understand that.

14           THE COURT:  That's what I'm saying.  I'm not here to

15   decide that.  That's a very important question in this case, no

16   question.  But you want me to tie the plaintiff's hands behind

17   their back in order for them to try and make the arguments that

18   they want to make, and I'm disinclined to do that.  I just

19   don't understand how I can rule in your favor and expect Judge

20   Torres to feel that the plaintiff will have had a fair fight on

21   the issue especially if other than more searching and more

22   lawyer hours there isn't otherwise a burden to Hearst in the

23   first instance.

24           MR. DONNELLAN:  There are three entities for sure, two

25   of which they prevailed on summary judgment, and one where

HaqWedwCredacted

1    there's a question of fact, where discovery absolutely will go

2    forward.

3         THE COURT:  Your argument makes sense to me with

4    respect to Axciom, your agent, because she ruled as a matter of

5    law in that regard, but I don't think Axciom and company 1 and

6    company 2 are identically situated.  I could be wrong, but

7    that's how I read her decision.

8         MR. DONNELLAN:  She did rule as a matter of law that

9    they don't have a claim against Hearst, that she doesn't have a

10   claim against Hearst, the plaintiff, with respect to company 1

11   and company 2.

12        THE COURT:  Right.

13        MR. DONNELLAN:  And the extracts.

14        THE COURT:  But she doesn't suggest that someone else

15   couldn't, does she?

16        MR. DONNELLAN:  She does not address that, your Honor.

17        THE COURT:  Because of the unique phasing.

18        MR. DONNELLAN:  Because of the unique phasing, and

19   here really the issue is where, as reflected in her opinion,

20   the evidence with respect to each one of these companies is

21   very different, and even as to each individual as to each one

22   of these companies is very different, that the claim with

23   respect to these companies has been decided for purposes of

24   this case.

25        That's how I read her decision.  I understand your

HaqWedwCredacted

1     Honor may take a different view of it, but that's the basis.

2     We thought that this was a commonsense limitation based on her

3     ruling, because otherwise, phase I proceedings would have been

4     effectively meaningless.

5          THE COURT:  No, they wouldn't have been effectively

6     meaningless.  They were done this way because if you had been

7     correct in your prediction, we wouldn't be standing here.  But

8     instead of you winning wholesale, you won partial judgment and

9     you lost, and you didn't think that's what was going to happen,

10    but it made sense on some level to stage this case, because

11    class action, as you argued months ago, would be very

12    burdensome if you otherwise were going to win hook, line and

13    sinker in this case, which is what you hoped would happen, but

14    it didn't.  So that's the way this has played out.

15         MR. DONNELLAN:  And we still believe that class

16    discovery will be burdensome, your Honor.

17         THE COURT:  But you have to particularize for me why

18    that's so, otherwise it's a hard argument for me to accept.

19    And you're just making it for you, and I don't know what's

20    happening with respect to the subpoenas to company 1 and

21    company 2.  Are they making a burdensomeness argument, and is

22    it in fact so burdensome for them to do this?  I don't know.

23    That's not before me.  So they're going to provide it

24    potentially on the flip side anyway.  Is what you'd be

25    providing duplicative?  I don't think so; it's the transmission

1   from you to them.  That's a separate piece of the puzzle, and I

2   think, not to get ahead of ourselves, this is what has been

3   complained about, in part, about how Hearst has provided in and

4   of itself very little, and so what was before Judge Torres the

5   last time around came from a nonparty, not from Hearst.  So

6   they want to make every effort in phase II discovery to get

7   from Hearst whatever you have and whatever you can provide.  I

8   understand their desire, especially given the criticism of both

9   sides by Judge Torres in her decision about how the record

10  wasn't as developed as she would like, and given how focused in

11  detail her decision was, it's clear she explored every nook and

12  cranny of that record.  And so she's desirous of having the

13  most information possible, and that makes me very reluctant,

14  without hearing more, to simply go along in this kind of cookie

15  cutter, "Oh, yeah, we got summary judgment as to company 1 and

16  company 2, so they're out of the case."

17          If there was language in her decision that you can

18  cite me to that really supported that, I would love you to do

19  that, because I don't read her decision that way.  I just think

20  it's just too neat a solution.

21          All right.  Mr. Bursor, on the other hand, let me ask

22  you, what was the purpose of Judge Torres trying to streamline

23  this case in the way she did by taking it company by company

24  and ruling as she did, if not to narrow it in some fashion, and

25  maybe I am reading this completely incorrectly and that, in

HaqWedwCredacted

1  fact, by ruling as she did with respect to company 1 and

2  company 2, she in fact did think she was narrowing this case,

3  and Mr. Donnellan may well be right and I may be wrong in the

4  hard time I was just giving him about articulating this?  What

5  do you have to say about that?

6          MR. BURSOR:  Well, your Honor, the rationale that was

7  given for the phase I, phase II was done at the urging of the

8  defendant, and I'll just tell you the rationale that they gave

9  the Court back in 2016.

10          THE COURT:  I was there.

11          MR. BURSOR:  You were there, yes.

12          THE COURT:  But you can tell me.

13          MR. BURSOR:  He said phase I was to determine whether

14  or not the individual plaintiff has a claim.  He did not say

15  the purpose of phase I is to narrow the proposed class

16  definition.  That is not how this was pitched to the court.

17          The whole phase I was about Article III standing and

18  were there transmissions, and Hearst's story at the beginning

19  of the case was the plaintiff lacked standing and there were no

20  transmissions.  Judge Torres ruled the plaintiff has standing

21  and there were lots of transmissions, there were hundreds of

22  them.  So there was no motion brought to narrow the class

23  definition in any way, and the summary judgment order does not

24  do that in any way.  And none of the claims that the plaintiff

25  pleaded in her complaint -- there's two causes of action.

HaqWedwCredacted

```
1          THE COURT:  Unjust enrichment as well as the statutory

2     one.

3          MR. BURSOR:  And the statutory, right.

4          There's no claim for disclosure to company 1 and then

5     another claim for disclosure to company 2 and company 3, and so

6     forth.  There's a claim for disclosure without consent under

7     the statute.

8          THE COURT:  Why do you need discovery from Hearst

9     about these transmissions when you're going to get them from

10    the companies?

11         MR. BURSOR:  We don't know yet if we're going to get

12    them from the companies, your Honor, and we've been told that a

13    lot of these records are mysteriously missing.  We've been told

14    a lot of the records haven't been preserved.  That's No. 1.

15         THE COURT:  Told by the companies.

16         MR. BURSOR:  We've been told some of the companies

17    have them and are ready to produce and some are having trouble

18    finding them, and we're trying to help them find them, but

19    there's a big monkey wrench in that process, which is something

20    I hope we're going to get to later, which is Hearst's

21    obstruction of that whole process.  But we need to make sure

22    that we get those records from both sides of the transaction

23    and that we get them in the appropriate format, because if you

24    look at the phase I summary judgment order, there were

25    arguments about the authenticity of the file, about whether the
```

HaqWedwCredacted

1    file was hearsay, whether the file was a business record.

2    That's why we want the file from the sender and the receiver so

3    that we can show who sent it, who received it, what was in it

4    and when it was done, because there's a statute of limitations

5    issue in the case as well, which if you read Judge Torres'

6    order, as you have, you see that a lot of the analysis was,

7    Well, these transmissions were made at some time, but the

8    plaintiff did not meet her burden to show exactly when this

9    transmission was made, so I can't conclude that was within the

10   statute of limitations.

11         That's one of the reasons we're trying to be more

12   thorough in phase II and get things like the FTP logs for the

13   transmissions themselves and the metadata that will show when

14   they were sent, so Judge Torres is going to have that clear

15   record.  But there's no claim in this case for disclosure of

16   company 2 as distinct from company 3 as distinct from anyone

17   else.  There's one claim on behalf of one class, all Michigan

18   residents who had their information disclosed without their

19   consent.

20         That's why your Honor's take on this from the first

21   part of the hearing seems entirely correct to me, but the point

22   that your Honor made that is the most compelling is that it's

23   not an issue for your Honor to decide.  It's an issue for Judge

24   Torres to decide.  We're here just on discoverability, and if

25   your Honor rules no discoverability on any company that

1    plaintiff didn't prevail on, that's going to preemptively cut

2    off a big chunk of our class cert motion, which is then going

3    to force us to try to either take that up with Judge Torres, or

4    when we make the motion to say the reason we don't have this

5    information about the other half of our class is because Judge

6    Cott didn't give it to us.  And I don't want to have that

7    happen.

8            What I think we're here on today is discoverability.

9    Discoverability is broad, and clearly under the standard in the

10   *NECA* case of the Second Circuit about class standing, the issue

11   is whether the harm that the plaintiff suffered from disclosure

12   to Experian is the same as the harm that some other class

13   member suffered from disclosure to company 1 or company 2 or

14   company 3.  And by the way, company 4, 5, 6 and 7, same thing.

15   It doesn't matter who the recipient is.  What matters is, Are

16   they in the within the class as we pled it?  If Mr. Donnellan

17   had wanted to narrow that discovery, he should have made a

18   motion to strike the class allegation or to narrow the class

19   allegation.  He could have made any motion he wanted in phase

20   I, and he did not make that motion.  Judge Torres did not make

21   a ruling like that, and it's not for your Honor to take it upon

22   yourself to preemptively cut off a big chunk of our class cert

23   motion.

24           THE COURT:  Mr. Bursor, let me keep you up for another

25   minute.  Let's talk about the scope of your requests and how

1    they are effectively nationwide.  I'm troubled by that, to say

2    the least, given as you've just articulated, and that's why it

3    seems to me a natural point to pivot.  Given the proposed class

4    as defined, I don't understand why you would be entitled to

5    something, any data, in fact, unrelated to Michigan residents,

6    because that's outside the scope of the proposed class.

7             MR. BURSOR:  We're not asking -- your Honor, what we

8    want is the files that were transmitted.  OK?

9             THE COURT:  Right.

10            MR. BURSOR:  And the reason we want them is because

11   Judge Torres wants to see what's in those files, and she wants

12   to see when they were sent.

13            THE COURT:  I understand.

14            MR. BURSOR:  OK?

15            THE COURT:  You only want the Michigan residents in

16   those files, correct?

17            MR. BURSOR:  We need the whole file.

18            THE COURT:  Why do you need the whole file?

19            MR. BURSOR:  We're going to take that file.  We're

20   going to do two things with it.  One thing we're going to do

21   with it is prove what information was transmitted when.  That's

22   obvious.  Now, we can't do that if we don't have the file

23   intact, with the metadata and the FTP logs and so forth, and if

24   you have some file other than that file, there's going to be an

25   authenticity objection, there's going to be a hearsay

HaqWedwCredacted

```
 1   objection.  And we won't be able to get it in as a business
 2   record, because it won't be the file that was transmitted in
 3   the ordinary course of business, kept in the ordinary course of
 4   business.  It will be some special, altered, modified file by
 5   lawyers for this case, and that's a problem.
 6              That's one thing we're going to do with it.
 7              THE COURT:  So that means it needs to have subscribers
 8   from Alabama to Wyoming in it.
 9              MR. BURSOR:  No.  We just need the file.  It happens
10   to have those in it.
11              Now, the second thing we're going to do with the file
12   is we're going to compare it to the defendant's subscription
13   records to figure out who's in the class.  Right?  So there's
14   the files they transmitted, nothing's segregated, it's
15   nationwide.  Right?  But it's got the Michigan people and it's
16   got the class.  And by the way, the class members are a subset
17   of the Michigan people.  They're not all the Michigan people.
18              THE COURT:  Within that period of time.
19              MR. BURSOR:  Within a period of time, and there may be
20   other limitations.
21              THE COURT:  Right.
22              MR. BURSOR:  We have many requests -- not many, but we
23   have some requests where they are state-specific to Michigan.
24   For example, we asked the defendant to produce a data table
25   called the MT-underscore-mag-underscore-sum-data-table, and
```

1    there's a reason.

2              What we're going to do is take the file that was

3    transmitted, that has everyone in it, and then we're going to

4    use the MT—mag-sum-table to find out who were the Michigan

5    subscribers and who were the Michigan subscribers who purchased

6    directly from Hearst and who were the ones that were within the

7    class period, and when we take those two files together, that's

8    going to identify the class members.

9              Now, let me tell you something about these files.

10   There's no burden to just giving us the same file that they

11   already transmitted.  The burden occurs, and we've had third

12   parties tell us this -- I believe ████████ told us this -- it's

13   more of a burden to cull the Michigan people out of the file

14   than to just give us the same file.  And we're talking about

15   the same file they transmitted every Sunday at noon to

16   Experian.  Why can't they just give us that same file?

17             And we need it.  We need it to present the kind of

18   record that Judge Torres is looking for when she decides the

19   Rule 23 motion.

20             And let me just say, Judge, why would we be looking

21   for something other than what we need to prove our case?  There

22   isn't any other statute in any other state where, Hey, if they

23   give us the Colorado people, we're going to bring some other

24   lawsuit in Colorado.  That's not what's going on here.  What

25   we're saying is any file that has the Michigan people in it,

1    which is every file they transmitted, we want those files, and

2    if your Honor would look at -- I know you don't want to get too

3    deep into the extract rules, but Exhibit B to my letter of

4    October 13.

5            THE COURT:  Yes.

6            MR. BURSOR:  It's the extract rules.

7            THE COURT:  Yes.

8            MR. BURSOR:  And they look like Excel sheets like

9    this.

10           THE COURT:  Yes.

11           MR. BURSOR:  And every page has the same Bates number

12   on it, so that's very unhelpful, but if you flip to, for

13   example, the sixth unnumbered page --

14           THE COURT:  OK.

15           MR. BURSOR:  -- it says ▮▮▮▮▮ extract at the top.

16           THE COURT:  Does it say extract name?

17           MR. BURSOR:  Extract name, and then the name's

18   ▮▮▮▮▮ extract.

19           THE COURT:  What I'm looking at is Dunn Data extract.

20   Is that the right page?

21           MR. BURSOR:  You may have gone a page too far.

22           THE COURT:  ▮▮▮▮▮ extract.  OK.  I'm with you now.

23           MR. BURSOR:  OK.  Your Honor, if you look, the third

24   line down, it gives the file name.  It shows the directory

25   where it's stored.  Then it says file name, ▮▮▮▮▮, demo

1    batch.dat.  Do you see that?

2            THE COURT:  Yes.

3            MR. BURSOR:  That's the file we want.  They send a

4    file like that on the first Monday of every month to ███████,

5    and Judge Torres ruled that four of those files had our

6    client's name in it and her PRI, and that the transmission of

7    that file through that FTP site on the first Monday of that

8    month violated the Michigan statute four times.  And now I'm

9    saying I want that file, because in addition to my client's

10    name and PRI, there's the name and PRI of hundreds of thousands

11    of other people in that file, and some of those people are

12    class members.  And we have an obligation to represent them to

13    bring that Rule 23 motion, so I want the same file that Judge

14    Torres said violated the law.

15            Now, your Honor, I want to show you, and by the way,

16    it doesn't say anything in here about Michigan.  Right?

17            THE COURT:  Right, because it's a nationwide list.

18            MR. BURSOR:  Because there's no segregation state by

19    state.

20            THE COURT:  I understand.

21            MR. BURSOR:  If you look at Exhibit C to that letter,

22    your Honor, and I'm going to just keep this at a very high

23    level.

24            THE COURT:  OK.

25            MR. BURSOR:  Exhibit C is a collection of four emails

HaqWedwCredacted

 1   that were sent to Charlie Swift on the first Monday of each

 2   month or shortly after the first Monday of each month,

 3   confirming that someone at Axciom named Megan Damron is letting

 4   the fellow at ███████ know:  We uploaded the file.  The first

 5   Monday of the month came.  We put the file there for you, so go

 6   get it.  Here's the information.

 7           And this was copied to Charlie Swift at Hearst.

 8   Hearst did not produce this document to us.  You know why?

 9   Because the plaintiff's name isn't in the text of the email.

10   Now, the plaintiff's name was in that file and this confirmed

11   the transmission, and we got this from ███████, but when they

12   searched for it, these lawyers, as officers of the court, they

13   said, Well, if it doesn't say Josephine James Edwards, we're

14   not going to produce it.

15           Thank God ███████ produced it because then we were

16   able to show Judge Torres this is what happened.

17           So now, if you make an order that says only Michigan

18   is relevant, if they do what they did during phase I, they're

19   going to go back and look at this email, and they even said

20   this, after we pointed this out.  They're going to go back and

21   look at this email and say, It doesn't say anything about

22   Michigan; it's not responsive; don't produce it.

23           That's what happened in phase I, and what they're

24   trying to do is play a bunch of word games to do that again in

25   phase II to keep us from getting the evidence that we need to

HaqWedwCredacted

1    make our Rule 23 motion and to prove the class' claim.  Their
2    entire defense to the phase I summary judgment motion was
3    plaintiff has not met its burden.  Plaintiff showed
4    transmissions happened sometime, because the evidence got to
5    ███████  and got to Dunn Data, or company 1, company 2.  I
6    don't want to use the wrong --
7              Transmissions got there, but plaintiffs didn't show
8    when they got there and so they should lose summary judgment
9    because they didn't meet their burden, and the documents that
10   they want to show you to prove that the transmission was made,
11   that's not an authentic business record because they didn't go
12   depose someone across the country to lay the foundation for the
13   business record exception.
14             That's what we're dealing with during phase I.  So
15   now, for phase II, we know exactly what documents we want and
16   exactly what ESI we want.
17             THE COURT:  If you know, why are all your document
18   requests so improper?  Because they're so broadly written,
19   they're all documents about X and all documents about this and
20   any and all documents about Y.  I'm not going to get into a
21   discovery 101 class, but basically every request you make and
22   every objection Hearst has interposed all violate the rules.
23   They do.  They're all improper.  So when you tell me you've
24   drilled down and you know exactly what you want, if you know
25   exactly what you want, then you should have very specifically

1   drafted document requests instead of ones that are so

2   inherently overbroad that one can understand why they would be

3   responded to with the objections that you received.

4           MR. BURSOR:  Your Honor, the key document request is

5   on page 3 of my letter, and it's focused on the transmissions

6   that were made.  We want all documents and ESI concerning any

7   transmission of Hearst subscriber data during the time period

8   that Judge Torres said is relevant.  And to be extra helpful,

9   we gave examples, we want the extract rules.

10          Now, they know what extract rules are; I just showed

11  your Honor the extract rules.  We want the correspondence

12  concerning those transmissions, like the email I just showed

13  you which should have been produced in phase I but wasn't.  We

14  want the FTP logs.  I've never seen a document request that was

15  this specific and this laser-focused as this document and ESI

16  request.  And they know exactly where this stuff is.  If your

17  Honor looks at those extract rules, it gives the file name.  It

18  gives the directory where the file's stored.  It gives the FTP

19  server through which they sent it.  It gives the staging server

20  where it was stored before they sent it.  It tells you when it

21  was sent, the first Monday of each month or every Sunday at

22  noon.  If you look at that document request on page 3 of my

23  letter, you know exactly what we're asking for, exactly where

24  to find it, and it is not burdensome.

25          For example, for company 1, it's the first Monday of

HaqWedwCredacted

1    the month.  They know there's 12 files each year.  They know

2    the file names.  They know the server where they were stored.

3    What's so broad about that?  What's so burdensome about that?

4    And your Honor, these third parties, we've been meeting and

5    conferring with them for three weeks because we cannot

6    understand what's taking so long for them to give us exactly

7    what we told them to give us, and they've tell us they have it

8    in some cases and they're ready to produce it.  They don't know

9    if they have to cull the Michigan records.  They tell us that

10   would be difficult; they'd rather just give us the file that

11   they already sent on the first Monday of the month, but the

12   reason they're not giving it to us is because they're having

13   some communications with Hearst's counsel that are dissuading

14   them from doing that.

15           THE COURT:  Is that illegal?

16           MR. BURSOR:  Well, I don't know what's going on in

17   those phone calls.

18           THE COURT:  Do you have case law you can cite to me

19   that Hearst can't talk to these third parties.

20           MR. BURSOR:  I didn't cite any case law like that in

21   my letter.

22           THE COURT:  I didn't see any.

23           MR. BURSOR:  Yes.

24           THE COURT:  I don't think it is.

25           MR. BURSOR:  Is it illegal?

HaqWedwCredacted

1          THE COURT:  Is it inherently improper for Hearst to

2    talk to the third parties about their own information that the

3    third parties have?  I don't understand why you're so

4    accusatory, other than I'll incorporate by reference the first

5    three minutes of my remarks today.

6          MR. BURSOR:  OK, your Honor.  Is it illegal for them

7    to talk to the third parties?  The answer is it depends what

8    they said to the third parties.

9          THE COURT:  Of course it does.

10         MR. BURSOR:  OK?  And when we asked them, What did you

11   say --

12         THE COURT:  If they said please destroy documents,

13   yes, that would be improper.

14         MR. BURSOR:  And so we tried to meet and confer in

15   good faith, and we said, Well, what were you talking to them

16   about, "that's none of your business" was the response we got.

17         THE COURT:  And do they have a legal obligation to

18   tell you what they talked to Hearst about?  I don't think so.

19   You can subpoena people from these companies and take their

20   depositions if you want under oath, right?  But they don't have

21   an obligation to tell you on a telephone call to tell you

22   anything, I don't think, do they?

23         MR. BURSOR:  Do they have an obligation on a telephone

24   call?

25         THE COURT:  Yes.

HaqWedwCredacted

1    MR. BURSOR:  They have an obligation to meet and

2    confer in good faith, and to say, It's none of your business

3    what I talked about with the third party who's refusing to give

4    you the documents that we told you they have, I'm not sure how

5    good faith that meet-and-confer is.

6    THE COURT:  Let me talk to Mr. Donnellan about what

7    we'll call the second issue in the letter, the nationwide

8    production issue.

9    What are your thoughts, Mr. Donnellan?

10    MR. DONNELLAN:  Your Honor, we don't think that it's

11    relevant.  It multiplies the amount of information.

12    THE COURT:  When you say you don't think it is

13    relevant, what is "it"?

14    MR. DONNELLAN:  The information relating to

15    non-Michigan subscribers.

16    THE COURT:  Are you going to cull Michigan information

17    out of the documents?

18    MR. DONNELLAN:  We will.  Yes, we will.

19    THE COURT:  You will?  Why would you want to do that,

20    and wouldn't be that far more burdensome if there are otherwise

21    lists of subscribers from states all over the country because

22    they weren't otherwise maintained by state?  I gather they

23    weren't maintained by state, right?

24    MR. DONNELLAN:  I don't believe so, your Honor.

25    THE COURT:  So I'm not understanding why that's your

1     desire.  It sounds like it's a lot more work.

2            MR. DONNELLAN:  Well, in a case that's about private

3     information and alleges that this is all private information,

4     these are our subscribers.

5            THE COURT:  There's a protective order in this case.

6            MR. DONNELLAN:  I understand, but it's not relevant.

7            THE COURT:  And they need the list for purposes of

8     timing, not for purposes of names from subscribers in Alabama.

9            MR. DONNELLAN:  We have been very clear from the very

10    beginning, and Mr. Bursor, I think, misrepresented our

11    responses to the document requests and our conversations, that

12    we will produce all materials that relate to Michigan

13    subscribers.  If it relates to Michigan and others, we'll

14    produce that.  If it relates to Michigan specifically, we will.

15    But when it comes to information that is just about a

16    non-Michigan subscriber, we don't believe --

17           THE COURT:  What information is in that category?

18           MR. DONNELLAN:  Those could be subscribers records,

19    lists of names and addresses and other information about those

20    subscribers.

21           THE COURT:  But if you don't segregate by state, how

22    could there be documents that didn't involve Michigan

23    subscribers?  I don't follow.

24           MR. DONNELLAN:  If there's a document that lists

25    Michigan subscribers, we can extract those names or we could

HaqWedwCredacted

1    take that document and we could redact the non-Michigan names.

2                THE COURT:  Why would you want to go to that trouble?

3                MR. DONNELLAN:  Because we want to preserve the

4    confidentiality with respect to our subscribers who are not

5    implicated in this case and not potentially class members.

6                THE COURT:  OK, but that only really would matter if

7    those documents are exhibits in motion papers that are filed

8    with the court or exhibits at trial or something, and then you

9    can talk about redacting names if they otherwise would be on

10   the public record.  But for purposes of discovery pursuant to a

11   protective order, I don't understand why you'd have to do that.

12               MR. DONNELLAN:  Your Honor, I don't understand why we

13   have to justify it when there's no rationale that has been

14   articulated for why they need that information with relation to

15   non-Michigan subscribers.

16               THE COURT:  I'm sure Mr. Bursor would say, If you

17   could give me just Michigan, in these categories that he has

18   particularized, he would be happy to accept that.  But they're

19   not maintained that way.

20               MR. DONNELLAN:  Well, to the extent to which they're

21   commingled with others, we will provide the Michigan

22   information from those records either through an extract or

23   through a redacted document.

24               THE COURT:  But then what about the issue he raised

25   about the document then no longer being in its native format,

1    and then you're going to have something that isn't something

2    that may be in admissible form, because it wouldn't be your

3    business record; it would be something that you have modified?

4    What about that concern?

5         MR. DONNELLAN:  I can't imagine that we couldn't reach

6    agreement.

7         THE COURT:  You can't reach agreement about anything.

8    What are we talking about?  In another case, maybe.  Maybe when

9    this case is over, you'll all tell me why this has become such

10   an acrimonious dispute when it's the kind of case that hardly

11   deserves that.  Hardly.  And I may have said this to you

12   before, but it is shocking to me as a judge, who presides over

13   criminal matters, how members of the criminal bar get along far

14   better with each other given the stakes in those cases, and

15   very accomplished, high-powered lawyers like all of you can't

16   seem to manage to do so in a case like this, which is only

17   about money, after all, at the end of the day.  Let's be

18   crystal clear about that.  And sure, people's privacy is

19   implicated, and that's serious, but it hardly warrants the way

20   you all are litigating this case.

21        MR. DONNELLAN:  Your Honor, with all due respect, I

22   have been accused of spoliating evidence, of obstructing

23   witnesses and the like.  There's been a Rule 11 motion, which

24   was denied, which had been filed against me.  Mr. Bursor's

25   style of inquiry here during meet-and-confers has been, When

```
1   did you stop beating your wife?  The way that he frames

2   questions, which is, When did you destroy the information, and

3   as an I inquisition does not lend itself to productive

4   meet-and-confers.

5          I believe that our attempts here to limit the

6   information to Michigan when we're only dealing with a Michigan

7   class is not an unreasonable request.

8          THE COURT:  But can we go back?  Let's look at his

9   letter on page 3 and that particular request.  OK?

10         MR. DONNELLAN:  Sure.

11         THE COURT:  If he wants the extract rules concerning

12  certain transmissions, you're going to say you're going to give

13  him those but only as it relates to Michigan residents?  Is

14  that what you're saying?  Or B, all correspondence concerning

15  such transmissions, you're going to give him that, but only as

16  it relates to Michigan?

17         I don't even understand what that might mean.

18         MR. DONNELLAN:  Your Honor, no.  We've been very clear

19  with Mr. Bursor,and I'm sorry I wasn't clear enough earlier.

20  What I think I was trying to say here is that we absolutely

21  will provide all extract rules which would relate to the

22  transmission of any Michigan subscriber information.  The same

23  goes with FTP logs.

24         What we're talking about more specifically are data

25  files which reveal individual subscriber names and other
```

HaqWedwCredacted

1    personal information of theirs.  That's the information that we

2    would prefer not to produce and has no relevance to the case

3    whatsoever.  And to be clear on this request for production No.

4    32, this is for ESI, your Honor.  This is a brand-new request

5    that was just served.

6            You'll recall from phase I that we had a conference a

7    year ago and you had made the determination that we did not

8    have to search ESI at that point, aside from the 17 document

9    custodians that we had in our consumer marketing group where we

10   searched their emails, for anything that would have any mention

11   of the plaintiff in this case, and also, production from

12   Axciom, our database host, records of transmission and the

13   like.  We produced all that and were entirely fulsome.

14           So with respect to this information and making

15   available ESI under an ESI protocol, that is just beginning

16   now.  We are just arriving at this point in the case.

17           THE COURT:  So it's premature for me to be considering

18   this?

19           MR. DONNELLAN:  I absolutely think it is premature.

20           THE COURT:  You should make a production and then you

21   should have a further meet-and-confer if you're dissatisfied

22   and then you can come back to me.

23           MR. DONNELLAN:  The only issue that we had brought up,

24   or the two issues, one was with respect to scope on company 1

25   and company 2.  The second one was with respect to non-Michigan

1    subscribers, and these are broader scope issues that are not

2    related to these specific categories of information.  We

3    haven't said that we're not going to search for or produce any

4    of those categories.

5            THE COURT:  Hold on a second.

6            Mr. Bursor, you don't care or have a need for

7    information about non-Michigan subscribers, correct?

8            MR. BURSOR:  That's correct, your Honor.

9            THE COURT:  OK.

10           MR. BURSOR:  But if you look at, like, the file that I

11   need, which is referenced on page 3, right in that request,

12   ███████████████████████████████ --

13           THE COURT:  Right.

14           MR. BURSOR:  It has Michigan people in it, it has

15   Alabama people in it.  It has everybody.

16           THE COURT:  What if he redacts it because he wants to

17   and you just get the Michigan people in that file?  What

18   difference does that make to you?

19           MR. BURSOR:  I need the metadata from that file.

20           THE COURT:  He's not saying he's not giving you the

21   metadata.

22           MR. BURSOR:  I need the file with that name on it so

23   when I look at the FTP logs about when that file was sent, and

24   if they want to do that for their stuff -- first of all, they

25   don't have any stuff, because they spoliated it all, which

HaqWedwCredacted

| | |
|---|---|
| 1 | we're going to get to. |
| 2 | THE COURT:  Mr. Bursor, it's the second time you've |
| 3 | done that.  It's annoying. |
| 4 | MR. BURSOR:  OK. |
| 5 | THE COURT:  Stop it. |
| 6 | MR. BURSOR:  They have told us they do not have this |
| 7 | file, so there is no burden on them.  They do not have a file |
| 8 | to redact.  So why Mr. Donnellan is volunteering to redact a |
| 9 | file he does not have I do not understand.  The person who has |
| 10 | this file is ████████, and what they tell us is:  It's going to |
| 11 | be a pain for us to cull the Michigan people.  Can we just give |
| 12 | you that file? |
| 13 | Yes, please. |
| 14 | Oh, but we're not doing it because we had a phone call |
| 15 | with Mr. Yuhan. |
| 16 | THE COURT:  You're repeating yourself now. |
| 17 | Mr. Donnellan, what about the third parties?  What are |
| 18 | we doing about your proposed redaction of non-Michigan |
| 19 | residents?  If it's burdensome to third parties, you can't make |
| 20 | them do that, right?  I don't really know how to deal with this |
| 21 | issue to the extent Mr. Bursor's telling me you're talking |
| 22 | about documents you don't have.  Obviously I assume you're |
| 23 | talking to me about documents Hearst plans to produce. |
| 24 | Correct? |
| 25 | MR. DONNELLAN:  That's correct, your Honor. |

1          THE COURT:  OK, but if you're planning to produce some

2     documents and you're redacting them and the counterparts, if

3     that's the right word, that the third parties have are ones

4     that they would find burdensome to redact, then why isn't it an

5     academic exercise for you to do that?  I don't understand that.

6          MR. DONNELLAN:  Your Honor, I think that the third

7     parties would take the lead from this Court.  I don't think

8     that they want to produce anything that they don't have to

9     produce either.

10          THE COURT:  Well, they're not here, and they have a

11     right to make a burdensomeness argument.  You don't have the

12     right to make it for them.

13          MR. DONNELLAN:  I understand that, your Honor.

14          We're just trying to get some clarity in terms of our

15     own obligations, but we think that it will have an impact in

16     terms of the scope of the subpoena.  Certainly the subpoena to

17     Axciom, which Mr. Bursor has acknowledged and the Court has

18     ruled they're our agent, he served them with a subpoena

19     nonetheless because he says he wants to take a

20     belt-and-suspenders approach.  I would certainly think that any

21     ruling here with respect to our obligation would extend over to

22     Axciom as well, given the fact that they are our agent and it

23     is our data.

24          THE COURT:  If I make a ruling that suggests that you

25     can, at least in the first instance, redact non-Michigan

1    residents' information in your production, I would do that

2    without any sense of that ruling binding the nonparties,

3    because that might be burdensome to the nonparties, and they're

4    not before me today.  It would by definition have to be

5    limited, so I don't know how much guidance it really provides.

6    The nonparties are going to say, Oh, because Judge Cott in the

7    Southern District allowed the party to redact in the first

8    instance because they want to and until the judge is told that

9    somehow that creates some of the problems that Mr. Bursor

10   anticipates they might, he's going to allow it to proceed in

11   that fashion doesn't necessarily mean that the third parties

12   would or should go along with that, I wouldn't think.

13           But they're not here.  And I know you've had

14   conversations with them, and that's fine to have conversations

15   with them.  But they might well say to you, We don't want to

16   redact, that's too much work for us.  Right?  So by definition,

17   all that's before me today is not what the third parties are

18   going to be producing, because that would be litigated wherever

19   those subpoenas were served in the first instance, and not

20   here, unless they get transferred here and unless they have

21   objections that they're interposing and are opposed and then we

22   have a proceeding with some of those nonparties, which is the

23   last thing I want, but I'm confident between now and the

24   holidays in December, I suspect it may well be more likely than

25   that that some variation of that is going to occur.

1          I just don't quite understand.  I mean, I understand

2     from a macro level why matters that you deem irrelevant, to

3     wit, the names of non-Michigan resident subscribers, shouldn't

4     have any involvement in production in this case.  I get that at

5     a macro level, but it seems a little bit like a red herring in

6     the grand scheme of things.

7          MR. DONNELLAN:  Also, your Honor, with respect to

8     searches for email or other ESI, we'd want that limited

9     necessarily to transmissions of Michigan subscribers as well.

10          THE COURT:  OK, but except the problem with that is,

11     as Mr. Bursor pointed out, in a lot of the search fields

12     there's going to be no reference to the word "Michigan" or any

13     other state for that matter, and that's why he argues that some

14     things weren't produced by Hearst in phase I but they ended up

15     getting from nonparties because they undertook their searches

16     in a way different than you did.

17          And I'm not imposing a value judgment as if you did

18     something right or wrong.  I know Mr. Bursor thinks it was

19     wrong; I'm not in a position to evaluate that today.  But if

20     you take a very narrow view of what your obligation is in terms

21     of how you're going to search for certain things, it may well

22     be that nothing you have will then be produced whereas there

23     are, in fact, lots of documents that should be produced by

24     Hearst.  That's my concern.

25          MR. DONNELLAN:  I understand your concern, your Honor,

1    and again, I would just like to say again that we will produce

2    any documents or information that relate to the transmission of

3    Michigan subscribers, even if that includes others and even if

4    it is done on a commingled basis.  But what I would like to

5    exclude are documents and information, because they ask for any

6    ESI or transmissions concerning any transmission of Hearst

7    subscriber data, without limitation.  I want to exclude any

8    documents or information that relate to non-Michigan

9    subscribers, to the extent that those documents exist.

10            THE COURT:  When is your production due?

11            MR. DONNELLAN:  November 17.

12            THE COURT:  Great.  We'll be celebrating Thanksgiving

13    together.

14            Does anybody else have anything else they want to

15    say -- and if they do, it should be brief -- on the two issues

16    presented in Mr. Donnellan's letter?

17            MR. BURSOR:  Yes, your Honor, on the

18    Michigan/non-Michigan people.

19            THE COURT:  Yes.

20            MR. BURSOR:  Just to be crystal clear, I do not care

21    about the non-Michigan people, but what I do care about is the

22    integrity of those files and the metadata in those files, such

23    that if they are redacted, the redaction has to be done in a

24    way that does not affect the metadata for those files, and I

25    don't think that's possible, No. 1.  And No. 2, I can foresee

HaqWedwCredacted

1    now having to depose the person who did the redaction to figure

2    out how they did that and what effect that may or may not have

3    had on the metadata to the file, and that's going to be a

4    burden on us, and I don't want to do that.  I just want the

5    files so I can identify the class members and identify the

6    dates and times of the transmissions.

7            THE COURT:  Without knowing what the production is, I

8    don't know how we can resolve the issue.  If I rule the way

9    Mr. Donnellan wants on this particular point, it would clearly

10   be without prejudice to your making an application if it isn't

11   produced in a way where the metadata or any other aspect of it

12   somehow is not as useable as it otherwise would have been.

13           Mr. Donnellan, I understand and hope you're mindful of

14   the point Mr. Bursor is making in this regard.  Do you

15   understand the point he's making?

16           MR. DONNELLAN:  I do, absolutely.

17           THE COURT:  Do you believe the production that you are

18   anticipating making wouldn't corrupt in some fashion the

19   metadata of the production?

20           MR. DONNELLAN:  I wouldn't make it if it would corrupt

21   it.

22           THE COURT:  OK.  I'd like to take a short recess, and

23   then I'll come back and we'll figure out how we're going to

24   proceed.

25           (Recess)

HaqWedwCredacted

1          THE COURT:  You may be seated.

2          There are two issues in Hearst's letter to the Court

3   of October 11.  And actually, before I get into this, can I ask

4   the parties a simple question, which is the Boelter case is

5   dismissed and yet the parties keep filing everything in both

6   cases.  Why are we doing that?  Is there a reason I don't know?

7          MR. BURSOR:  Your Honor, Judge Torres ordered us to do

8   that.

9          THE COURT:  Do you know why?

10         MR. BURSOR:  I didn't ask her, but I just did what she

11  said.

12         THE COURT:  That would be good.

13         Because it seems somehow more burdensome to me,

14  because when you file two things, then any time even a

15  ministerial matter like adjourning the conference from

16  yesterday to today, as we did, I noted, last night or whenever,

17  Oh, I didn't do that on the second docket, I only did it on the

18  first docket sort of thing.

19         Is there a particular reason from the lawyers'

20  standpoint why we need to be doing that, or should we simply be

21  filing everything at this point just in Edwards and not in

22  Boelter?

23         MR. BURSOR:  That would be fine with us, your Honor.

24         THE COURT:  OK.

25         MR. BURSOR:  I think at the time Judge Torres ordered

HaqWedwCredacted

1  us to do that, the two filings, that was before the Boelter

2  case --

3       I'm sorry.  We did what she said, but we're fine to do

4  it your way.

5       THE COURT:  Do you have a view, Mr. Donnellan?  Does

6  it matter?  I think it has to do with the consolidation.

7       MR. DONNELLAN:  It does have to do with the

8  consolidation.  As I recall, there is no consolidated complaint

9  actually filed on the Edwards docket.

10      THE COURT:  I see.

11      MR. DONNELLAN:  It's on the Boelter docket only.

12      THE COURT:  What if that were changed?

13      MR. DONNELLAN:  That would be fine with us, your

14 Honor.

15      THE COURT:  All right.  Why don't I take it upon

16 myself at some point to talk to Judge Torres about that.  I

17 just think it may be less work for everybody and less for the

18 Court to keep track of as well.  I'll separately discuss that

19 administrative piece with her.

20      Back to our issues here.  In the October 11 letter,

21 the first issue is what we've discussed about the discovery

22 with respect to company 1 and company 2.  Hearst has argued

23 that it's improper, and I'm not going to recap all of what was

24 said both in the letter and at our hearing here today, but my

25 conclusion is for some of the reasons that I articulated during

HaqWedwCredacted

1   the course of our colloquy, I think the appropriate

2   direction -- or guidance, I think, was what was sought from

3   me -- is that I am not prepared to rule that discovery with

4   respect to company 1 and company 2 is improper on the record

5   that exists today.  I think that there is the possibility that

6   others -- not Ms. Edwards, but others -- may have viable claims

7   with respect to company 1 and company 2, and plaintiff should

8   be given the opportunity in discovery to develop the record on

9   that point.

10          As I said earlier, this is not on some level a

11  question of discoverability; it's a question of law that has to

12  be adjudicated in the context of the Rule 23 motion; to wit,

13  whether the plaintiff can pursue and develop this evidence on

14  behalf of others who may have claims that she does not.  That

15  question is not before me, and I think if I were to foreclose

16  any discovery, as Hearst has asked the Court to do, that the

17  record would be less developed than it otherwise could be and

18  should be, and in light especially of the criticism Judge

19  Torres lodged in her summary judgment decision in which she

20  felt that the record in some respects hadn't been fully

21  developed, that to me is yet another reason why I should err on

22  the side of allowing discovery at least as a broad category to

23  go forward.  That's not a license for there to be any kind of

24  discovery with respect to company 1 and company 2.

25          Obviously if Hearst wants greater clarity on the point

HaqWedwCredacted

1    and wants a legal ruling, if you will, on the point, in advance

2    of the Rule 23 motion practice, you can seek further review of

3    this issue before Judge Torres.  That's your right.  But at

4    least I am tasked with discovery-related decision-making only,

5    and in that context, I'm not prepared to foreclose discovery

6    with respect to company 1 and company 2.

7              So that's as to that issue.

8              On the second issue, I think in light of the colloquy

9    we've had that it is premature on some level for me to rule on

10   the question about whether there can or cannot be discovery

11   with respect to nationwide magazine subscribers.  I take

12   Mr. Donnellan at his word that it is Hearst's preference in the

13   first instance when it responds to the request for production

14   in mid-November that it would like to take the opportunity, as

15   it deems appropriate, to redact non-Michigan residents.  I am

16   certainly of the view, given how the class has been proposed,

17   that clearly non-Michigan residents' information on some level

18   is not relevant to this case.  However, Mr. Bursor has made

19   several, I think, salient points about ensuring that what is

20   produced does not disturb, corrupt or otherwise alter the

21   production in a way that will hamstring the plaintiff from

22   making arguments it needs to make both with respect to timing

23   and the integrity, if you will, of the documents at issue.

24             I would say I'm not going to prevent Hearst from

25   undertaking the proposed redactions that have been articulated,

HaqWedwCredacted

1   but I would say, without sounding too harsh, that you do so at

2   your peril, because it could lead to other issues.  And in

3   making this ruling it is plainly without prejudice to the

4   plaintiff seeking further relief from the Court if it believes

5   that the production that is made in mid-November is one that

6   they believe threatens the integrity of their further use of

7   the documents, either on motion or at trial, for purposes of

8   its admissibility.

9           That's where I come out on that issue.

10          I think we've resolved, I'll say the first patch of

11  information.  It's now after five.  I had a 5:00 conference

12  scheduled, which I moved to 5:30, anticipating that this was

13  going to be a longer hearing than I had originally anticipated.

14          I think what I'd like to do is spend a little time at

15  least on Mr. Bursor's October 19 letter and let the parties

16  speak to those issues, and then I'll determine to what extent I

17  think I can make some rulings today and whether we should, in

18  fact, set some kind of a schedule for formal briefing on the

19  spoliation issue.

20          I will say at the outset, given what I've already said

21  in my exchanges with Mr. Bursor, that I'm not in a position

22  today based on the record in front of me, to use Mr. Bursor's

23  word, to "admonish" Hearst's counsel to cease efforts to urge

24  third parties to withhold evidence.  Talk about a loaded

25  phrase.  I don't have anything in the record in front of me to

HaqWedwCredacted

1      suggest that that's, in fact, what has happened other than

2      Mr. Bursor telling me that's what he thinks is happening.  I

3      know of nothing that prohibits Hearst from talking to third

4      parties about their production as it implicates Hearst's

5      interests here.

6              Obviously if Hearst counsel were to be urging them to

7      withhold or otherwise destroy evidence, that would be an

8      extraordinarily serious issue.  But the record, certainly as it

9      is today, doesn't justify an admonishment or anything else.

10     That ruling is without prejudice to the record being further

11     developed if there is any evidence to support that sort of

12     request.

13             Of the four items in the relief requested, that

14     dispenses with C.

15             Let's go back to A, and let's talk about No. 34, the

16     nature of the request and the nature of the response.

17             Mr. Bursor.

18             MR. BURSOR:  Sure, your Honor.

19             I take the Court's guidance very seriously about

20     trying to meet and confer and civility and so forth, and what

21     we want to do -- we really don't want to sling mud.  What we

22     want to do is find out what happened to the files and if we can

23     recover the files, and if we can't recover the files -- I think

24     we're going to get some of them and not get some others and

25     then we'll explain to the Court what we were able to recover

HaqWedwCredacted

1   and what we were not able to recover, and we're going to ask

2   for, if there's some that we can't get that are important, we

3   may have to ask for an adverse inference.  If there are some

4   additional costs to recovering them, then we may ask for that,

5   but we're not asking for any of that today.

6          THE COURT:  Can I ask, to just skip ahead a little

7   bit, but since you're saying what you are, why doesn't that

8   augur, if I'm using the word correctly, in favor of deferring a

9   potential spoliation motion until you actually see everything

10   you're going to get rather than what I think might be a

11   premature motion on a not fully developed record?

12          MR. BURSOR:  I agree with that.

13          THE COURT:  You do.

14          MR. BURSOR:  I agree with you.

15          THE COURT:  OK.

16          MR. BURSOR:  I don't want to make it.

17          THE COURT:  But your letter said, We'd like you to set

18   a schedule for briefing, and I didn't think you meant in

19   January.  I thought you meant today.

20          MR. BURSOR:  What I think needs to happen is we need

21   to find out were the files deleted or destroyed, whatever term

22   you want -- I don't want to use a loaded term -- what happened

23   to the files?  And then once we find that out, once we know,

24   then we can bring the motion, if a motion is in order.

25          THE COURT:  Right, and that depends not just on

1  document production, it also depends on depositions.  Right?

2  Shouldn't it?

3      MR. BURSOR:  I would have hoped that we could have

4  just had a phone call among counsel and ask them what happened

5  to the files and they would tell us.  That's what I would have

6  hoped through a civil meet-and-confer process.  But that didn't

7  happen, so we have no information about what happened to the

8  files.  All we're asking for now, request No. 34, documents

9  about what happened to the files, to paraphrase.  All documents

10  concerning the policies, procedures or practices for retention.

11      THE COURT:  "All documents" is incredibly broad.  What

12  are you really want?  What are you really looking for in No.

13  34?

14      MR. BURSOR:  I want to know if there were

15  communications between Hearst and Axciom about preserving

16  documents for *Grenke* and about destroying documents before,

17  during or after *Grenke*, anything about the preservation or

18  destruction of the files that we just talked about, the FTP

19  logs, the actual database files that were transmitted, those

20  emails to Charlie Swift.  If there were communications about

21  that, we want those communications.  And if those

22  communications came from lawyers, we want a privilege log if

23  there's a claim of privilege.  That's all we want now, is to

24  get the documents about what happened to those files.  Because,

25  your Honor, there is no question that there was a duty to

HaqWedwCredacted

1   preserve them.

2           THE COURT:  Well, there is a question, right?  There's

3   a legal question, which is if one lawsuit ends and another

4   lawsuit isn't brought for four months, or whatever it is,

5   whether as a legal matter there is a duty.  That's a legal

6   question.

7           MR. BURSOR:  That's a legal question your Honor has

8   answered before.

9           THE COURT:  Well, I answered it not in the same

10  context, if you're citing *Pippins*.

11          MR. BURSOR:  *Pippins*, yes.

12          THE COURT:  But *Pippins* is not on all fours with the

13  facts; it's just not.  That was about something in the context

14  of a pending case.

15          MR. BURSOR:  OK.

16          THE COURT:  Not when a case ended and another case

17  started.

18          MR. BURSOR:  Well, the *Napster* case is that, where one

19  case ended and another case started.  But your Honor, if the

20  files were deleting during the pendency of *Grenke*, then we

21  don't even get to that.  We don't even get to the *Pippins*

22  question.

23          THE COURT:  OK, but you don't know the answer, is your

24  point, and you want to know what the answer is.  You think you

25  know what the answer is.

HaqWedwCredacted

1          MR. BURSOR:  Well, what Mr. Donnellan told us --

2          THE COURT:  Doesn't that mean you'd have to depose

3     somebody?  Why couldn't you serve a 30(b)(6) notice on this

4     issue?

5          MR. BURSOR:  We have.

6          THE COURT:  OK.

7          MR. BURSOR:  We've done that.

8          THE COURT:  But you haven't taken a deposition yet.

9          MR. BURSOR:  We don't have any documents yet.  I'm

10    trying.

11         THE COURT:  I know you don't have any documents yet

12    because they're not due until mid-November, right?

13         MR. BURSOR:  But we served a subpoena before.  Judge

14    Torres gave them extra time.  We didn't know when their

15    production was going to be due.

16         But your Honor, I take your point.  That's why we

17    haven't made the motion yet.  I want to make it on a proper

18    record.  If they come back and say, Hey, you know what, we

19    found them, then I won't make a motion.  I don't want to make a

20    motion that's unnecessary.  All I want to do is get the files,

21    and if I can't get the files, I want to know why so I can tell

22    this Court.

23         THE COURT:  OK.  But when you say documents concerning

24    Hearst's policy, procedures or practices for retention or

25    destruction of documents, that's all very broad, isn't it?

HaqWedwCredacted

1          MR. BURSOR:  I don't think it's very broad.  How do

2     you specify did Hearst send a communication to Axciom to

3     destroy these files?  Did Hearst send a communication to Axciom

4     about *Grenke* and making the litigation hold for *Grenke*.

5          THE COURT:  Shouldn't you ask for litigation holds in

6     *Grenke*?

7          MR. BURSOR:  Not broad enough, because then if I get

8     the litigation hold but I don't get the email from Hearst that

9     says, Hurry up and destroy those records before we get sued --

10          THE COURT:  Shouldn't you ask for what their policy

11     for destruction of documents is?

12          MR. BURSOR:  We've done that.

13          THE COURT:  That's how you read this?

14          MR. BURSOR:  Yes.

15          THE COURT:  OK.

16          Mr. Donnellan, what are you prepared to provide with

17     respect to No. 34?

18          MR. DONNELLAN:  Your Honor, we already produced last

19     year our document production policy that's been in existence

20     since before the relevant time period and up to the present.

21          THE COURT:  Has it been the same the whole time?

22          MR. DONNELLAN:  There was one or two versions.  One,

23     the same one.

24          THE COURT:  Because I remember reading that.  I think

25     it was from 2004, if I'm remembering correctly.

HaqWedwCredacted

1          MR. DONNELLAN:  That's correct.

2          THE COURT:  And the policy that was produced in 2004

3    except for one change has been the same until 2016?

4          MR. DONNELLAN:  That's correct, your Honor.

5          I'm sorry.  No changes.  I misspoke.

6          THE COURT:  And that document has been produced.

7          MR. DONNELLAN:  That document was produced a year ago.

8          THE COURT:  All right.

9          MR. DONNELLAN:  No. 1.

10          No. 2, this whole question about where are the

11    transmissions, this was an issue that was the subject of

12    intensive discovery last year during phase I where Mr. Bursor

13    asked Hearst's 30(b)(6) witness, Do you have records of

14    transmissions?

15          No, we don't.

16          THE COURT:  But why wouldn't Hearst have them?

17          MR. DONNELLAN:  Because it's in the nature of the FTP

18    file process, and I said this to you, your Honor, and I

19    explained it when we were last here in front of you, last

20    October 11, which is that we don't retain copies of it.  The

21    extracts are uploaded, they're downloaded.  Copies of that are

22    not retained.

23          THE COURT:  And that's pursuant to a policy of some

24    kind, or something else?

25          MR. DONNELLAN:  Business practice.

HaqWedwCredacted

1          THE COURT:  OK.  And has a witness so sworn?

2          MR. DONNELLAN:  Yes.

3          THE COURT:  OK.

4          MR. DONNELLAN:  Yes, our 30(b)(6) witness attested to

5     that last year.

6          THE COURT:  OK.

7          MR. DONNELLAN:  And Mr. Bursor took question with it

8     last year and then didn't follow up with spoliation charges or

9     try to burn the house down over that.  This is relatively new.

10         THE COURT:  This being the spoliation issue?

11         MR. DONNELLAN:  Yes, the spoliation charges at this

12    point directed toward us.

13         And all of it hinges on not only what happened before

14    this case was ever brought but what happened after.  He wants

15    to go back and revisit essentially, do a forensic audit of what

16    our responsibilities may have been during the *Grenke* lawsuit

17    and what happened during that lawsuit.

18         Your Honor, that not only would be a wasteful and

19    irrelevant exercise, it's entirely irrelevant because there's

20    no duty to preserve after *Grenke*.

21         THE COURT:  That's the same legal question that I

22    challenged Mr. Bursor on, isn't it?

23         MR. DONNELLAN:  It absolutely is, your Honor.

24         THE COURT:  I mean, I know you think there isn't a

25    duty and he thinks there is a duty.  Funny, you both don't

HaqWedwCredacted

1    agree about that.

2              MR. DONNELLAN:  It is funny that we don't agree.

3              In all of the cases that have been cited, your Honor's

4    case in *Pippins*, they also cite *Fujitsu*, *Casale*, *M&T Mortgage*

5    *Company*, *Napster*, in each one of those cases there was either

6    pending litigation at that time, such as in the *Pippins* case.

7    You had that also in *Casale*, where the court had retained

8    jurisdiction to ensure compliance with orders, the *M&T Mortgage*

9    case, there were overlapping cases in that particular case.

10   The *Napster* case, there was a subpoena and also a direct threat

11   of personal litigation.

12             In all of these cases, you had a situation where the

13   parties were entirely on notice that there was active

14   litigation.

15             Let me tell you about the *Grenke* case.  The Michigan

16   VRPA was enacted back in the late 1980s, and for 25 years,

17   there was no enforcement history whatsoever.  There were no

18   public cases, no private cases, until a Chicago law firm, the

19   Edelson firm, started filing lawsuits against magazine

20   companies claiming that their list rental practices violated

21   the Michigan VRPA.  The *Grenke* case was one of those cases.  It

22   was filed in 2012.  They filed a class certification motion at

23   the outset of it.  That class certification motion was

24   withdrawn in 2013.

25             In 2015, the parties agreed to dismissal with

HaqWedwCredacted

1    prejudice.  At that point there were no other pending claims,

2    no other threatened claims, no other people who would have been

3    covered by the class who had then stepped forward to bring

4    their own actions or to join into the case.  There was no

5    reason to anticipate that there would be any further

6    litigation, and at that point, no other law firm, except for

7    the Edelson firm, had come forward and filed any claims.  So we

8    had every reasonable expectation that we were done, and there

9    was no threat of litigation, no pending or overlapping

10   litigation, nothing that would put anyone on notice of another

11   claim.

12          On that basis, I said to Mr. Bursor, What's the basis

13   for your claim of spoliation?  What's the basis for your claim

14   to want to go back and to revisit history?  There was no legal

15   duty going forward, and there's no basis to go back in time to

16   examine what did or didn't occur in the second-guess judgments

17   during the *Grenke* case.

18          THE COURT:  Based on what you said, and you used the

19   phrase "business practice," right, I'm not sure why this

20   matters in some respects, because your business practice wasn't

21   to retain anything anyway, right?

22          MR. DONNELLAN:  That's correct, your Honor.

23          THE COURT:  So irrespective of whether there is or

24   isn't a duty, the record is going to be what the record is,

25   which is you wouldn't have preserved things because your

HaqWedwCredacted

1  business practice wasn't to, right?

2          MR. DONNELLAN:  Our business practice was not to take

3  those records in the direction of that case.  The focus of that

4  case was list rental.  Certainly all documents were preserved

5  which related to list rental practices.  In that case, in Rule

6  26 conferences, it was never raised about other sorts of

7  issues.  There were never any requests to do anything more than

8  what was our normal business practice.  So your Honor, there's

9  just no basis to go back and to revisit any of that.  And when

10 that case ended, our legal obligations ended.

11         THE COURT:  Well, you've produced Hearst's policy that

12 has existed since 2004 about document retention and/or

13 destruction, correct?

14         MR. DONNELLAN:  That's correct, your Honor.

15         THE COURT:  And you have that, Mr. Bursor?

16         MR. BURSOR:  Yes, your Honor.

17         THE COURT:  OK.  Is there something else you think

18 that Hearst should produce that you think exists that they

19 haven't in that regard?

20         MR. BURSOR:  Yes, your Honor.

21         THE COURT:  Which is what?

22         MR. BURSOR:  Any communications about a litigation

23 hold for *Grenke*, because if the normal business practice is to

24 not preserve these records, once you get sued, you change your

25 normal business practice and you preserve them under a

HaqWedwCredacted

1    litigation hold.

2              THE COURT:  Let's say they say there wasn't a

3    litigation hold, then what?

4              MR. BURSOR:  Then there was spoliation ongoing during

5    the *Grenke* case.

6              THE COURT:  What difference does that make for our

7    case?

8              MR. BURSOR:  Here's the difference it makes.  There's

9    a legal question, Did their duty to preserve continue between

10   *Grenke* and the 87 days when we filed?

11             THE COURT:  Right.

12             MR. BURSOR:  That's the legal question.

13             THE COURT:  Right.

14             MR. BURSOR:  If they were destroying the records

15   throughout *Grenke*, that question becomes irrelevant because

16   spoliation was going on before grange was even dismissed, and

17   what Mr. Donnellan is saying --

18             THE COURT:  How can you seek spoliation sanctions in

19   this lawsuit if there was what you suggest in another unrelated

20   lawsuit?

21             MR. BURSOR:  By saying they had a duty to preserve it

22   and at the time they destroyed it, they violated that duty.

23             THE COURT:  Preserve it for what?

24             MR. BURSOR:  For litigation.

25             Now, you're saying did they have a duty to preserve

1    for the *Grenke* litigation or for any litigation by any class

2    member in *Grenke*?  That's a legal question.  Your Honor is

3    going to have to rule on that when we bring the motion, but

4    shouldn't we know what happened?  Should we know what happened

5    or not before we brief the motion?

6           THE COURT:  By the way, since we're getting into this

7    a little bit more deeply than I anticipated, haven't you waived

8    this argument?

9           MR. BURSOR:  Have I waived it?

10          THE COURT:  Yes.  Where have you been on this

11   argument?  I mean, you knew everything you're telling me a year

12   ago.

13          MR. BURSOR:  I have not waived anything, and I did not

14   know that they didn't preserve them during *Grenke*.  I still

15   don't know that, but that's what Mr. Donnellan said in the

16   brief, and I didn't know that until October 5.  That's when I

17   became more active on this issue, but this was always going to

18   be an issue, your Honor.

19          There's no case law that you waive spoliation by not

20   bringing it in phase I of a bifurcated discovery.  I'd like to

21   see the case law on that.

22          THE COURT:  I'm confident in saying having done no

23   research that I'm sure you're right in what you just stated.

24          MR. BURSOR:  Right.

25          THE COURT:  Because this case has an unusual

1    procedural posture to say the least.

2           As a practical matter, where do we go from here as far

3    as the particular production in this case is concerned given

4    what Mr. Donnellan tells me has been produced?  What relief are

5    you seeking from me, leaving aside the timing of any potential

6    motion, which I think we've agreed if it's going to be made

7    should be made at the back end of discovery so we know what the

8    full record is that exists.

9           MR. BURSOR:  I do agree we should wait to find out

10   what happened.

11          THE COURT:  OK.

12          MR. BURSOR:  But in the meantime we need to find out.

13          THE COURT:  OK.

14          MR. BURSOR:  Was there a litigation hold in *Grenke*?

15   If there was, why weren't these records preserved?  What

16   happened to them?

17          THE COURT:  Let me ask you this.  Why don't you serve

18   some requests for admissions?  Why isn't that a more direct way

19   of getting at this?

20          MR. BURSOR:  Why can't they just tell us?  Why don't

21   they just say, Here's what we did?  Then we're not back here

22   five times on discovery disputes.  Requests for admissions, I'm

23   going to get four pages of objections and no answer.

24          THE COURT:  That would be in violation of Rule 36.

25          MR. BURSOR:  Of course it would be, but that's what's

HaqWedwCredacted

```
 1   going to happen.

 2              THE COURT:  Mr. Donnellan, are you not prepared to

 3   answer those questions?

 4              MR. DONNELLAN:  I'm not prepared to answer those

 5   questions, your Honor, because I don't believe they're

 6   relevant.

 7              THE COURT:  Then we need to adjudicate the legal

 8   question of whether they're relevant or not.

 9              MR. DONNELLAN:  Yes, your Honor.

10              THE COURT:  So we should do that and brief that right

11   now.  Then we shouldn't wait.

12              MR. DONNELLAN:  I think your Honor can rule on it

13   based on the authority that's been provided.

14              THE COURT:  I'm not ruling today.  To be clear, I'm

15   not ruling today.

16              MR. DONNELLAN:  That's fine.

17              Your Honor, Mr. Bursor's got the analysis exactly

18   opposite, which is he says, Let's figure out what happened in

19   the Grenke case, and that will somehow relate to what their

20   duty was.  The reality is regardless of what happened in the

21   Grenke case, if our duty ended at the end of that case, then --

22              THE COURT:  OK, let's do this.  Of course, I'm never

23   looking for more work than I already have, because I have

24   plenty of work, but it seems to me I need to resolve what we're

25   calling this duty question, and I think I should resolve that
```

1  sooner rather than later because that's going to impact

2  potential discovery production or not.

3       Why don't we do this.  Why don't I give you all an

4  opportunity to develop whatever additional arguments you want

5  to make and file a full-fledged brief on the subject, and I'll

6  give you up to 15 pages.  You may need far less than that.  I'm

7  not encouraging 15 pages, if you want to submit seven, that's

8  great.  But why don't we have simultaneous briefs.  Why don't

9  we have two sets of simultaneous briefs.  I'll let you do that.

10  OK?  That's probably more briefing than I want or need, but

11  that way you can respond to each other as well.  In fact, let's

12  do this.  Ten pages for your main briefs, five pages for your

13  reply briefs.  OK?

14       How much time do you want to submit these briefs?  To

15  some extent you're going to be recasting what you already

16  submitted in your letters, but you can develop that argument a

17  little more.

18       MR. BURSOR:  One week and one week would be fine.

19  This is an important issue we need to resolve quickly.

20       MR. DONNELLAN:  That's fine, your Honor.

21       THE COURT:  OK.  Today's the 26th.  We'll have your

22  main briefs on the 2nd and we'll any replies on the 9th.  And

23  since it's a discrete issue, I'll obviously do my best to try

24  and get a written ruling out.  I don't anticipate I'll need to

25  reconvene you all.  I'll just issue a written decision, I hope

HaqWedwCredacted

1  not a terribly long one, and I'll try and front burner that as

2  much as I can so that you have guidance on it.  Until I do

3  that, I'll have to put a pin in the rest of this to some

4  extent, because I think how I rule will affect how at least

5  some further discovery or not proceeds on this discrete point.

6          MR. BURSOR:  Your Honor, not to go back over treaded

7  ground, but the issue goes beyond just whether there was

8  spoliation or not spoliation.

9          THE COURT:  Let me be crystal clear about what you're

10  going to brief.

11          MR. BURSOR:  Yes.

12          THE COURT:  I would not characterize what we're

13  briefing as spoliation motions.

14          MR. BURSOR:  Right.

15          THE COURT:  What we're briefing right now is simply

16  the question of whether Hearst did or did not have a duty here

17  to preserve in light of the sequence and timing of *Grenke*

18  relative to the sequence and timing of Boelter and Edwards.

19          MR. BURSOR:  I understand that.

20          THE COURT:  That's the issue.

21          MR. BURSOR:  I understand that.

22          THE COURT:  That's a narrow legal question that I'm

23  going to opine.  That's all I'm opining on and nothing beyond

24  that.

25          MR. BURSOR:  I understand that.

HaqWedwCredacted

1          THE COURT:  OK.

2          MR. BURSOR:  But let me tell you why I think that may

3     not be necessary.  Whether they had a duty to preserve or not

4     does not change the discoverability of the *Grenke* litigation

5     hold, because the relevant time periods here overlap.  OK?  And

6     that means for purposes of discoverability, we're entitled to

7     anything that's relevant or may lead to the discovery of

8     relevant evidence.

9          THE COURT:  That's not the standard anymore, just so

10    you know.  The rule has changed.

11         MR. BURSOR:  But it's close enough for purposes of

12    this argument, your Honor, because what I'm getting to is if

13    there was a litigation hold or not a litigation hold or if

14    there were communications about preserving or destroying

15    records that are relevant to this litigation, we're entitled to

16    discover them, because that's going to help us find the records

17    that are relevant to this litigation.  And so whether they had

18    a duty to preserve or not does not matter because Rule 26 is

19    broad enough that these documents are relevant whether they had

20    a duty to preserve or not.  The *Grenke* litigation hold or

21    communication about destroying the records is relevant to this

22    case whether they had a duty to preserve or not, and we're

23    entitled to get those documents whether they had a duty to

24    preserve or not.

25         THE COURT:  OK.  Let's do this.  Within your briefing,

HaqWedwCredacted

1   you can brief both the duty question and the related secondary

2   question, because I assume, Mr. Donnellan, you disagree with

3   everything Mr. Bursor just said.  So why don't we fold that in

4   as well, and I will adjudicate both the duty question and the

5   irrespective-of-the-duty question, if you will.  OK?

6           MR. DONNELLAN:  Thank you, your Honor.

7           MR. BURSOR:  Yes, your Honor.

8           THE COURT:  Anything else we need to do today?

9           MR. DONNELLAN:  Two matters, your Honor, quickly.

10          One is Mr. Bursor was reading earlier from a

11  confidential document, the Charlie Swift email where he named

12  company 3, which is under seal, and so for purposes of this

13  transcript, I would request either that we have the opportunity

14  to review the transcript to make appropriate redactions or that

15  the entire transcript be sealed.

16          THE COURT:  I certainly don't think the entire

17  transcript should be sealed over the reference to a single

18  name.

19          MR. DONNELLAN:  Agreed.

20          THE COURT:  And I think as I understand the process,

21  when you order the transcript, it's going to be provided and

22  the parties are given an opportunity to seek redactions, and if

23  you want to, then you'll know what page it is and if all we

24  literally need to do is redact a single name, you can make such

25  an application to me, and I will issue an order to that effect.

HaqWedwCredacted

```
 1            Let me go off the record for a minute.

 2            (Discussion off the record)

 3            THE COURT:  I think that's how we'll deal with that.

 4    That shouldn't be a problem.

 5            MR. DONNELLAN:  Perfect.

 6            The second thing is earlier when I said earlier we

 7    were going to produce documents on November 17, I just wanted

 8    to clarify that a bit.  In our discussions with plaintiff's

 9    counsel earlier we agreed, consistent with the Court's order,

10    that we would begin our production on the 17th and it would be

11    a rolling production.  We do anticipate making a substantial

12    production on the 17th that will include information from our

13    databases, but the review of emails may go on beyond that.  But

14    we will obviously be making production as soon as possible.

15            THE COURT:  When you say rolling, did Judge Torres

16    make some ruling in this regard?

17            MR. DONNELLAN:  Judge Torres' scheduling order

18    provides that our deadline to respond to phase II discovery

19    requests is on the 17th.

20            THE COURT:  Right.  That's right, from her order.  OK.

21            MR. BURSOR:  And your Honor, because of that, there

22    have been some delays in getting documents from third parties

23    as well.  I'm anticipating some delays with this rolling

24    production.

25            THE COURT:  Right.
```

HaqWedwCredacted

1          MR. BURSOR:  And I don't know what those delays are

2     going to be, but at some point it is very likely that we're

3     going to come to you to request scheduling relief because of

4     all these delays.

5          THE COURT:  Again, I think I will have to check with

6     Judge Torres about that.  I'm looking for her order now.  The

7     order she issued says you shall address all discovery disputes

8     to me.  I make a distinction between that and a referral from

9     her for general pretrial supervision, which would enable me to

10    extend discovery or whatever.  I would think in the first

11    instance a request of that kind should go to her since she's

12    the one who issued the schedule in the first place, and all she

13    has tasked me with is dealing with discovery disputes, not

14    scheduling matters.  If she wants to obviously refer that to

15    me, that's fine, but I think if you are going to seek that

16    relief, I would seek it from her in the first instance.

17         MR. BURSOR:  Understood.

18         THE COURT:  And then obviously if she wants me to

19    address it in part because it may be emanating as a result of

20    matters before me, I'm happy to deal with that.  But she could

21    have referred the case to me for more than simply discovery

22    disputes, and that's not what her order says.  OK?

23         Anything else?

24         All right.  Have a good evening, everyone.

25         (Adjourned)